UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------:

CHARLES JOHNSON,                  : Case No.: 23-cv-2441

             Plaintiff,      :

     v.                         :

CLEARVIEW AI, INC.,              : New York, New York

            Defendant.   : July 11, 2023

----------------------------:


TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE KATHERINE POLK FAILLA

UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff:          ALSTON & BIRD, LLP
                        BY: Steven Penaro, Esq.
                            Kristen Kuan, Esq.
                        90 Park Avenue
                        New York, New York 10016


For Defendants:         GORDON & REES LLP
                        BY:  Ronald A. Giller, Esq.
                             Mallory Benner, Esq.
                        18 Columbia Turnpike - Suite 220
                        Florham Park, NJ 07932


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

1          THE DEPUTY CLERK:  Your Honor, this is in

2    the matter of Johnson versus Clearview AI, Inc.,

3    et al.

4          Counsel, please state your name for the

5    record, beginning with plaintiff.

6          MR. PENARO:  Good morning, Your Honor.

7    Steve Penaro from Alston & Bird.  I'm joined by my

8    colleague, Kristen Kuan, and we're here on behalf of

9    plaintiff, Charles Johnson.

10         THE COURT:  Good morning, and thank you to

11   both of you.

12         And representing the defendants this

13   morning?

14         MR. GILLER:  Good morning.  It's Ron Giller

15   from Gordon & Rees, and I'm here with my colleague,

16   Mallory Benner.

17         THE COURT:  Okay.  Thank you as well.

18         Some of you on the docket may not yet have

19   entered notices of appearance.  If you will be going

20   forward in this case, I will ask you to file them

21   when you can.  This is our initial pretrial

22   conference in this case.  There is also a -- an

23   application for a dispositive motion, so we'll be

24   discussing that as well.

25         Mr. Penaro, if you'll just allow me the

1   indulgence, I've had a chance to read the complaint

2   and to read the parties' briefing.  From my

3   perspective, sir, I think that there are a lot of

4   details that I would have liked to know before going

5   forward with resolving the questions about the

6   adequacy of the pleadings, and -- which, perhaps,

7   suggests that the pleadings may not be fully

8   adequate.

9         I want to make clear that I do understand

10  the difference between Rule 8 and Rule 9(b), and I

11  do understand pleading standards, but particularly

12  with respect to the issue of disparagement or icing

13  your client out of business opportunities, I got the

14  sense that there were more conclusory statements

15  than actual allegations that I could properly

16  consider in the context of a 12(b)(6) motion.

17        Separately, there's at least one section --

18  it's paragraph 39 -- where the statement is that,

19  "upon information and belief," discovery will reveal

20  something.  And I found that to be a bit of a

21  tension because it would seem to me -- your client

22  knows who he referred, so I'm not sure why he's

23  asking who the agreements were with, but that

24  there's a tension between saying, my client is

25  giving referrals that are not being heeded -- and

1    that's one species of breach -- and my client has

2    given referrals that have led to business agreements

3    for which my client has not gotten the appropriate

4    commission, which seems to be the other side of

5    that.

6           So my point is, I -- there's a lot of

7    conclusory statements here.  I don't actually know

8    what's happening.  So perhaps you could begin by

9    telling me what really are your client's concerns

10   and what evidence he really has that this agreement

11   has been breached.  And I thank you very much for

12   allowing me that indulgence.  Go ahead, sir.

13         MR. PENARO:  Sure.  And, Your Honor, if I

14   might, maybe it's useful to provide some sort of

15   brief background before really getting into what

16   you're, I guess, focused on in terms of the

17   evidence, in terms of the breach of 5, Section 5,

18   and then the disparagement issue with 4(b).  But if

19   the Court will indulge me for a moment, I could give

20   you some background and start that way.

