UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES JOHNSON,

                              Plaintiff,

                    -v.-

CLEARVIEW AI, INC.; HOAN TON-THAT;
and RICHARD SCHWARTZ,

                              Defendants.

23 Civ. 2441 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        In early 2017, Plaintiff Charles Johnson founded a facial recognition
technology company, SmartCheckr, LLC ("SmartCheckr"), with Defendants
Hoan Ton-That and Richard Schwartz (together, the "Individual Defendants").
Over the years, the parties' relationship soured, such that the Individual
Defendants ultimately sought to wind down SmartCheckr and transfer its
assets to a new company, Defendant Clearview AI (also the "Company," and
together with the Individual Defendants, "Defendants").  The dissolution of
SmartCheckr was formalized in a Wind-Down Agreement, pursuant to which
Plaintiff was given a ten-percent ownership stake in Clearview AI and the right
to receive certain commissions on Clearview AI's sales, to the extent that an
introduction made by him led to a sale of Clearview AI's software or services.

        More than four years after the execution of the Wind-Down Agreement,
Plaintiff brought the instant action, principally alleging that both the Individual
Defendants and Clearview AI had breached their obligations under that
agreement.  Before the Court is Defendants' motion to dismiss three of the four

causes of action set forth in Plaintiff's Amended Complaint.  For the reasons
set forth below, the Court grants Defendants' motion in full.

**BACKGROUND**[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff is a citizen and resident of Virginia.  (AC ¶ 8).  Plaintiff formerly
served as the Co-President and Chief Strategic Officer of SmartCheckr, a now-
defunct New York limited liability company.  (*Id.* ¶¶ 9, 20).

Defendant Clearview AI is a Delaware corporation.  (AC ¶ 9).  It is the
successor company to SmartCheckr.  (*Id.*).  The Individual Defendants are each
a part-majority owner of, and have a controlling interest in, Clearview AI.  (*Id.*
¶¶ 10-11).  Both Individual Defendants are citizens of New York.  (*Id.*).

#### 2.    The Founding of SmartCheckr LLC

On or about February 24, 2017, Plaintiff and the Individual Defendants
co-founded a facial recognition technology company called SmartCheckr, LLC.
(AC ¶ 19).  Plaintiff initially approached Defendant Ton-That in early 2016
about the possibility of starting such a company (*id.* ¶ 17), and thereafter

---

[1]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #25)), the well-
pleaded allegations of which are taken as true for purposes of this Opinion.  *See
Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on a
copy of the parties' Wind-Down Agreement, which is incorporated by reference as
Exhibit A to the Amended Complaint (Dkt. #25-1 ("WDA")).  *See DiFolco* v. *MSNBC Cable
L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that, on a motion to dismiss, courts
may consider documents incorporated by reference and documents integral to a
complaint).

For ease of reference, the Court refers to Defendants' memorandum of law in support of
their motion to dismiss as "Def. Br." (Dkt. #31); to Plaintiff's memorandum of law in
opposition to Defendants' motion as "Pl. Opp." (Dkt. #32); and to Defendants' reply
memorandum of law as "Def. Reply" (Dkt. #33).

introduced Ton-That to Defendant Schwartz (*id.* ¶ 18).  Through SmartCheckr, Plaintiff and the Individual Defendants sought to become leaders in the field of facial recognition technology, specifically by selling their software to law enforcement agencies.  (*Id.* ¶ 19).

For the first year-and-a-half after SmartCheckr's founding, Plaintiff served as SmartCheckr's Co-President and Chief Strategic Officer, with Ton-That serving as its Chief Executive Officer and Schwartz as its Co-President and Chief Operating Officer.  (AC ¶¶ 20-21).  Throughout this time, Plaintiff made substantial contributions to the company by, *inter alia*, raising money, recruiting talent, and making key policy and management decisions.  (*Id.* ¶¶ 21-23).  Plaintiff alleges that he provided significant value to SmartCheckr, in part by leveraging relationships in the intelligence and law enforcement communities that he had cultivated while serving as a confidential informant for the Federal Bureau of Investigation.  (*Id.* ¶ 24).  Plaintiff also introduced Ton-That to several individuals who ultimately became investors in and board members of SmartCheckr.  (*Id.* ¶ 25).

### 3.    **SmartCheckr Becomes Clearview AI**

In 2018, the Individual Defendants set out to limit Plaintiff's role in their shared company.  (AC ¶¶ 29-30).  Specifically, the Individual Defendants initiated the process of winding down SmartCheckr and transferring its assets to a new company, Defendant Clearview AI.  (*Id.* ¶ 29).  On or about November 24, 2018, the parties entered into an agreement, pursuant to which

"SmartCheckr … [was] dissolved with immediate effect and its affairs wound up" (the "Wind-Down Agreement").  (*Id.* ¶ 31).

The Wind-Down Agreement allotted Plaintiff only a ten-percent interest in the surviving company (a small percentage compared to his thirty-three-percent stake in SmartCheckr).  (AC ¶ 32 (citing WDA ¶ 2)).  In return, the Wind-Down Agreement provided Plaintiff with the right to receive a ten-percent commission (the "Sales Commissions") on sales of Clearview AI's software and services

> to the extent [Plaintiff] introduce[d] [Clearview AI] to potential customers with whom [Clearview AI] was not previously in contact, and such introduction le[d], in fact, to a sale of [Clearview AI's] software or services[.]