21         THE COURT:  Yes.

22         MR. PENARO:  Your Honor, this case, it's a

23   fairly simple case.  Mr. Johnson co-founded a

24   facial-recognition technology company called

25   SmartChecker with the defendants in or around

1  February of 2017.  About a year and a half later, in
2  November of 2018, the parties entered into what you
3  have before you, the wind-down agreement, under
4  which they agreed to transfer assets and shares of
5  the old company to this new company called
6  Clearview AI.
7          It was at this time that Mr. Johnson
8  relinquished -- and through this document, through
9  this wind-down agreement, that Mr. Johnson
10 relinquished his substantial ownership interests in
11 the old company, SmartChecker, for a smaller
12 interest in Clearview, but with a 10 percent
13 commission.  And he would get 10 percent commissions
14 on gross revenues when he introduced new customers
15 to Clearview that resulted in consummated sales.
16         Why would he make this trade?  Well,
17 Mr. Johnson, as an FBI informant, has close
18 connections and ties to the law enforcement
19 intelligence communities, was led to believe that
20 this would be a very lucrative arrangement, this
21 trade; otherwise, he wouldn't have exchanged his
22 substantial interests.
23         Going to the merits --
24         THE COURT:  I'm sorry, sir.  I'm going to
25 ask you to pause for just a second.  So far, a lot

1  of what you told me is in the complaint, but that's,
2  I suppose, okay.
3          Did you just say your client is an FBI
4  informant?
5          MR. PENARO:  He was a former FBI informant,
6  correct.
7          THE COURT:  I see.  Where I come from,
8  folks don't normally announce that, so -- but you
9  did.  So go ahead and tell me why that was going to
10  be useful.
11         MR. PENARO:  Just for the fact that he has
12  connections to -- close connections to law
13  enforcement and the intelligence community.
14         THE COURT:  I got it.
15         MR. PENARO:  And that's why --
16         THE COURT:  That's also -- sir, please.
17  That's also at paragraph 24 of your complaint, so I
18  guess there it was, too.
19         MR. PENARO:  Yep.
20         THE COURT:  I should have noticed it with
21  the read.  I think I was -- I'm just -- but it's now
22  out there again.  All right.
23         So go ahead.  Former informant, ties to law
24  enforcement, and?
25         MR. PENARO:  Right.  And I bring -- I raise

1    that because, again, when we're talking about the

2    breaches here, and maybe more to your question,

3    Judge, where is the evidence, the answer is, it's

4    with the defendants.  And I understand your concern

5    that there are companies and entities, law

6    enforcement agencies, intelligence community members

7    that we know that we made introductions, and they

8    are not apparently in the complaint.

9            You know, the -- you know, for example, we

10   made introductions to the NSA and multiple police

11   departments in Texas and many police departments in

12   Florida, including Miami-Dade County.  We have tried

13   to reach out to those agencies, those affiliates,

14   and it turns out that many of the contacts that

15   Mr. Johnson had are no longer with those companies.

16   And likewise, given the nature of the technology at

17   issue here, facial-recognition software, there's

18   kind of a shroud of confidentiality that pertains to

19   these contracts and these agreements.  So it's not

20   as simple as calling up a lead and saying, hey, I

21   know I introduced you to Clearview two years ago,

22   what happened with that?  In many instances, those

23   individuals are not there.  And if they are, they

24   have no incentive to answer our phone calls or to

25   provide us with the consummated contracts due to

1    confidentiality concerns.  So...

2           THE COURT:  Okay.  Then what is your basis

3    for arguing that some subset of those people your

4    client referred did, in fact, enter into agreements

5    with Clearview AI?

6           MR. PENARO:  Well, we're aware -- and to

7    use the police departments that I just referenced,

8    Texas and in Florida -- we're aware that many of

9    these police departments use Clearview AI, including

10   Miami-Dade County.  And so the introductions that

11   Mr. Johnson made were with the exact sorts of

12   customers that Clearview sells its products to in

13   the same regions, the same law enforcement agencies,

14   many of which we know use the technology.  And so

15   we -- we're --

16          THE COURT:  Sure.  Although, the -- again,

17   sir, the possibility exists that there's someone in

18   the Clearview family who, him or herself, had

19   alternate connections to these agencies.  I don't

20   think you're suggesting that your client is the one

21   person who could have put Clearview in touch with

22   the Miami-Dade Police Department.  Or is that your

23   argument?