(*Id.* ¶ 33 (citing WDA ¶ 5)).

The Wind-Down Agreement also contained a restrictive covenant, pursuant to which Plaintiff and the Individual Defendants each agreed not to

> make, or cause or assist any other person to make[,] any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of [Clearview AI], or any of its respective directors, officers, representatives, agents[,] or employees.

(AC ¶ 34 (citing WDA ¶ 4(b)).  This covenant (the "Anti-Disparagement Provision") was enforceable for the duration of the so-called "Restricted Period," which extended through the time that Plaintiff and the Individual Defendants remained stockholders in Clearview AI, plus two years thereafter.  (*Id.* ¶¶ 34-35 (citing WDA ¶ 4(a)).

### 4. Defendants' Alleged Failure to Pay Sales Commissions

Following the execution of the Wind-Down Agreement, Plaintiff "spent significant effort in connecting Clearview AI with numerous motivated customers interested in Clearview AI's products and services," hoping to collect Sales Commissions as set forth in the Wind-Down Agreement. (AC ¶¶ 36-38). For instance, Plaintiff introduced Clearview AI to Matty Beckerman, an affiliate of the Miami-Dade Police Department, and to Sheriff Ryan Gable, an employee at the Texas Department of Public Safety. (*Id.* ¶¶ 39-40). Plaintiff asserts that Clearview AI consummated contracts with at least the Miami-Dade Police Department and the Texas Department of Public Safety — and potentially several other individuals and entities — as a result of Plaintiff's introductions. (*Id.* ¶ 45).

Plaintiff claims that he cannot himself confirm whether these (or any other) contracts were consummated, given general confidentiality concerns and the fact that many of his contacts are no longer employed at the respective public agencies at which they once worked. (AC ¶¶ 41-42). To that end, Plaintiff has repeatedly asked Defendants for copies of the sales agreements that resulted from his introductions. (*Id.* ¶ 43). Defendants, however, have taken the position that Clearview AI's records reflect no agreements for the sale of its software or services that resulted from Plaintiff's introductions. (*Id.*).

Plaintiff also asserts that, on top of failing to pay Plaintiff the Sales Commissions he is duly owed, Defendants have also intentionally ignored or refused to do business with potential customers who were introduced to them

by Plaintiff, "want[ing] to distance themselves from [Plaintiff]" altogether.  (*Id.*
¶ 47).  In Plaintiff's view, Defendants have succeeded in "remov[ing] [Plaintiff]
from [Clearview AI's] [sales] process ... rendering his ability to collect the
contractually agreed-upon Sales Commissions impossible."  (*Id.* ¶ 46).
According to Plaintiff, "[t]he only explanation is that Defendants wanted to
prevent [him] from realizing the Sales Commissions rightfully owed to him
under the Wind-Down Agreement and pocket those revenues [for themselves]."
(*Id.* ¶ 49).

### 5.   The Alleged "Campaign of Lies and Disparagement" Against Plaintiff

Separate and apart from the issue of the unpaid Sales Commissions,
Plaintiff alleges that, after the execution of the Wind-Down Agreement, the
Individual Defendants "further distance[d] themselves from [Plaintiff] through a
campaign of lies and disparagement."  (AC ¶¶ 50, 55-57).  By way of example,
the Individual Defendants were credited as sources in two articles published by
*The New York Times* in March 2021 that diminished Plaintiff's role in the
founding of Clearview AI.  (*Id.* ¶¶ 51-53).  Further, Plaintiff claims that
Defendant Ton-That has "continuously den[ied] [Plaintiff]'s co-founding role in
Clearview AI to a myriad of individuals, including David Scalzo (investor in
Clearview AI), David Ulevitch (venture capitalist at Andreessen Horowitz), Ryan
Petersen (venture capitalist), John Burbank (venture capitalist), and Cyan
Banister (former partner at Founders Fund)."  (*Id.* ¶ 54).  Although Plaintiff has
repeatedly asked the Individual Defendants to correct their false and
disparaging statements, his requests have been rebuffed.  (*Id.* ¶¶ 58-59).

According to Plaintiff, "[t]he disparaging and false comments made by the Individual Defendants irreparably damaged [Plaintiff's] reputation by painting [him] as a liar within the artificial intelligence community and venture capital industry[.]" (AC ¶ 60). Moreover, because the Individual Defendants made the comments during the Restricted Period (which ended in March 2023), they constituted an express violation of the Wind-Down Agreement's Anti-Disparagement Provision. (*Id.* ¶¶ 50, 55-57).

## B.    Procedural Background

Plaintiff filed the initial complaint in this action on March 22, 2023. (Dkt. #1). On May 26, 2023, Defendants filed a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. #12). The Court granted Defendants' request (Dkt. #14), and a pre-motion conference was held on July 11, 2023 (*see* July 11, 2023 Minute Entry).