24          MR. PENARO:  I -- of course, there is a

25   possibility, Your Honor, that folks at Clearview

1   could have directly reached out to these law

2   enforcement agencies.  But, again, going back to the

3   FBI informant issue that you raised at the outset,

4   that's why this was an appealing or lucrative

5   arrangement.  My client had those contacts, those

6   law enforcement contacts, and that is where

7   Clearview was selling its product.

8       So, yes, of course -- I don't want to speak

9   in absolutes -- it is possible that Clearview may

10  have reached out to these folks on its own, but that

11  was the value add that my client brought.

12      THE COURT:  Okay.  But other than

13  Miami-Dade, are you aware of any other agency or

14  police department who is using Clearview that you

15  believe is as a consequence of your client

16  introducing them?

17      MR. PENARO:  Again, we don't know for

18  certain, otherwise we would have certainly put it in

19  the complaint.  But we believe that there are

20  several police departments, particularly in Texas

21  and in Florida, that we've heard through others that

22  are using or have used Clearview's software,

23  Clearview's product.  Which ones exactly we don't

24  know.  And that is why, as we put in the papers, we

25  think discovery is going to be incredibly useful

1    here.

2            And, in fact, you know, we did ask before

3    this lawsuit was initiated.  We said -- we reached

4    out and said, hey, can you provide us -- can you let

5    us know, you know, who you consummated contracts

6    with.  And they said, we -- you know, we don't have

7    any of those contracts.  We asked them for an

8    affidavit, and that request was not met with an

9    affidavit.  So we think that we need discovery here

10   to get -- to get at those consummated contracts.

11           THE COURT:  Okay.  All right.  Please

12   continue, sir.

13           MR. PENARO:  Well, I think, hopefully, that

14   addresses your concern, Your Honor, as to the -- I

15   guess, what was styled in the papers of the "upon

16   information and belief argument" pertaining to the

17   breach of Section 5, the sales commission piece.

18           With respect to the breach of Section 4(b),

19   the disparagement issue, that, I think, is a little

20   bit more straightforward.  Section 4(b) -- and I

21   have in front of me here -- of the wind-down

22   agreement states that the individual defendants

23   agree that at no time during the restricted period,

24   which is a period of two years following the

25   November 2018 wind-down agreement -- so they agree

1    that during that restricted period shall the

2    individuals -- I'm skipping ahead a little -- make

3    or cause or assist any other person to make any

4    statement or other communication to any third party

5    which impugns or attacks or is otherwise critical of

6    the reputation, business or character of the company

7    or, importantly, any of its representative

8    directors, officers, representatives, agents or

9    employees. Mr. --

10        THE COURT: And that's -- sir, one moment,

11    please, sir.

12        I actually thought you were relying on the

13    next sentence, where the company agreed it wasn't

14    going to attack the business or character, any of

15    the individuals, with your client being defined

16    among the individuals, correct?

17        MR. PENARO: Well, no. I would argue that

18    our client -- my client was most -- you know, at the

19    very least, an agent. He was an owner of the

20    company when certain remarks were made. He was an

21    owner of the -- 10 percent owner of Clearview. I

22    believe, up through and including October of 2021,

23    he was a 10 percent owner.