At the July 11, 2023 conference, the Court set forth a schedule for the briefing on Defendants' anticipated motion to dismiss. (July 11, 2023 Minute Entry; Dkt. #27 (transcript)). The Court also provided Plaintiff with the opportunity to amend his complaint prior to motion practice. (*Id.*). Plaintiff accordingly filed an amended complaint (the "Amended Complaint") on August 4, 2023. (Dkt. #25). Thereafter, Defendants filed the instant motion to dismiss the Amended Complaint on September 25, 2023 (Dkt. #29-31); Plaintiff filed his opposition to Defendants' motion on October 6, 2023 (Dkt. #32); and

7

Defendants filed a reply in further support of their motion on October 20, 2023 (Dkt. #33).

While not pertinent to the instant motion, the Court notes that, on multiple occasions after July 2023, Defendants' counsel has brought to this Court's attention certain posts made by Plaintiff on his social media accounts. (*See* Dkt. #21-24, 34-39). These posts have remarked on Defendants, Defendants' counsel, and this litigation, and have included, *inter alia*, seemingly antisemitic remarks directed at Defendants' counsel (*see, e.g.*, Dkt. #21), and unsupported accusations regarding the childhood sexual abuse endured by one of the Individual Defendants (*see, e.g.*, Dkt. #34). In view of the limitations imposed upon its power by the First Amendment, this Court has refrained from formally sanctioning Plaintiff for his conduct, instead relying upon Plaintiff's counsel to impress upon Plaintiff the impropriety of his actions. (*See* Dkt. #22, 24, 36, 39).

## DISCUSSION

### A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Generally speaking, when considering the adequacy of a complaint upon a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must (i) accept all of the complaint's factual allegations (but not legal conclusions) as true, and (ii) determine whether it states a "plausible" claim for relief. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009). In doing so, the court must always "draw all reasonable inferences in the non-movant's favor." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Put another way,

the court's task is to "assess[] the legal feasibility of the complaint," not "weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

At the motion to dismiss stage, a court may consider only "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *accord Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016). However, "where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' [rendering] the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

## B.    Analysis

The Amended Complaint brings four causes of action. Count One alleges breach of contract against Clearview AI, on account of Clearview AI's "breach[] [of] its obligation to pay [Plaintiff] the Sales Commission for every introduction of new customers that [Plaintiff] made that led to sales of Clearview AI software or services." (AC ¶¶ 61-67). Count Two alleges breach of contract against the Individual Defendants, owing to the "breach[] [of] their obligations under the Wind-Down Agreement to not make any statements that were critical of

[Plaintiff]'s reputation and character," *i.e.*, the Anti-Disparagement Provision. (*Id.* ¶¶ 68-74).  Count Three alleges breach of the duty of good faith and fair dealing against all Defendants, on account of their "knowingly and substantially impairing [Plaintiff]'s rights under the Wind-Down Agreement," in particular by (i) "arbitrarily refus[ing] to negotiate with [Plaintiff]'s contacts"; (ii) "spread[ing] false information denying [Plaintiff]'s role" in developing Clearview AI; and (iii) "upon information and belief, conceal[ing] consummated contracts that resulted from [Plaintiff]'s introductions." (*Id.* ¶¶ 75-79).  Finally, Count Four alleges unjust enrichment against Clearview AI, which Plaintiff "ple[ads] in the alternative to [his] breach of contract and breach of the duty of good faith and fair dealing claims." (*Id.* ¶¶ 80-86).

Defendants' motion seeks to dismiss Counts Two, Three, and Four only. (Def. Br. 8).  That is, Defendant Clearview AI does not seek dismissal of Count One, Plaintiff's breach-of-contract claim concerning the unpaid Sales Commissions.

### 1. The Court Dismisses Plaintiff's Breach of Contract Claim Against the Individual Defendants (Count Two)

As previously noted, Count Two of the Amended Complaint alleges that the Individual Defendants breached the Anti-Disparagement Provision of the Wind-Down Agreement.  (AC ¶¶ 68-74).  Pursuant to the Anti-Disparagement Provision, the parties agreed

> that at no time during the Restricted Period [(*i.e.*, the period during which the Individual Defendants and Plaintiff, or their affiliates, are stockholders of Clearview AI, and for two years thereafter)] shall the [Individual Defendants and Plaintiff, or their affiliates,] make, or

> cause or assist any other person to make any statement
> or other communication to any third party which
> impugns or attacks, or is otherwise critical of, the
> reputation, business[,] or character of [Clearview AI], *or
> any of its respective directors, officers, representatives,
> agents[,] or employees*.

(WDA ¶ 4(b) (emphasis added)).  According to Plaintiff, the Individual

Defendants violated this provision by "publicly criticiz[ing] and disparag[ing]

[Plaintiff] and den[ying] his involvement in Clearview AI."  (AC ¶ 71).  The

Court, however, finds that — in accordance with the unambiguous language of

the Anti-Disparagement Provision — the Individual Defendants could not have

breached the provision by making statements about Plaintiff.