24        He also, like I said, was per -- you know,

25    through paragraph 5, was providing services, and

1    that's where the sales commission piece came in.  So

2    at the very least, he was an agent, but I would

3    submit that he -- you know, whether he's an agent or

4    owner, again, I would submit that's a factual issue

5    that would not warrant the grant of a motion to

6    dismiss at this juncture.  But --

7         THE COURT:  Okay.  Mr. Penaro, please stop

8    because I think you're not understanding me.  My

9    point is a little bit different, which is -- I

10   understood the sentence that you were reading to

11   talk about individuals, which might be Mr. Schwartz

12   or Mr. Ton-That or in -- would proscribe them from

13   saying anything derogatory about an agent of the

14   company or an employee of the company, which you say

15   your client is.

16        But I'm looking at the next sentence, which

17   says the company -- which I understand to be a

18   defendant in this case, is it not -- is not able to

19   say anything bad about any of the individuals, which

20   includes your client directly.  Are you not

21   proceeding under that sentence?

22        MR. PENARO:  Well, we're proceeding against

23   the individuals on the breach of Section 4(b).

24        THE COURT:  I see.  Okay.  All right.

25        MR. PENARO:  Yeah.  That claim is just

1    against the individuals, Your Honor.  I think that's

2    clearly pled in the complaint.  If you look at --

3    and I'll just -- if you allow me to open the

4    complaint, you'll see Cause of Action 2, breach of

5    contract against the individual defendants, and it's

6    on page -- it's right above paragraph 56 on page 10.

7              THE COURT:  Okay.  All right.  So what, in

8    fact, was said bad -- what bad things were said

9    about your client?

10             MR. PENARO:  That he wasn't a co-founder of

11   Clearview.  And again, in a vacuum, that might not

12   sound like the worst thing in the world, but it,

13   kind of, colors my client as a liar.  It ruins his

14   reputation in the public where he is telling people

15   that he helped co-found a leading facial-recognition

16   company.  And then you have the other co-founders

17   basically saying, I don't know what you're talking

18   about.  He didn't do this with us, and the documents

19   suggest otherwise.

20             So, really, you know, he -- my

21   understanding is he made some other remarks, or they

22   made some other remarks.  Well, at the core of it,

23   Your Honor, is the fact that they denied his role as

24   co-founder of Clearview publicly.

25             THE COURT:  I see.

1          MR. PENARO:  And they did this in

2    *The New York Times*.

3          THE COURT:  They did this in *The New York*

4    *Times*?  Okay.

5          MR. PENARO:  That's my understanding.

6          THE COURT:  All right.  Sir, as has been

7    suggested by my questions, one of the things I'm

8    going to do after speaking with you is to speak to

9    defense counsel and ask them whether they are hell

10   bent, as it were, on pursuing their motion to

11   dismiss.

12         Before I were to schedule a motion to

13   dismiss, I certainly want to give your client an

14   opportunity to amend the pleadings if you and your

15   client thought that was a thing to do.  So is that

16   something you're interested in doing, sir, if I

17   cannot persuade the folks on the other side of the V

18   to refrain from bringing a motion to dismiss?

19         MR. PENARO:  Yes, Your Honor.  Obviously,

20   I'd want to discuss it with the client, but I would

21   counsel them to the extent that we could -- it's --

22   what I'm hearing from Your Honor is that, to the

23   extent we could put in some more specifics here,

24   that would go a long way in potentially obviating

25   the need for motion practice at this stage, and so

1    that's how I would phrase it to my client.  And to

2    the extent that we can include some more specifics,

3    then that would be -- I think that would be useful

4    and maybe get -- you know, prevent this detour of

5    the motions.  Yes, that is something we --

6         THE COURT:  Yeah, well -- and to be clear,

7    sir, I can -- I can't promise that that will

8    forestall the motion.  I just --

9         MR. PENARO:  Understood.

10        THE COURT:  I do think it might make it --

11   it might make it a little bit easier for me to

12   decide it.  I do -- I think I've made clear what I

13   think are, you know, some issues.

14        But let me ask a related question, and this

15   is just a question for which hope springs eternal.

16   It's your -- at this stage, sir, is there any

17   utility -- my sense is no -- in early ADR in this

18   case?  My sense is you guys would have tried to do

19   this before the lawsuit was brought, but I'll ask.