Under New York law,[2] the elements of a breach of contract claim are:

(i) existence of a contract, (ii) performance of the contract by one party,

(iii) breach by the other party, and (iv) damages.  *See Terwilliger* v. *Terwilliger*,

206 F.3d 240, 245-46 (2d Cir. 2000).  "Courts may dismiss breach-of-contract

claims on a Rule 12(b)(6) motion to dismiss where the [contract] language is

clear and unambiguous; however, a plaintiff's claim should not be dismissed if

she has an arguable claim under the contract."  *Lamoureux* v. *Trustco Bank*,

592 F. Supp. 3d 14, 27 (N.D.N.Y. 2022) (internal quotation marks omitted).

Contract language is clear and unambiguous where it has "a definite and

---

[2]     Interpretation of the Wind-Down Agreement is governed by New York law in
accordance with its Paragraph 8.  (*See* WDA ¶ 8 ("This Agreement shall be governed
by the laws of the State of New York, without regard to conflicts of laws.")).  Further,
both parties apply New York law in support of their respective interpretations of the
Agreement.  (*See, e.g.*, Def. Br. 11; Pl. Opp. 7-8).  *See also Am. Fuel Corp.* v. *Utah
Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed
to the application of the forum law, their consent concludes the choice of law
inquiry.").

precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed* v. *Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978); *accord Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

As a threshold matter, the parties disagree over whether the Anti-Disparagement Provision even applies to Plaintiff.  (*Compare* Def. Br. 11-15, *and* Def. Reply 2-6, *with* Pl. Opp. 6-9).  That is, the parties dispute whether Plaintiff constitutes "any of [the] directors, officers, representatives, agents[,] or employees [of Clearview AI]" who are protected by the proscription in Paragraph 4(b).  (WDA ¶ 4(b)).  Importantly, both sides appear to concede that Plaintiff was neither a "director," nor an "officer," nor an "employee" of Clearview AI; the parties diverge, however, as to whether Plaintiff constituted an "agent" or "representative" of the Company.  (*Compare* Def. Br. 11-15, *and* Def. Reply 2-6, *with* Pl. Opp. 6-9).  Taking each in turn, the Court finds that Plaintiff can be considered neither an "agent" nor a "representative" of Clearview AI.

"New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio* v. *Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (internal quotation marks omitted).  Where an agency relationship is purportedly established by a contract, a court looks to the language of that contract to ascertain the legal nature of the parties' relationship; notably, however, how the parties choose to

label any given relationship is not dispositive.  *See N. Shipping Funds I, LLC* v. *Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013); *Samba Enter., LLC* v. *iMesh Inc.*, No. 06 Civ. 7660 (DC), 2009 WL 705537, at *7-8 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enter., Ltd.* v. *iMesh Inc.*, 390 F. App'x 55 (2d Cir. 2010) (summary order).  At the motion to dismiss stage, "[o]nly if the material facts from which agency is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case, may agency be decided by the court as a matter of law."  *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 403 (S.D.N.Y. 2021) (alterations adopted) (internal quotation marks omitted).

The Amended Complaint alleges an agency relationship between Plaintiff and Clearview AI on the basis of two provisions of the Wind-Down Agreement, namely, (i) Plaintiff's ten-percent interest in the Company (AC ¶ 32 (citing WDA ¶ 2)), and (ii) Plaintiff's right to receive a ten-percent commission on sales of Clearview AI's software and services "to the extent [Plaintiff] introduces [Clearview AI] to potential customers with whom [Clearview AI] was not previously in contact, and such introduction leads, in fact, to a sale of [Clearview AI's] software or services" (*id.* ¶ 33 (citing WDA ¶ 5)).  The Court disagrees.  On these facts, the Court finds that, as a matter of law, the Wind-Down Agreement did not establish an agency relationship between Plaintiff and Clearview AI.

Importantly, as to the relationship between Plaintiff and Clearview AI, the key "hallmarks" of agency are missing.  *First,* there is no evidence that either

13

Clearview AI or Plaintiff consented to an agency relationship, *e.g.*, by defining Plaintiff as an agent of Clearview AI in the Wind-Down Agreement.  *See, e.g.*, *Samba Enter.*, 2009 WL 705537, at *7 ("[B]oth parties manifested their intent to have [plaintiff] act [as defendant's agent] by entering into the Agreement, which … is entitled, 'Agency Agreement,' and defines [plaintiff] as 'Agent.'").  *Second*, it cannot be said that Clearview AI exercised "direct control" over Plaintiff.  Indeed, under the Wind-Down Agreement, Clearview AI had no ability to obligate Plaintiff to do anything at all, let alone in any particular manner.  *See, e.g.*, *Enter. Press, Inc.* v. *Fresh Fields Markets, Inc.*, 13 F. Supp. 2d 413, 415 (S.D.N.Y. 1998) (noting that principal would "maintain[] control over the methods and details" of production process operated by agent).