20        MR. PENARO:  Speaking on behalf of

21   plaintiffs, I think we would certainly consider

22   that.  You're right, we did try at a high level,

23   settlement discussions.  There was a prior counsel

24   involved before that discussions didn't go anywhere.

25        I don't want to speak for anyone,

1    Mr. Giller, on your side of the V, but we would be

2    amenable to ADR proceedings.

3         THE COURT:  Okay.  All right.  Let me

4    then -- sir, I don't want to cut you off if there's

5    anything else you'd like me to know, but at this

6    time, I'd like to turn to defense counsel.

7         MR. PENARO:  Sure.  Nothing else at this

8    point, Your Honor.

9         THE COURT:  Okay.  Mr. Giller, I appreciate

10   your patience, sir, and let me hear from you at this

11   time.

12        MR. GILLER:  Hi, Judge.  I appreciate that.

13        So you've hit on a lot of the things that

14   we've been struggling with, with this complaint and

15   the reason we sent the letter in.  I don't believe

16   that plaintiff is somebody intended by this contract

17   to be covered by 4(b).  I think it's pretty clear.

18   And the argument that's not in the complaint, but

19   which is what he's making in his papers, that

20   counsel is making in his papers and argued to you

21   now, is the agency argument, but it's not pled.

22   There's no pleading here about Mr. Johnson having

23   any ability to bind the company or any kind of

24   transfer of authority from the company over to him.

25        And any of the indicia of agency is not in

the complaint.  So, one, that's why I didn't address
it in my moving papers, because I didn't expect that
to be their argument.  But even now hearing it, it's
not here, so, you know, I still think that's a fatal
flaw to this first part of the -- you know, this
Count 2 against the individual.  He's not
somebody -- the other thing that I didn't mention,
because I didn't know this was their argument, but
in 4(d) it talks about that these covenants that
they're relying upon for their claim are necessary
to protect the company's confidential and
proprietary information in goodwill, not an
individual like Mr. Johnson.

        And then in 4(e), it goes on to talk about
that if the parties breach Section 5, the company
shall be entitled, in addition to and without
limitation, all the remedies.  So clearly, this
section is designed to protect the company, not
Mr. Johnson, an individual who had a contract, you
know, that he was going to get paid on if he
actually referred potential customers.  So with
respect to Count 2, I don't think there's any basis
for that.

        Similarly, on Count 1, you know, again, you
struck on the thing that has troubled us, which is

1    they would know if some -- they're claiming there
2    was a breach of this contract.  If they're claiming
3    there was a breach, then they have to know that
4    there was somebody that signed up with my client and
5    they were not paid on.  I can tell you, based upon
6    my investigation and speaking to my client, there is
7    nobody.  But I understand that's, you know, a
8    factual issue on that part.  But as a pleading
9    matter, if they had somebody, then they would have
10   pled it.  It wouldn't be on information and belief.
11   And, you know, my client shouldn't have to defend
12   something in the hypothetical world of, you know, if
13   there was somebody out there.  Well, if they know of
14   somebody, then they should have pled that.  And
15   then, as I understand it, there isn't anybody.
16           THE COURT:  Well, what about the Miami-Dade
17   Police Department, sir?
18           MR. GILLER:  This is the first -- you know,
19   Counsel and I have had a number of conversations.
20   This is the first I'm hearing about an allegation of
21   Miami-Dade, so I -- I don't want to speak, you know,
22   beyond what I've just said, but I'm not aware of
23   anybody signing a contract that was referred by
24   Mr. Johnson.  I will certainly investigate
25   Miami-Dade, but unless this is something that just

1   happened, which I really doubt, I don't think

2   there's anything to that either.

3               THE COURT:  Well, do you want to respond --

4               MR. GILLER:  That's easy enough for me to

5   check.

6               THE COURT:  Okay.  Well, sure, except I

7   wouldn't be able to consider it, but I appreciate --

8   I appreciate you, just for Rule 11 reasons, checking

9   this out.