Also absent from the parties' relationship is any one of the many other circumstances that courts commonly associate with agency.  *See, e.g.*, *Supreme Showroom, Inc.* v. *Branded Apparel Grp. LLC*, No. 16 Civ. 5211 (PAE), 2018 WL 3148357, at *10 (S.D.N.Y. June 27, 2018) (finding agency relationship existed where purported agent "negotiated" sales orders that principal subsequently "confirm[ed]"; "appear[ed] [as] [principal]'s public face"; and "cultivated and maintained [principal]'s primary client relationship[s]")*; Wiener* v. *Lazard Freres & Co.*, 672 N.Y.S.2d 8, 15 (1st Dep't 1998) (finding agency relationship where purported agent "acted on [principal's] behalf in assuming negotiations" and customers "relied upon [agent] specifically because of [principal]'s expertise and reputation").  Specifically, Plaintiff had no authority to bind Clearview AI in any agreement or to negotiate with potential customers on Clearview AI's behalf; no

14

title or appearance that would indicate to his contacts that he had such authority; and no obligation to either transmit information to potential customers or to report information back to the Company.  (*See* Def. Reply 4). In short, pursuant to the Wind-Down Agreement, Plaintiff had no role in Clearview AI's sales process except for the (voluntary) facilitation of introductions.  Accordingly, the Court finds that Plaintiff was not an "agent" of Clearview AI.[3]

The Court also finds that Plaintiff did not function as a "representative" of Clearview AI.  Importantly, there is no governing legal test for "representative" status, as there is for "agency."  The Court thus begins with the observation that the terms "representative" and "agent" are often used synonymously.  *See, e.g., Agent*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining agent as, *inter alia*, "a representative"); U.C.C. § 1-201(b)(33) (AM. L. INST. & UNIF. L. COMM'N 2022) ("The term 'representative' includes an agent[.]").

---

[3]    The Court briefly addresses Plaintiff's argument that he was an agent of Clearview AI by virtue of the fact that he "was a minority owner of Clearview [AI]."  (Pl. Opp. 6).  As Defendants elaborate on in their reply brief, Plaintiff's "alleged status as a 'minority owner' [does not] automatically create[] an agency relationship."  (Def. Reply 2).  Where courts have found that an owner was an agent of her company, many other hallmarks of agency status were also present.  For instance, in one of the cases cited by Plaintiff in support of his argument, *Banko Co., Ltd.* v. *Starrett Housing Corp.*, the court explained that its finding of agency rested on four bases, with "ownership" being just one part of one of those bases:

> the undisputed facts supporting a finding of [agency] include [i] [the purported agent] was the managing director and a principal owner of [the company], a closed corporation, [ii] the Agreement contained [the purported agent]'s sworn acknowledgment of authority [to act for the company], [iii] [the purported agent] was the sole signatory (on behalf of [the company]) of the [disputed] contract ..., and [iv] [the purported agent] claims authority to [bring lawsuits] on behalf of [the company].

No. 90 Civ. 2178 (PNL), 1991 WL 220958, at *3 (S.D.N.Y. Oct. 15, 1991).

15

While familiar and well-settled contract interpretation principles require the Court to assume that the drafters of the Wind-Down Agreement did not mean for the terms "representative" and "agent" to carry the same meaning, in view of the clear lack of an agency relationship between Plaintiff and Clearview AI, the fungibility of the terms is nonetheless informative.

Turning to the ordinary meaning of the word "representative," the Oxford English Dictionary defines "representative" as "a person chosen or appointed to act or speak for another or others." *See Representative*, NEW OXFORD ENGLISH DICTIONARY (3d ed. 2010). Sources specific to legal writing define "representative" almost identically. Black's Law Dictionary, for example, defines "representative" as "someone who stands for or acts on behalf of another," *see Representative*, BLACK'S LAW DICTIONARY (11th ed. 2019); and though it does not govern the instant agreement, the Uniform Commercial Code describes a representative as "an agent, an officer of a corporation or association, and a trustee, executor, or administrator of an estate, or any other person empowered to act for another," U.C.C. § 1-201(b)(33) (AM. L. INST. & UNIF. L. COMM'N 2022).

In view of his narrowly circumscribed role in Clearview AI's sales process, Plaintiff does not even arguably meet these definitions. Plaintiff was in no way "chosen," "appointed," or "empowered" to act on Clearview AI's behalf: he could neither make offers; nor enter into contracts; nor sign documents; nor negotiate terms of sale; nor appear at meetings, conferences, or legal

proceedings on behalf of Clearview AI.[4]  Beyond his ownership stake in the Company, Plaintiff's role was, at most, that of a reference or recommender.

In view of the foregoing, Plaintiff has failed to make the threshold showing that he is an "agent" or "representative" of Clearview AI under the Wind-Down Agreement.  For this reason, the Court finds that, pursuant to the plain language of the Wind-Down Agreement, Plaintiff is not protected by the Anti-Disparagement Provision, and the Individual Defendants could not have breached that provision by making comments about him.  As a result, the Court need not assess whether any of the Individual Defendants' comments actually "impugn[ed] or attack[ed], or [were] otherwise critical of, [Plaintiff's] reputation, business[,] or character."  The Court thus dismisses Count Two of the Amended Complaint.