10              But do you -- would you be able to speak,

11  sir, to the comments that Mr. Penaro was making, for

12  example, about his client's ties to law enforcement

13  and, sort of, this secrecy that would inhere in --

14  for any number of reasons, in people disclosing the

15  agreements they had entered into with Clearview?

16              I mean, he's basically saying --

17              MR. GILLER:  Again, this is the first time

18  I'm hearing this.

19              THE COURT:  Sure.  He's basically saying

20  the value that he -- "he," Mr. Johnson -- added was

21  to put you-all -- the defendants here -- in touch

22  with a number of law enforcement agencies or

23  officers.  And is it the -- I mean, would you agree,

24  sir, at the very least, that Mr. Johnson did give

25  your client's names or referrals?

1           MR. GILLER:  I under -- my understanding is

2     there were some referrals.  It was not a significant

3     number.  And those referrals did not lead to any

4     consummated contracts with a single exception of

5     one -- I think it's an airport, maybe, that is in

6     the works, but has not paid any money.

7           So there's one possibility, not even an

8     actual one.  And if that one came to fruition and

9     fit within the contract, the company absolutely

10    planned to pay on it if that was the case, but I'm

11    not aware of any others based upon the investigation

12    I've done to date.

13          THE COURT:  Did you advise Mr. Penaro that

14    there -- about the airport, about the possibility of

15    one of these referrals bearing fruit?

16          MR. GILLER:  It hasn't borne fruit, so

17    there hasn't been a reason for this to have come up.

18    And we've been in this --

19          THE COURT:  Of course.

20          MR. GILLER:  You know, at this point, that

21    hasn't been something that's been part of the

22    discussions.  No.

23          THE COURT:  All right.  Let me ask a

24    different question, sir.  And if you believe it's

25    not something I should know, then you will tell me

1   that.

2           When Clearview AI is signing up clients, is

3   it the case that there's some indication in signing

4   up the client as to how this client came to be a

5   client of Clearview AI, such that there would be a

6   space somewhere to indicate whether it was a

7   referral from Mr. Johnson or not?

8           MR. GILLER:  I can't speak to that, Judge.

9           THE COURT:  Okay.  All right.  Because he

10  says, if only he had discovery, he would know.  He

11  would be able to recognize your clients as folks he

12  had introduced you to.

13          MR. GILLER:  I appreciate that, but, you

14  know, we're in federal court.  He filed a complaint

15  saying we breached the contract -- my client

16  breached the contract, but it's all on information

17  and belief.  He has no information that it actually

18  happened, so that's not how this works.  I mean, he

19  shouldn't be able to proceed on this claim if he has

20  no basis for it.

21          THE COURT:  All right.  What about -- would

22  you acknowledge -- and the answer may be no -- that

23  your client may have said that Mr. Johnson did not

24  have an involvement in the development or the -- the

25  formation of Clearview AI?

1          I mean, I was wondering what the
2    disparaging comment was, and I was just told by
3    Mr. Penaro that the disparaging comment was that he
4    was not a founder of Clearview.  Do you know any --
5    can you speak to that issue at all, sir?
6          MR. GILLER:  I can speak to the -- well,
7    let me address this a little more directly.
8          One, I think there have been some comments.
9    I don't know specifically which one he's referring
10   to because, from reading the complaint, it sounds
11   like there were disparaging comments, but clearly,
12   hearing this, there were not.
13         There may have been some comments about
14   this.  I don't know specifically what is being
15   referred to.  I do know that Mr. Johnson himself is
16   a prolific social media poster and frequently posts
17   negative comments about the company to the point
18   that my client has asked me to investigate whether
19   we want to file a defamation action.
20         And just to take it a step further -- and
21   this is no reflection upon Counsel, but Mr. Johnson
22   was tweeting negative things about me personally as
23   the attorney for the defendants.  So he is
24   prolifically out there posting negative things.
25   It's not part of this case.  I'm just putting this

1    in some context.  So I don't know exactly which

2    comment.  If they want to show it to me, I'm happy

3    to take a look at it, but it's not pled, and I

4    haven't seen it.