### 2. The Court Dismisses Plaintiff's Breach of the Duty of Good Faith and Fair Dealing Claims Against All Defendants (Count Three)

As previously noted, Count Three of the Amended Complaint alleges breach of the duty of good faith and fair dealing against all Defendants, on account of their "knowingly and substantially impairing [Plaintiff]'s rights under the Wind-Down Agreement."  (AC ¶¶ 75-79).  "Under New York law … '[i]mplicit in all contracts is a covenant of good faith and fair dealing in the

---

[4]     Black's Law Dictionary further defines a "*Legal* Representative" as a "legal heir"; "an executor, administrator, or other l[awful] representative"; or "someone who manages the legal affairs of another because of incapacity or death."  *See Legal Representative*, BLACK'S LAW DICTIONARY (11th ed. 2019).  To the extent the term "representative" in the Wind-Down Agreement subsumes this term, Plaintiff clearly does not qualify as a "legal representative."

course of contract performance.'"  *Woodard* v. *Reliance Worldwide Corp.*, No. 18

Civ. 9058 (RA), 2019 WL 3288152, at *2 (S.D.N.Y. July 22, 2019) (alteration in

original) (quoting *Dalton* v. *Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)),

*aff'd*, 819 F. App'x 48 (2d Cir. 2020) (summary order).  "This [obligation]

embraces a pledge that 'neither party shall do anything which will have the

effect of destroying or injuring the right of the other party to receive the fruits

of the contract.'"  *Dalton*, 87 N.Y.2d at 389 (quoting *Kirke La Shelle Co.* v. *Paul

Armstrong Co.*, 263 N.Y. 79, 87 (1933)).  Stated differently, "[a] claim for breach

of this covenant may be brought, if at all, only where one party's conduct,

though not breaching the terms of the contract in a technical sense,

nonetheless deprived the other party of the benefit of its bargain."  *Dreni* v.

*PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 729 (S.D.N.Y. 2020) (internal

quotation marks omitted).

Importantly, the protection afforded to contracting parties by the implied

covenant "cannot exist in the absence of an underlying valid contract."  *ARI &

Co.* v. *Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003); *see also

Alter* v. *Bogoricin*, No. 97 Civ. 662 (MBM), 1997 WL 691332, at *7 (S.D.N.Y.

Nov. 6, 1997) ("[T]he covenant of good faith and fair dealing is not distinct from

the underlying contract[.]").  A corollary to this principle is that an implied

covenant claim must fail where "a breach of contract claim, based upon the

same facts, is also pled."  *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d

Cir. 2013) (internal quotation marks omitted); *see also ARI*, 273 F. Supp. 2d at

523 ("Because the facts that constitute the breach of the implied covenant

claim readily could have been encompassed in [plaintiff]'s breach of contract claims, [it] must be dismissed as a separate cause of action.").

Finally, while appearing to invite in a broad variety of claims, the implied covenant of good faith and fair dealing is narrowly circumscribed in its application.  Specifically, the implied covenant "cannot be used … to create, in essence, new, affirmative duties … that were not expressly set forth in [an agreement]." *Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*, 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) (internal quotation marks and citations omitted), *aff'd*, 976 F.3d 239 (2d Cir. 2020); *see also Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989) (refusing to "permit [the] implied covenant to shoehorn into [a contract] additional terms plaintiffs now wish had been included").

Turning to the case at hand, as an initial matter, the Court notes that there is an "underlying valid contract" here that serves to support an implied covenant claim.  *ARI*, 273 F. Supp. 2d at 522.  As the Court expands upon further in Section B.3, *infra*, the parties do not dispute the validity of the Wind-Down Agreement or its applicability to Plaintiff's claims.  As a result, the Court is empowered to "dismiss[] [Plaintiff's implied covenant claim] as redundant [if] the conduct allegedly violating the implied covenant is also the predicate for breach … of an express provision of the [Wind-Down Agreement]." *TVT Records* v. *Island Def Jam Music Grp.*, 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003) (internal quotation marks omitted).

19

To that point, the Amended Complaint sets forth three factual bases for Plaintiff's claim for breach of the implied covenant of good faith and fair dealing:  Defendants' (i) "conceal[ing] [of] consummated contracts that resulted from [Plaintiff]'s introductions," (ii) "spread[ing] [of] false information denying [Plaintiff]'s role" in developing Clearview AI, and (iii) "arbitrar[y] refus[al] to negotiate with [Plaintiff]'s contacts."  (AC ¶¶ 75-79).  To the extent that Plaintiff's implied covenant claim rests on the first (*i.e.*, that Defendants "conceal[ed] consummated contracts that resulted from [Plaintiff]'s introductions"), it must be dismissed.  After all, the same facts form the basis of Plaintiff's first breach-of-contract claim, which alleges that Clearview AI breached the Wind-Down Agreement by failing to pay Plaintiff Sales Commissions "for every introduction of new customers that [Plaintiff] made that led to sales of Clearview AI software or services."  (*Id.* ¶¶ 61-67).  Similarly, to the extent that Plaintiff's breach of good faith and fair dealing claim rests on the second basis (*i.e.*, that Defendants "spread false information denying [Plaintiff]'s role" in developing Clearview AI) it must also be dismissed.  Plaintiff's second breach-of-contract claim, which alleges that the Individual Defendants breached the Wind-Down Agreement by making statements that were critical of Plaintiff's reputation and character, is founded upon the same facts.  (*Id.* ¶¶ 68-74).