5         THE COURT:  Okay.  All right.  And, well,

6    if you -- if -- does your client hold the view that

7    Mr. Johnson was not a founder of Clearview?

8         MR. GILLER:  I need to investigate that a

9    little more.  I know that they don't have -- share

10   the same view about his involvement in the company.

11   I think their view is -- again, I don't want to

12   speak too far out of school here.

13        THE COURT:  Of course.

14        MR. GILLER:  I think their view is that his

15   role was much more limited than he believes his role

16   was.

17        THE COURT:  I see.  But it -- you're taking

18   the position, sir, that saying that is not

19   disparaging.

20        MR. GILLER:  Correct.  I am taking that

21   position.  I also don't know what the actual

22   statement is that they're referring to, so it's hard

23   for me to, sort of, address whether I think it's

24   disparaging or not.

25        THE COURT:  Okay.  Fair enough.

1          As I suggested in my conversations with

2    Mr. Penaro, I did want to get a sense, Mr. Giller,

3    whether you were -- and I used the expression "hell

4    bent" on filing a motion.  It sounds like you may

5    be, but I also do want to examine whether there is

6    any utility in sending the parties to mediation or

7    to a settlement conference before any amended

8    complaint is filed and any motion scheduled.

9          Again, please understand, sir, I don't have

10   a sense of what happened before the complaint was

11   filed, so, for all I know, you-all could have been

12   talking about settlement for years and just didn't

13   work out or -- or not.  So tell me, please, your

14   thoughts about motion practice, even after

15   amendment, and about settlement.

16         MR. GILLER:  Well, I will say, if you're

17   asking me personally, after seeing negative tweets

18   about me from the plaintiff, that did make me a

19   little more hell bent on filing a motion.

20         THE COURT:  Okay.

21         MR. GILLER:  But from my client, which is

22   more important, they're the ones driving the

23   decision-making on that.  They feel very strongly

24   that there should not be a case here.  They don't

25   feel that they breached the contract.  They don't

1    feel they made a disparaging statement.  So, yes,

2    they would like a motion to be filed.

3              THE COURT:  Okay.  This, I understand.

4              And does that also -- for that reason, sir,

5    that means that you're not interested in this time

6    in a -- your clients, not you, sir, personally --

7    but your clients are not interested in ADR at this

8    time?

9              MR. GILLER:  We -- Mr. Penaro and I had

10   some friendly discussions beforehand about seeing if

11   there was any room for settlement.  And after some

12   back and forth, it didn't look like at that point

13   there was.  I'm happy to take it back to them, but,

14   you know, my last instruction was, you know, we

15   would like to knock this out, or as much of it out

16   as we can first.

17             THE COURT:  I'm sorry.  Just if you could

18   explain something to me, when you say you had some

19   friendly discussions with Mr. Penaro, I'm, of

20   course, appreciative of that.  You thought that

21   there was some possibility of settlement, sir?

22   Should I -- should I --

23             MR. GILLER:  No.  There -- sorry.

24             THE COURT:  No?  Oh, okay.

25             MR. GILLER:  No, there was not at that

1    point.

2           THE COURT:  Thank you.  That's what I --

3    that's the clarity that I needed.  Not at this time.

4    Okay.

5           Well, obviously, I will not stop the

6    parties from continuing to have those discussions,

7    and perhaps those discussions would be aided by a

8    resolution of a dispositive motion.

9           Mr. Penaro, sir, may I have a sense,

10   please -- and it's not my interest in, for example,

11   wrecking anyone's summer plans.  May I have a sense

12   of how much time you would like to file an amended

13   complaint, or at least to discuss the possibility

14   with your client, and if in agreement, to file an

15   amended complaint.