The third factual basis — Plaintiff's allegation that "Defendants failed to follow up with many other potential customers that [Plaintiff] introduced to Clearview [AI] … thereby frustrating [Plaintiff]'s ability to earn additional Sales

Commissions separate and apart from the Sales Commissions owed to him for
the introductions that actually led to [sales]" (Pl. Opp. 12 (citing AC ¶¶ 46-
49)) — is unique to Plaintiff's implied-covenant claim.  The Wind-Down
Agreement does not explicitly obligate Defendants to pursue customers that
were introduced to them by Plaintiff; Defendants' refusal to pursue such
customers thus could not have amounted to an explicit breach of contract.
But, under the Wind-Down Agreement, Defendants had discretion as to
whether to pursue the leads, and Plaintiff can challenge Defendants' exercise of
such discretion via a claim for breach of the implied covenant of good faith and
fair dealing.

     "Where [a] contract contemplates the exercise of discretion, [the duty of
good faith and fair dealing] includes a promise not to act arbitrarily or
irrationally in exercising that discretion." *Cordero* v. *Transamerica Annuity
Serv. Corp.*, 39 N.Y.3d 399, 409 (2023) (internal quotation marks omitted); *see
also 511 W. 232nd Owners Corp.* v. *Jennifer Realty Co.*, 98 N.Y.2d 144, 153-54
(2002).  To succeed on an implied covenant claim on the basis of a defendant's
arbitrary or irrational exercise of discretion, a plaintiff must demonstrate that
the defendant's behavior was more than "misguided[,] ignorant[,] or even
merely negligent."  *Wagner* v. *JP Morgan Chase Bank*, No. 06 Civ. 3126 (RJS),
2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (internal quotation marks
omitted); *see also M/A-COM Sec. Corp.* v. *Galesi*, 904 F.2d 134, 136 (2d Cir.
1990) (noting that the implied covenant of good faith and fair dealing "does not
extend so far as to undermine a party's general right to act on its own interests

21

in a way that may incidentally lessen the other party's anticipated fruits from the contract"). Indeed, courts applying New York law "generally hold that a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive." *Wagner*, 2011 WL 856262, at *4 (internal quotation marks omitted).

Here, Plaintiff alleges that Defendants acted with such a motive. According to Plaintiff, "Defendants negotiated the Wind-Down Agreement *in bad faith* and … purposefully ensured that no Sales Commissions could be obtained as they wholly ignored and failed to follow up with many of [Plaintiff]'s introductions." (AC ¶ 3 (emphasis added)). The Court acknowledges that other courts have permitted implied-covenant claims to (at a minimum) proceed to discovery in the face of similar allegations. *See, e.g.*, *Wagner*, 2011 WL 856262, at *4-5 (discussing evidence of defendant's improperly motivated exercise of discretion in ruling on implied-covenant claim at summary judgment); *Team 125, Inc.* v. *United States Aviation Underwriters, Inc.*, No. 20 Civ. 11025 (VEC), 2022 WL 329317, at *4-5 (S.D.N.Y. Feb. 2, 2022) (same); *Trireme Energy Holdings, Inc.* v. *Innogy Renewables US LLC*, No. 20 Civ. 5015 (JLR), 2023 WL 8643799, at *15-21 (S.D.N.Y. Dec. 14, 2023) (same, following bench trial).

However, even accepting that Plaintiff's implied-covenant claim has some valid factual basis distinct from that of his breach-of-contract claims, it is still not safe from dismissal. A claim for breach of the implied covenant of good faith and fair dealing may be dismissed if "the relief sought by plaintiff is

intrinsically tied to the damages allegedly resulting from the breach of contract." *Bogoricin*, 1997 WL 691332, at *8 (alterations adopted) (internal quotation marks omitted); *see also EFG Bank AG, Cayman Branch* v. *AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 94 (S.D.N.Y. 2018) (dismissing implied-covenant claim where "the damages [p]laintiffs s[ought] as a result of [defendant]'s alleged [breach of the implied covenant] [were] identical to the damages they s[ought] for the alleged breach of contract"); *Amcan Holdings, Inc.* v. *Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 50 (1st Dep't 2010) (dismissing implied-covenant claim that "s[ought] the identical damages" as breach of contract claim); *ARI*, 273 F. Supp. 2d at 523 ("The breach of the implied covenant claim must also be dismissed because the damages it seeks to recover are identical to those asserted in the breach of contract claims.").

Plaintiff here seeks a single sum of $75,000 as damages for Defendants' breaches of contract and breaches of the implied covenant.  (AC ¶¶ 66, 73, 78). The Amended Complaint therefore intimates that the three claims resulted in the same, indivisible injury.  (*Cf. id.* ¶ 49).  Because the damages associated with Plaintiff's implied-covenant claim are part and parcel of the damages associated with Plaintiff's breach-of-contract claims, the Court finds that Plaintiff's implied-covenant claim must be dismissed.