16          MR. PENARO:  Sure, Your Honor.  Excuse me.

17   Looking at a calendar here as I pull that up.  I'm

18   actually on vacation next week, but two to three

19   weeks, maybe the first week of August, if that

20   works.

21          THE COURT:  Okay.  That will work for me.

22   That's the -- let's say the 4th on that Friday, the

23   4th of August for the amended complaint.  All right.

24          And, Mr. Giller, sir, about how much time

25   would you like for your opening brief?

1          MR. GILLER:  Trying to remember when I'm

2    supposed to be taking vacation.  I'm not sure which

3    week it is, but it's either the week of the 14th or

4    the 21st.  I mean, could we say the 25th to give me

5    enough wiggle room there?

6          THE COURT:  Well, see, I was going to give

7    you, like, September 1st or September 8th.

8          MR. GILLER:  Oh, that would be -- yeah, if

9    we could do that just because I'm -- one of those

10   weeks -- I know I'm away those last two weeks.

11         THE COURT:  Okay.  Let's -- okay.  Let's

12   say September 8th.  Okay.  Thank you.  All right.

13         Mr. Panero, could I have your opposition by

14   October 6th?

15         MR. PENARO:  I'm looking at a calendar

16   here, Your Honor.

17         I think that's fine.

18         Ms. Kuan, who's also on the line, do you

19   have any issue with the October 6th deadline?

20         MS. KUAN:  That's fine with me.  Thank you,

21   Your Honor.

22         THE COURT:  Okay.  Much appreciated.  Thank

23   you.

24         And then the reply brief, if there is

25   one -- and that's not -- I'm not encouraging it, but

1    I have to at least provide for it, October 20th for
2    the reply.
3              MR. GILLER:  Okay.  That sounds good.
4              THE COURT:  Okay.  Great.  All right.
5              So we will -- in the minute entry for
6    today's conference, we'll put this new schedule in
7    there.  And I do appreciate everyone coming to this
8    conference prepared and helping me understand a
9    little bit more about this case.  All right.
10             Mr. Penaro, from my perspective, sir, I've
11   addressed the things that I wanted to, but if there
12   is an issue that you'd like to discuss with me,
13   please do so now.
14             MR. PENARO:  Thank you for your time,
15   Your Honor.  I don't think we have anything else at
16   this time.
17             Kristen -- or, Ms. Kuan, rather, do you
18   need anything?
19             MS. KUAN:  Nothing for me.  Thank you,
20   Your Honor.
21             THE COURT:  All right.  And, yeah, this is
22   my hint to the associates or the junior folks in
23   this case, you should get to speak next time, I
24   think.
25             Mr. Giller, anything else I should know

1  today?

2        MR. GILLER:  No, but I agree.  And next

3  time, Ms. Benner will be doing some speaking, I

4  promise.  No, nothing else.

5        THE COURT:  All right.

6        MR. PENARO:  Likewise.

7        THE COURT:  Okay.  All right.  I'm looking

8  forward to that.  I thank you.  All right.

9        With that, we are adjourned.  Thank you so

10 much.  I wish you well.  And to the extent you are

11 taking some time off this summer, I wish you an

12 enjoyable vacation.  We're adjourned.  Thanks.

13       MR. GILLER:  Thank you, Judge.

14       MR. PENARO:  Thank you.

15

16                        0o0

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      I, Adrienne M. Mignano, certify that the

4    foregoing transcript of proceedings in the case of

5    Johnson v. Clearview AI; Docket #22CV2441 was

6    prepared using digital transcription software and is

7    a true and accurate record of the proceedings.

8

9

10   Signature   ___*Adrienne M. Mignano*___

11                ADRIENNE M. MIGNANO, RPR

12

13   Date:        September 7, 2023

14

15

16

17

18

19

20

21

22

23

24

25

              AMM TRANSCRIPTION SERVICE - 631.334.1445