That said, because the Court is not convinced that amendment of Plaintiff's claim for breach of the implied covenant of good faith and fair dealing would be futile, it dismisses Count Three without prejudice to replead.  *See* Fed. R. Civ. P. 15(a)(2).  The Court warns Plaintiff, however, that — should he

23

elect to replead — he must be careful to set forth "sufficient factual matter," over and above his assertion that his introductions were ignored by Defendants, to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 663, 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). (*See also* Def. Reply 9 ("Plaintiff [claims] that he cannot identify a single lead that he alleged he introduced to Clearview [AI] that he believes went ignored or that he cannot provide any facts to support the conclusory assertion that Clearview [AI] acted in bad faith in pursuing these alleged leads.")).

### 3.   The Court Dismisses Plaintiff's Unjust Enrichment Claim Against Clearview AI (Count Four)

Finally, Count Four alleges unjust enrichment against Clearview AI.  (AC ¶¶ 80-86).  Unjust enrichment is a so-called "quasi-contract claim," which contemplates "an obligation imposed by equity to prevent injustice, *in the absence of an actual agreement* between the parties[.]"  *Georgia Malone & Co. v Rieder*, 19 N.Y.3d 511, 516 (2012) (emphasis added) (internal quotation marks omitted).  Under New York law, to prevail on a claim for unjust enrichment, a plaintiff must show "[i] that [a] defendant benefitted; [ii] at the plaintiff's expense; and [iii] that equity and good conscience require restitution."  *Kaye* v. *Grossman,* 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks omitted); *see Clifford R. Gray, Inc.* v. *LeChase Constr. Servs., LLC*, 819 N.Y.S.2d 182, 187 (3d Dep't 2006).  "The essence of such a claim is that one party has received money or a benefit at the expense of another."  *Kaye*, 202 F.3d at 616 (internal quotation marks omitted).

24

While Federal Rule of Civil Procedure 8(d) generally allows claims to be pleaded in the alternative, New York courts have consistently held that a "claimant cannot plead unjust enrichment in the alternative" where "the validity of a contract that governs the subject matter at issue is not in dispute, and the claimant alleges breach of the contract." *Stanley* v. *Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 430-31 (S.D.N.Y. 2020); *see also Am. Med. Ass'n* v. *United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) ("[D]ecisions both in New York state courts and in [the Southern District of New York] have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute[.]").

Here, there is undoubtedly a contract that governs the subject of Plaintiff's unjust-enrichment claim. Count Four, "pled in the alternative to [Plaintiff's] breach of contract and breach of the duty of good faith and fair dealing claims," asserts that Plaintiff "conferred a tangible economic benefit upon Clearview AI by providing his services, knowledge, and contacts" to the Company, which benefit Clearview AI retained at Plaintiff's expense. (AC ¶¶ 80-86). The Wind-Down Agreement, however, sets forth precisely how Plaintiff should have been compensated for the "services, knowledge, and contacts" he provided to Clearview AI. Accordingly, the Wind-Down Agreement "govern[s] the subject matter of" this claim. *Am. Med. Ass'n*, 2007 WL 683974, at *10.

Further, there is no dispute as to the validity of the Wind-Down Agreement. While Plaintiff is correct that "an unjust enrichment claim may be brought in the alternative to a breach of contract claim where a court could determine the contract's invalidity after the motion to dismiss stage" (Pl. Opp. 14), such is the case only where "the validity or enforceability of a contract is in doubt or uncertain," *Gao* v. *JPMorgan Chase & Co.*, No. 14 Civ. 4281 (PAC), 2015 WL 3606308, at *5 (S.D.N.Y. June 9, 2015) (internal quotation marks omitted); *see also In re Navidea Biopharmaceuticals Litig.*, No. 19 Civ. 1578 (VEC), 2019 WL 7187111, at *9 (S.D.N.Y. Dec. 26, 2019) ("Where a plaintiff fails to allege that the contract at issue is invalid or unenforceable ... a claim for [unjust enrichment] is precluded."). Here, Plaintiff has affirmatively pleaded that the Wind-Down Agreement is a valid, enforceable contract (AC ¶¶ 62, 69 ("The Wind-Down Agreement constitutes a valid and enforceable contract between [Plaintiff] and [Defendants].")), and Defendants decline to dispute the validity of the Agreement (Def. Br. 21-22). Accordingly, Plaintiff's claim for unjust enrichment must be dismissed.

## CONCLUSION

Based on the foregoing analysis, the Court hereby DISMISSES Counts Two (breach of contract against the Individual Defendants) and Four (unjust enrichment against Clearview AI) of the Amended Complaint with prejudice. The Court further DISMISSES Count Three of the Amended Complaint (breach of the implied covenant of good faith and fair dealing) without prejudice to replead.

The Clerk of Court is directed to terminate the pending motion at docket entry 29.  Plaintiff is directed to submit a letter on or before **June 3, 2024**, advising the Court as to whether he intends to file a second amended complaint in which Count Three is repleaded.

SO ORDERED.

Dated:      May 20, 2024
            New York, New York

_____
         KATHERINE POLK FAILLA
         United States District Judge