P18DJohC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHARLES JOHNSON,

4                   Plaintiff,

5           v.                          23 CV 02441

6   CLEARVIEW AI, INC., ET AL,

7                   Defendants.
                                        Conference
8   ------------------------------x
                                        New York, N.Y.
9                                       January 8, 2025
                                        11:00 a.m.
10
    Before:
11
                        HON. KATHERINE POLK FAILLA,
12
                                        District Judge
13

14                      APPEARANCES

15  LAW OFFICE OF BERNARD V. KLEINMAN, PLLC
         Attorney for Plaintiff
16  BY:  BERNARD V. KLEINMAN

17  GORDON REES SCULLY MANSUKHANI
         Attorneys for Defendants
18  BY:  RONALD ANDREW GILLER
         MALLORY J. BENNER
19

20

21

22

23

24

25

P18DJohC1

1          (In open court)

2          THE DEPUTY CLERK:  Your Honor, this is in the matter

3    of *Johnson v. Clearview AI.*

4          Counsel, please state your name for the record,

5    beginning within counsel for the plaintiff.

6          MR. KLEINMAN:  Good morning, Judge.  My name is

7    Bernard Kleinman, and I represent Mr. Johnson.  He is sitting

8    to my right.

9          THE COURT:  Sir, thank you very much.

10         Mr. Giller.

11         MR. GILLER:  Good morning, your Honor.  Ronald Giller

12   from Gordon, Rees, Scully, Mansukhani for the defendants.

13         THE COURT:  Thank you very much.  Good morning to you

14   as well.

15         MS. BENNER:  Good morning, your Honor.  Mallory

16   Benner, also from Gordon, Rees, Scully, Mansukhani also on

17   behalf of the defendants.

18         THE COURT:  Thank you very much.

19         I've been advised Mr. Giller is taking the lead for

20   the moment.

21         Is that correct?

22         MR. GILLER:  That's right, your Honor.

23         THE COURT:  I will keep that in mind.  Thank you.

24         Counsel and client, initially when I scheduled this

25   conference, I was scheduling it against the backdrop of some

P18DJohC1

1    claims of content and other issues, but as of I guess Monday

2    there's an additional thing to add to the mix, and that is

3    questions of the production of discovery.  So it's my intention

4    today to speak both to issues of certain social media postings

5    and then as well issues of discovery.

6          Mr. Kleinman, actually, I'm going to begin with you,

7    please, sir.  There should be three microphones at the table,

8    so I'll ask you to bring one of them closer to you, sir, just

9    because the acoustics in this courtroom are not what I would

10   like them to be.

11         Mr. Kleinman, I read very carefully your letter of

12   January 3rd in response to submissions of defense counsel of

13   December 24 and December 30, and I do wrestle with the First

14   Amendment issues here, sir.  They were real ones.  But I'll say

15   there's a bit of a difference I think, and that was that

16   previously I at least had the comfort that the Alston & Bird

17   firm was at least trying, if not always successfully -- don't

18   shake your head, Mr. Johnson.

19         MR. JOHNSON:  Sorry, ma'am.

20         THE COURT:  Was at least trying to reign in some of

21   your client's more problematic impulses.  You're not.  In fact,

22   you're trying to justify them.  Your January 3rd letter at

23   times transcends advocacy and actually mistakes what has been

24   posted.

25         So I am aware of the limits on my power that are sort

1  of implicit in your client's First Amendment rights, and I

2  don't want to trample on them, but at some point the postings

3  become vexatious, and at some point they interfere with my

4  litigation.  So I'd like to begin on that issue, which is of

5  Alston at least tried to keep your client from saying stupid

6  things that compromised his case.  You're not.  Why not?

7          Secondly, as a second point, is it not the case that I

8  can direct your client not to have contact with the individual

9  litigants who are the defendants in this case?

10          MR. KLEINMAN:  If I can respond, Judge?

11          THE COURT:  Please.

12          MR. KLEINMAN:  Yes.  Well, first of all, I don't

13  believe, and I may be wrong, that at least from the

14  correspondence that Alston & Bird submitted, that they ever

15  really raised this First Amendment issue and also the issues

16  regarding the fact --

17          THE COURT:  I raised the First Amendment issues, sir,

18  but they told me that they would try very hard to keep your

19  client from making antisemitic posts.

20          MR. KLEINMAN:  And as I said in my letter, I forwarded

21  the letters from Mr. Giller and your orders to my client.  The

22  reason I raised the First Amendment issue and also the other

23  issues in my correspondence to your Honor, including this issue

24  about defamation and the restrictions as the Second Circuit has

25  expressed on that, and also the fact that Mr. Johnson is a

P18DJohC1

1    shareholder in Clearview, and also his family is, and I think

2    has legitimate concerns about the value of the corporation, is

3    that I just thought these were issues that needed to be

4    explored within the context of what he had said.

5          I'm not saying that -- obviously, you have control

6    over the litigation in front of you, and, obviously, if there

7    is -- as you said, an individual acts in a vexatious manner,

8    that he or she needs to be reigned in.  I just wanted to raise

9    those issues, because I just felt they had not been fully

10   explored.

11         I also, in my letter, I think on the first page, I

12   also stated that at least according to the case law that I had

13   read and the case law that I cited, excuse me, I think the case

14   that Mr. Giller cited, they're like this four-part test to make

15   a determination.  And I didn't see any satisfaction about

16   whether there should be some First Amendment -- Mr. Johnson's

17   statements should be dealt with within the context of the First

18   Amendment, and, secondly, whether there was a lesser

19   sanction -- I guess he was asking for attorney fees -- than

20   what he was asking for.  I was trying to just raise those

21   issues, Judge.  Okay.

22         THE COURT:  Thank you.

23         On the issue of lesser sanctions, I've been thinking

24   about it as well.  So one thing I absolutely can do I think is

25   to tell your client in your presence, do not under any

P18DJohC1

1    circumstances, while this litigation is pending, reach out to

2    the individual defendants in this case.

3            Is there anything that stops me from doing that?

4            MR. KLEINMAN:  I don't believe that there is, Judge.

5            THE COURT:  Then I have now done that.

6            MR. KLEINMAN:  Okay.

7            THE COURT:  There should be no more of those

8    communications.

9            MR. KLEINMAN:  And I can tell you, again, I'm a

10   lawyer, okay, I'm not -- sorry, I'm not the client.  I have

11   certain limitations I can do, and I try to do those, Judge.

12           THE COURT:  Of course.  I'm the Judge.  I'm presiding

13   over the case.  If you can't reign in your client and it starts

14   to impact my litigation, there are things that I can do.

15           MR. KLEINMAN:  Correct.

16           THE COURT:  Today we can talk about them.  Right.

17   Yes.  I could impose fees.  I could also foreclose claims, and

18   of course, in the very worse circumstance, there is the

19   possibility of terminal sanctions if this keeps on keeping on.

20           What I'm concerned about, sir, is I appreciate that

21   you have to zealously advocate for your client.  I understand

22   that.  But some of your descriptions of the attachments to the

23   December 30 letter from Mr. Giller and the December 24 letter

24   are descriptions I simply can't agree with, because I, too,

25   have seen these documents.  So I just think going forward I

P18DJohC1

1    think you should try to preserve your credibility with the

2    Court and your relationship with your client.  I have to

3    believe there's a way of doing it.

4            But, I mean, at one point your client announced -- you

5    say on your second page of your January 3rd letter that on the

6    fourth page of the attachments to the December 30 letter that

7    there is a -- it contains a reference to an alleged admission

8    by Attorney Giller but is not otherwise offensive.  This

9    statement includes allegations by your client that individuals

10   are, "try to kill me in my doorstep," that they are part of a

11   criminal enterprise, and then says, the supposed admission by

12   Mr. Giller, which I'll talk to him about in a moment, is that

13   Mr. Giller has admitted that Clearview board members are

14   illegally coordinating legal strategies.

15           I'm not sure whether the coordination of legal

16   strategies is illegal --

17           MR. KLEINMAN:  I don't know either.

18           THE COURT:  -- but I'm not sure he's admitting to this

19   either, and I'm not sure why this gets publicized.  I feel as

20   though your client is trying to pursue one case here and one

21   case on social media.

22           To the extent the social media postings, ridiculous as

23   they may be, impact this case, I get to get involved.  So what

24   I'm saying to you is I appreciate your efforts to explain some

25   of these statements, but some of your explanations do not

P18DJohC1

1    accord with the actual documents that I have.

2            So what do we do?  Your client, if he's going to

3    continue to post about the case, he's going to run the risk of

4    sanctions.  Yes.

5            MR. KLEINMAN:  Yes, he is.

6            THE COURT:  Okay.

7            MR. KLEINMAN:  And I can tell you, Judge, that he is

8    -- I mean, he no longer is on X, or Twitter, whatever it is.

9            THE COURT:  Was he banned?

10           MR. KLEINMAN:  Yes, he was removed from Twitter, as I

11   understand it.  So that issue is I guess dead.  But I know

12   there are other avenues, unfortunately, on social media that

13   people can post whatever they want to post.

14           THE COURT:  Also, I've seen situations in which folks

15   banned from social media are reinstated in social media.  So

16   this may not be a forever thing.

17           MR. KLEINMAN:  No, it may not be.  It may not be a

18   forever thing.

19           THE COURT:  But I guess what can we do, and "we" is

20   you and me at this point, to keep this case on the path it

21   should be and not have it impacted inappropriately by social

22   media postings?

23           MR. KLEINMAN:  Well, I think, first of all, correct me

24   if I'm wrong, but your prior orders were not delivered in

25   person.

P18DJohC1

1          Is that correct?

2          THE COURT:  Correct.  I didn't think I needed to, but

3  that's why I have your client here today --

4          MR. KLEINMAN:  Okay.

5          THE COURT:  Because I --

6          MR. KLEINMAN:  Okay.

7          THE COURT:  -- apparently --

8          MR. KLEINMAN:  Okay.

9          THE COURT:  -- need to.

10          MR. KLEINMAN:  There is a difference between the

11  written cudgel and the sitting on the bench cudgel.  All right.

12          THE COURT:  Okay.

13          MR. KLEINMAN:  And I think it has some impact on

14  individuals.  I don't think that -- I'm a firm believer in

15  redemption and a firm believer in telling my client that, you

16  know, he has to do what he has to do to make sure the

17  litigation moves forward and not, you know, interfere with the

18  process and the rules.  So I think that it is a little -- at

19  least in your juncture, a little early for any type of

20  sanction, financial sanction, or any other sanction.  However

21  --

22          THE COURT:  But is it, sir?  I mean, this has been

23  going on since 2023.  The particular type of offensive speech

24  is different.  Last time really was directed toward counsel and

25  his religiosity --

P18DJohC1

1          MR. KLEINMAN:  That's true.

2          THE COURT -- which seems bad.  But it's not as though

3     your client hasn't been talking trash on social media for the

4     entirety of this case.  No?

5          MR. KLEINMAN:  No.  I mean, I don't know the number of

6     postings, Judge.  I don't follow X or any of those places.

7          THE COURT:  You said to me "it's early for sanctions,"

8     and I'm saying this is yet another instance in which your

9     client's social media posting's called to my attention and it's

10     taken place over more than a year.  So if I think about the

11     factors for sanctions, the nature of the conduct, the time over

12     which it's taken place, the availability of lesser sanctions,

13     things of that nature, I've got a year of this.

14          MR. KLEINMAN:  Well, there are a lot of options that

15     you have, Judge.  Okay.

16          THE COURT:  Yes.

17          MR. KLEINMAN:  I mean, you can -- if you want me to

18     spitball them, I'm happy to do it.

19          THE COURT:  No.  Thank you.  I know what my options

20     are.  Thanks.

21          MR. KLEINMAN:  With imposing a sanction and staying

22     it, and then making sure that my client doesn't engage in the

23     behavior the Court finds offensive, and then it immediately

24     becomes effective if he does violate that is something that,

25     you know, is the sword of Damocles being over him, so that the

P18DJohC1

1    matter is resolved that way.

2              THE COURT:  Yes, but --

3              MR. KLEINMAN:  I mean, I understand --

4              THE COURT:  Again, sir, thank you.  One of the things

5    is you've used an interesting phrase about the behavior that I

6    find problematic, or something to that effect.  In your

7    submission what you're suggesting is what your client's doing

8    is not bad at all.

9              MR. KLEINMAN:  That's not the point I was trying to

10   make, Judge.

11             THE COURT:  Because, to me, certain of these postings,

12   if he wakes up and says I'm really not liking the progress of

13   this litigation, I don't think I can stop him from having that

14   opinion.  If he suggests that he is asking his attorneys, which

15   would include you, to work with law enforcement agencies to

16   investigate the defendants, that seems to be -- you said that's

17   not a threat.  I think it's a threat.

18             So I'm only picking what I think to be the worse of

19   the statements, and you and I may disagree as to whether all --

20   and Mr. Giller and I may disagree as to whether each statement

21   is independently worthy of sanctions.

22             MR. KLEINMAN:  That's true.

23             THE COURT:  But I am saying that, in the aggregate,

24   there are things from which I can choose, estimates that he has

25   made that I think are vexatious and are designed to impact and

P18DJohC1

1    impede the litigation over which I'm presiding, so I just

2    wanted to make clear that you were being very careful about

3    saying that about statements I might be troubled by.

4         I'm acknowledging that I'm not going to say that

5    everything here affects me or I have a reaction to it in the

6    same way, but there are statements, some of which I've read to

7    you this morning, that give me grave concern that your client

8    is trying to try to this case in a forum other than this court.

9         MR. KLEINMAN:  I understand that, Judge, and, as I

10   said, actually, in my letter to you and I think it is --

11   correct me if I'm the wrong, that you've admitted --

12   acknowledged rather that there are some things that he posted

13   that are -- like posting the letter that is on Pacer is like,

14   so what, I mean --

15        THE COURT:  But he posted the letter and then referred

16   to people as criminals and spies.  I'm not sure that was

17   necessary.  Again, referring to folks as a criminal enterprise.

18   Later on he suggests that the defendants are going to end up in

19   prison.  Something about being compromised by the Israeli

20   Defense Force?  Was that something --

21        MR. KLEINMAN:  I --

22        THE COURT:  Yes.  Things that are almost certainly

23   demonstrably false and probably don't even qualify as opinion

24   statements here, but --

25        MR. KLEINMAN:  As I said, I mean, the defamation cases

P18DJohC1

1    that I cited to you, I mean, I've tried a lot of defamation

2    cases in New York and whether someone's a public person or

3    not -- I'm sorry.

4              THE COURT:  Please stop assaulting my microphone, sir.

5              MR. KLEINMAN:  You know, whether something is opinion

6    or whether something is proveable fact or not, I don't know.

7    And of course that's a matter of -- you know, for the parties

8    to determine.

9              But I understand what you're saying about certain

10   statements, you know, and I do accept that.  And I just feel

11   that there are other statements that were cited by Attorney

12   Giller that were not actionable under your previous orders.

13   And it was just everything that he had -- Mr. Johnson had

14   posted on the 24th and the 30th, whatever those dates were.

15   That was all I was trying to bring to your attention.

16             And as I said, I didn't think that -- I just thought

17   these were -- you know, before the Court issues some type of

18   sanction and gag order, okay, you've issued a gag order

19   already, but also imposing sanctions, that there should be a

20   little bit of conversation, especially since that we're finally

21   in front of your Honor, rather than just dealing with a written

22   order from your Honor.

23             THE COURT:  Understood.

24             Before I turn to Mr. Giller, let me please understand

25   the facts as you understand them, sir.

P18DJohC1

1          Some of these statements seem to have been occasioned

2     by a settlement offer that your client made.  I want to -- I'll

3     hear from the defense in a moment as to whether they believe an

4     offer was made.

5          But, to the best of your understanding, did your

6     client at some point in December communicate a settlement offer

7     to the individual defendants in this case?

8          MR. KLEINMAN:  I do not know if he actually

9     communicated directly to them.  I obviously have not

10    communicated with the defendants.

11         I did send a lengthy settlement offer to Attorney

12    Giller.

13         THE COURT:  When approximately was that, sir?

14         MR. KLEINMAN:  It was -- I think it was before

15    Christmas, Judge.  I'd have to look back, but it was before

16    Christmas.  And then I followed up -- my recollection may be

17    wrong, maybe Attorney Giller has a better recollection.  I did

18    not hear from him.

19         And then I think I asked him about if he had spoken to

20    his clients, and the response was they had no interest in

21    settling.  And I even suggested, if I might, Judge, that we

22    have a four-way, and he was not even interested -- his clients

23    were not interested in a four-way.

24         So, I mean, I'd like to also -- I mean, if I can jump

25    for a second, this issue about the discovery issues --

P18DJohC1

1          THE COURT:  No.  We'll talk about that in a second.

2          MR. KLEINMAN:  We'll talk about that later.  Okay.

3     Thank you.

4          THE COURT:  The reason I was asking about your timing

5     of the settlement offer is when there are references on the

6     18th of September by your client to settlement talks breaking

7     down, is that a reference to a settlement offer that you made?

8          MR. KLEINMAN:  I believe that's so.

9          THE COURT:  I see.

10          MR. KLEINMAN:  And I have to look at my email

11    correspondence, the dates, but I'm pretty sure that's what it

12    was.

13          And the response of the defendant was they had no

14    interest of even having discussions, so the settlement

15    statement that there was a breakdown was that there was nothing

16    even initiated.

17          THE COURT:  It is unfortunate that your client then

18    says, "unfortunately, one of the defendants continued to

19    instruct his attorney, Ron Giller, to be complicit in

20    Ton-That's" -- I don't know how to pronounce the gentleman's

21    name -- "securities fraud and criminality."

22          It is one thing to say they didn't want to settle, but

23    accusing securities fraud and complicit criminality is more

24    fun.

25          But it is your recollection that there was in fact a

P18DJohC1

1    settlement offer that you communicated to Mr. Giller?

2              MR. KLEINMAN:  Yeah.  And it was a written -- I maybe

3    raised five or six detailed points for settling the case.

4              THE COURT:  Thank you for letting me know.

5              Mr. Giller, let me hear from you now, please, on these

6    issues, sir.

7              MR. GILLER:  Good morning, your Honor.

8              THE COURT:  Good morning, sir.

9              I'll ask you also to bring the microphone closer to

10   you, because the acoustics in the courtroom are not the best.

11   Thank you.

12             MR. GILLER:  I tend to speak loud, so I didn't want to

13   get too close to the mic, but here we go.

14             Where do you want me to start, your Honor?

15             THE COURT:  Well, you can talk about the underlying

16   facts that led to the spate of social media postings, beginning

17   on the 18th of December.  You can talk about the First

18   Amendment issues that Mr. Kleinman has raised.  You can talk

19   about the defamation issues that he's raised.  All of those

20   things need to be discussed, sir.

21             MR. GILLER:  Okay.  Thanks, your Honor.

22             Look, I know you're familiar with what the statements

23   were.  You've read them.  I can hear the thoughtfulness that

24   went into this.

25             This is one of the most outrageous cases I've ever

P18DJohC1

```
 1    been involved in.  I've never been personally attacked, never
 2    had an adversary or adversary's client make comments that are
 3    clearly thinly veiled comments about my religion.  It can only
 4    be described as antisemitic.
 5            To be that attacked personally, for criminality, when
 6    obviously it's nonsense and there's nothing to any of this, has
 7    been troubling, to say the least.  But we have taken I believe
 8    a very restrained approach to this by coming to your Honor and
 9    seeking assistance, not filing motions and seeking what would
10    be the more extreme sanctions.  We've just asked here for the
11    first time just to have our attorneys' fees covered, my
12    client's attorneys' fees, for having to bring these issues
13    repeatedly to your Honor.
14            You know, you made a comment a few minutes ago, do the
15    postings impact and impede the litigation?  They do, your
16    Honor.
17            How am I supposed to properly defend my client in what
18    we believe is a completely frivolous lawsuit when I'm being
19    personally attacked with these allegation?
20            And I understand that --
21            THE COURT:  Sir, just one moment.  I am pushing back,
22    because I am kicking the tires on both sides.
23            The materials that I was given suggested that, for
24    example, one of these tweets on -- or whatever they're called
25    now, on X., on December 18, had just under 3,000 views.  Now,
```

P18DJohC1

```
1    it's one thing if your adversary were Mr. Musk and he had
2    hundreds of millions of people looking at it, but tell me,
3    please, and I ask this with all seriousness, how 3,000 people
4    who are similarly minded to Mr. Johnson are going to really
5    impact the progress of this litigation.
6         Maybe I'm not understanding the number of views, maybe
7    there are 3,000 people who are more thoughtful than I think
8    they are, but I want to understand how they impact this
9    litigation.
10        MR. GILLER:  Your Honor, I'm not suggesting
11   necessarily that those 3,000 people have chosen to follow
12   Mr. Johnson, if they're followers, or have seen the post -- I
13   don't know either of those, because we haven't gotten that
14   information in discovery as we should have --
15        THE COURT:  Yes.
16        MR. GILLER:  -- which I know is a separate issue.  So
17   I don't know -- I don't know the extent of these postings.  I
18   also don't know the extent of where these postings have
19   appeared.  I don't know if the reach of what Mr. Johnson has
20   put out, spewed out into the world is greater than 3,000 likes,
21   whatever it may be, on the post that is submitted.  So I don't
22   know the full reach of it.  That's one thing.
23        The other part of the impact is the impact on us and
24   our client.
25        THE COURT:  Slow down, please, sir.  Thank you.
```

P18DJohC1

1          MR. GILLER:  Sure.

2          THE COURT:  If I may ask, are you getting threats from

3     individuals because of this lawsuit?

4          MR. GILLER:  I'm not getting threats from other

5     individuals, but I have read Mr. Johnson's posts, if we're

6     calling them that, to be more than just antisemitic rantings or

7     rantings about phantom criminality, where he's made comments --

8     it's all in the submissions, but one comment from July of '23

9     is "now I'm bringing my friends."

10          And another comment was, "you won't get any more

11     chances."

12          These are -- I read these in the context of all of

13     these postings as being implied threats to myself and my

14     client.  So how does that not impact our ability to defend this

15     case?

16          THE COURT:  Your clients sincerely feel as though

17     their bodily integrity is in danger because of this litigation?

18          MR. GILLER:  Yes.  There has -- yes.  Yes.  In the

19     sense that these are threats by someone who has appeared to be

20     not directly connected to reality, that suggests physical harm.

21     So yes, I have some concerns about that.  Not beyond the things

22     we've submitted as of yet, though.

23          THE COURT:  I appreciate that you're asking me to view

24     all this in the aggregate, but I am actually focusing on the

25     more recent December submissions.  So I think Mr. Kleinman will

P18DJohC1

1    argue that these are musings, these are his opinions, this is

2    wishful thinking that somehow you'll all be arrested for this,

3    but let me hear from you why that's different, why that's not

4    true, why you should be concerned about being accused of

5    engaging in criminal conduct.

6          MR. GILLER:  I mean, your Honor, we're in a

7    litigation -- I know the Court's well aware, an individual, a

8    plaintiff in a case should not be permitted to violate a Court

9    order.  I mean, your Honor herself a year and a half ago made a

10   comment about being concerned he was trying to use his postings

11   to intimidate counsel, and then he proceeded for the next year

12   and a half.  It wasn't a short period of time.  This was the

13   entire length of the case, a history of these kind of postings

14   that have not stopped despite a court order.

15          So part of my concern is the bench has said this needs

16   to stop.  Prior counsel spoke to his client apparently and came

17   back to the Court and said, he's agreed to.  You've ordered

18   that.  The process needs some integrity.  If the orders aren't

19   going to be followed, we lose that integrity in the process and

20   our faith in the ability to pursue what we want to pursue,

21   which is what we believe to be a completely unfounded case here

22   --

23          THE COURT:  Can you engage on Mr. Kleinman's arguments

24   about the First Amendment?  Because it was something that

25   concerned me in my initial review and is something I remain

P18DJohC1

1      concerned with today.

2              I'll let you know, because I'm sure you've all been

3      looking for them, there are very few cases discussing sanctions

4      for social media postings.  Sometimes the social media posting

5      is evidence in the underlying case.  All right?  Its

6      significance is the posting precipitated the litigation.  But

7      here it's a question of social media postings occurring

8      concurrent with the progress of litigation.

9              I've seen two courts in other jurisdictions really

10     grapple with the First Amendment issue, so I'd appreciate your

11     thoughts on them.

12             MR. GILLER:  Your Honor, similarly, we have not seen

13     yet published decisions in the Second Circuit specifically

14     dealing with this issue.  I don't think there's a First

15     Amendment issue here.  For that reason, we have not yet filed a

16     motion seeking any type of gag order.  We're mindful of the

17     First Amendment.  We're not seeking to shut down Mr. Johnson's

18     ability to speak at all.

19             What we're trying to do is stop him and make him --

20     sanction him for what he has done so far, which is, like I

21     said, make comments -- clearly implied physical threats,

22     antisemitic comments.  The First Amendment doesn't protect his

23     right as a litigant to attack counsel, and I don't think

24     there's --

25             THE COURT:  Where do you see the antisemitic comments

P18DJohC1

1   in these postings?

2        There's a reference to the IDF, which I didn't quite

3   understand, and perhaps that is it.  Is there something else,

4   sir?

5        There's a posting that speaks about it, is not wise to

6   hire an attorney who is a lobbyist for Huawei, or one who works

7   closely with the Israelis.  So I just assume any time "Israel"

8   is mentioned it's a code word for antisemitism --

9        MR. GILLER:  Your Honor, I think it's a code word for

10  "counsel is Jewish," and that was one of the first comments he

11  made a year and a half ago.  I don't have a public position.

12  I'm not an official.  I don't post or tweet or make public

13  statements about my views on Israel.  Any comments about a

14  connection to Israel are clearly meant as an attack on my

15  religion.  I don't think there's any other way to read that.

16  There's no actual connections.  So if he's making a comment

17  about it, it's only because I'm Jewish.  What else could it be?

18       There's no defense to that, and there shouldn't be.

19  The First Amendment doesn't protect his right to do that.

20       THE COURT:  Please continue, sir.

21       MR. GILLER:  I'm sorry.  I thought I addressed the

22  points your Honor raised.

23       THE COURT:  You have.  Are there any other issues you

24  want to engage in based on my discussions with Mr. Kleinman?

25  For example, he discussed lesser sanctions.  You'll tell me,

1  no, this has been going on too long, things of that --

2         MR. GILLER:  Your Honor, this was the lesser sanction.

3  We didn't come to you requesting a gag order.  We didn't come

4  to you requesting something more severe, like striking what we

5  believe is a frivolous claim.  We just came to you saying, the

6  bare minimum is the letters we've had to write and the time

7  we've had to spend on this, he should have to pay for.  It's

8  been long enough.  It's time to stop this.

9         THE COURT:  Okay.  Could you please tell me, and if

10 you have already, excuse me, I just want to understand the

11 sequence of events.  Mr. Kleinman recalls sending a settlement

12 offer to you at a particular time sometime before Christmas.

13 Do you believe this is the settlement offer being referenced in

14 these December 18 postings?

15        MR. GILLER:  I'm not going to begin to guess what is

16 in Mr. Johnson's mind when he posts these things.

17        Yes, we received an email expressing some interest

18 about a settlement, but the way it addressed it is, Mr. Johnson

19 is looking to get back into the company, be part of the

20 company.  He is not part of the company now, and it should come

21 as no surprise there is no interest in having him be part of

22 this company.  Not now.  Not ever.  They are not going to

23 engage in settlement with someone who has done the things he

24 has done.

25        There was a reason he was wound down and separated

P18DJohC1

1   from the company several years ago, and that hasn't changed.

2   They don't have an interest in getting back into business with

3   Mr. Johnson.

4          So, yes, an outreach was made, and we responded and

5   said there was no interest in the outreach.  And there's no

6   interest in paying off Mr. Johnson, if that's what they're

7   suggesting.  One of the tweets makes reference to a payment or

8   a settlement, suggesting there is a number.  There's zero

9   interest here, because our view is there's nothing owed to

10  Mr. Johnson in this case.

11         If your Honor recalls, this is only about a breach of

12  contract at this point.  The other claims were all dismissed.

13         THE COURT:  Yes.

14         MR. GILLER:  The contract -- did he bring any business

15  to the company?  Was he the initial source of business they

16  signed up and got paid on?  The answer is no.  So there's no

17  interest in having him do anything.  If he actually had done

18  that, they would have just paid him for his work and been done

19  with it.

20         So there's no interest in this suggestion of

21  reengaging with him as part of this business.

22         THE COURT:  I see.  Just so I understand, the emails

23  and social media postings that were attached as exhibits

24  suggested that Mr. Johnson was offering to pay a price for part

25  or complete ownership of Clearview.  I don't know the specifics

P18DJohC1

```
1    of the offer, but was that in substance what was happening?
2              MR. GILLER:  No.  That didn't happen.  That didn't
3    happen.
4              THE COURT:  Okay.  Because there's a --
5              MR. GILLER:  No.  I know what you're referencing, your
6    Honor.  That didn't happen.
7              THE COURT:  There was no -- let me make sure I
8    understand this.  Mr. Johnson at no point offered to pay any
9    money to Clearview for part or complete ownership of the
10   company?
11             MR. GILLER:  Your Honor, no.  I have no recollection.
12   There was certainly no offer of any specific amount.  I don't
13   recall there being even an offer of anything, like in terms of
14   a concept of buying into the company, so no.
15             THE COURT:  I see.  So there are multiple references
16   here to a price that Mr. Johnson offered for Clearview AI.  You
17   have no knowledge of what that price is?
18             MR. GILLER:  No.  No.  I know that is a false
19   statement.  That is a false statement.  There is no price that
20   was offered.  I don't know in the five-point -- you know, hey,
21   we'd like to see if we can settle this and get into the
22   business, or we'll buy you out, like a general statement, I
23   don't recall.  I don't believe there was that.  But I do recall
24   specifically there was no number offered or settlement proposal
25   the way that that post suggests.
```

P18DJohC1

1          THE COURT:  I see.  All right.  I'm imagining, because

2     I imagine that you're an attorney who abides by his

3     professional responsibility obligations, that any offer you

4     received was communicated to your client.

5          MR. GILLER:  Immediately, your Honor.

6          THE COURT:  Right.  They rejected it?

7          MR. GILLER:  100 percent.

8          THE COURT:  All right.  Thank you very much.

9          Mr. Kleinman, do you want to be heard in reply on

10    these issues, sir?

11         MR. KLEINMAN:  Yes.  Just a couple of things, Judge.

12         I don't know that references to IDF, to Israel, or to

13    Prime Minister Netanyahu in a negative context constitute

14    antisemitic comments.

15         THE COURT:  There's no reason why the -- why would

16    they be mentioned at all in the context of this litigation,

17    sir?

18         MR. KLEINMAN:  I don't know, but I'm just asking

19    whether references to IDF or Israel automatically are code to

20    antisemitic comments --

21         THE COURT:  I might even agree with you in other

22    contexts, except in this case, and its history, I have see no

23    other reason to make mention of the IDF or Israel or Prime

24    Minister Netanyahu.  It's not an issue in this case.  It's not

25    a fact that came up in the history of this case.  So I can only

P18DJohC1

1  intuit that it's a code word, a dog whistle, as it were, for

2  antisemitism, because there's no other reason to mention it in

3  this case.

4       MR. KLEINMAN:  I would respectfully disagree, Judge.

5       THE COURT:  You haven't given me another basis, sir.

6  You haven't given me a better reason why it's being mentioned.

7       MR. KLEINMAN:  I don't -- I don't think that people

8  making references to Israel or that is an antisemitic comment.

9       THE COURT:  Then let's back up.  Your client made

10  mention of counsel's religiosity in prior tweets.  I said he

11  could not.  He now makes reference to the IDF and Israel and

12  Prime Minister Netanyahu, in a case in which none of those

13  matters.

14       Now, if you've said to me -- you've respectfully

15  disagreed with me why he might be mentioning it, but you cannot

16  give me another reason why he's mentioning it.

17       MR. KLEINMAN:  At this point, I think I cannot give

18  you a specific reason.  I just do not think those are code

19  words for -- I just don't see it, Judge.  I mean, if I'm in

20  litigation, and it's an unrelated case, okay, nothing to do

21  with Israel, and someone says in it, well, Mr. Kleinman, you

22  know, has purchased trees in Israel, and it would be -- to me

23  it would be "I have no idea what you're talking about, and it

24  has nothing to do with it," and I don't take it as antisemitic.

25  I take it as a comment that has nothing to do with the case.  I

P18DJohC1

1    mean, as a Jew, I would tend to disagree with that, Judge.

2            THE COURT:  I don't see any other reason for your

3    client to make mention that it is not wise to hire an attorney

4    who works closely with the Israelis.  What does that mean?  It

5    has no relevance, other than as an indicator of his

6    religiosity.  It has no relevance.

7            MR. KLEINMAN:  It might relate to some discovery in

8    the case.  I don't know.  I just don't know, Judge.

9            THE COURT:  Okay.

10            MR. KLEINMAN:  I don't -- you know, I've tried drug

11    cases, and DEA guys get on the stand and talk about code and so

12    forth.  And you know that.

13            THE COURT:  Yes.

14            MR. KLEINMAN:  Right.  But I've never heard anyone get

15    on the stand and say, well, any time someone talks about

16    "Israel," they're clearly an anti-Semite.  And I don't know how

17    anyone would be qualified as an expert to say that.

18            I just want to make an observation.  There was, in the

19    offer to settle, okay -- it was a specific offer, and it was --

20    my client asked me to communicate an offer to actually purchase

21    Clearview.  There was no number.  And I just want to -- and as

22    your Honor well knows, in any negotiation to settle a case,

23    your initial offer is not your bottom line offer.  I just -- I

24    made an offer, a detailed offer.  I laid it out.  And I didn't

25    say, one to 23 -- I said like five specific points, with some

P18DJohC1

1  detail, and I anticipated that there would be, hopefully, a

2  response.  And in a lot of cases, hopefully, a response other

3  than saying, no, again, not interested, as opposed to saying,

4  well, we're not -- as opposed to saying, if you're talking

5  about buying the company, what's your number?  I want to make

6  that clear, there was no number, but there was an offer to

7  purchase the company.

8      THE COURT:  You said there was an offer to purchase

9  but no number, but your client then reaches out to these

10  individuals and says, I want you to know that the price I

11  offered for Clearview AI, that your attorney rejected, was very

12  real.  But there was no price offered.

13      MR. KLEINMAN:  I don't recall a price in my email.

14      THE COURT:  Exactly.  So criticizing, going after

15  these individuals for rejecting or for not accepting an offer

16  that has no numbers, seems strange.  More than that, he says

17  "I'm sending you this message now because I don't have

18  confidence that your attorneys are, in fact, your attorneys."

19      We've been in this case for more than a year, how

20  could he not think that Mr. Giller, who he has criticized so

21  clearly in the past, is not counsel to these people?

22      MR. KLEINMAN:  I don't know.  Maybe in some

23  metaphorical, sense, Judge.  I don't have an answer to that.

24      THE COURT:  It seems to me he's trying to make an end

25  run around the reason for having attorneys in the first place,

P18DJohC1

1   which is so individuals don't get harassed by adversaries

2   during litigation.

3         But I will accept your offer letter had an offer to

4   purchase with no number.  It makes no sense that your client is

5   reaching out, berating these individuals for not accepting a

6   number that was never communicated, but that's where we are.

7         MR. KLEINMAN:  Right.  And I just want to, also -- as

8   I said initially, and I laid out in my letter, my client has

9   raised serious concerns as a shareholder, and his family has

10   shares in the company.  And as I put forth in my letter, there

11   are significant issues that my client feels the way the company

12   is being managed, that affects the valuation of the company,

13   which if my client -- I mean, although Mr. Giller says that

14   it's completely spurious, this lawsuit, your Honor dismissed

15   most of the counts, but you've kept one cause of action.  So at

16   least it has one cause of action that was not subject to being

17   dismissed under Rule 12.  So I assume, if you had found that

18   cause of action completely specious, you would have dismissed

19   that as well.

20         THE COURT:  Well, I'm bound by Rule Six.  I have to

21   accept the well-pleaded allegations of the complaint.

22         MR. KLEINMAN:  Right.

23         THE COURT:  Which I did.  But the fact your client may

24   have concerns about how the company is run and, therefore, its

25   resulting obligations either on a per share or an aggregate

P18DJohC1

1    basis does not to me equate to announcing there's collusion,

2    criminal conduct, the need for law enforcement to get involved.

3            Also, I imagine, unless you cannot tell me because of

4    privilege, you haven't actually referred this case to any law

5    enforcement agencies.  Have you?

6            MR. KLEINMAN:  I have not, Judge.

7            THE COURT:  Because it says he'd be instructing his

8    attorney to do just that.  Maybe that happens tomorrow, but it

9    hasn't happened today.

10           MR. KLEINMAN:  I avoid any contact with law

11   enforcement as much as I can, Judge, so I have not contacted

12   any law enforcement agencies, at least to my recollection.

13           THE COURT:  I think you'd remember, sir.

14           MR. KLEINMAN:  But, you know, I'm just trying to reach

15   some accommodation here so the case can move forward, Judge,

16   and that there is no acrimony.  And this is the first time in

17   court I think -- I don't know if Mr. Giller's been in court

18   before, but at least for me in this case.

19           THE COURT:  All right.  Thank you.

20           Just please give me a moment.  Thank you.

21           (Pause in proceeding)

22           THE COURT:  Thank you very much for giving me a chance

23   to think about this.  I have been addressing these issues for

24   more than a year, but I still remain concerned both about the

25   Second Circuit's case law and the imposition of sanctions and

P18DJohC1

1    Mr. Johnson's First Amendment rights.  So I'm aware that I have

2    to consider the conduct, the length of time over which it's

3    occurred, and the efficacy of any lesser sanction, and I do

4    understand what defense counsel is saying is that they're

5    asking for a lesser sanction.  They could be asking for

6    termination of the case.

7           But I'm also thinking about what Mr. Kleinman has

8    said, about possibly having some greater efficacy if I could

9    speak to Mr. Johnson, and he is here, and I am now speaking to

10   him.

11          So let me say this, Mr. Johnson.  I think what you're

12   trying to do is try this case in social media, in addition to

13   this courtroom.  I think it is inappropriate.  I think it

14   allows me to do a number of things, including impose sanctions

15   and including terminating your case.  But, on the off chance

16   that you didn't understand it and need to be advised of it now,

17   I am telling you now what you can and cannot do.

18          You cannot reach out to any of the defendants in this

19   case.  Every contact must be done through counsel.

20          You can make no social media postings regarding

21   counsel in this case, because I will understand that any

22   posting, no matter how benign it may seem, is an effort to

23   undermine the order that I'm now imposing and is an effort to

24   intimidate defense counsel, which I will not let you do.

25          I can't exclude the possibility that there is a

P18DJohC1

1  legitimate, non-vexatious, non-intimidating reason for you to

2  post about this case.  Maybe it exists.  But you were warned

3  any postings about this case bring with them a high likelihood

4  that I impose sanctions.  The sanctions will begin with fines,

5  but they will very quickly progress to either the exclusion of

6  claims or defenses or the termination of the case.

7          So today I am denying without prejudice the request

8  for fees.  If this continues after today, then all bets are

9  off, and I might even consider allowing counsel to renew the

10  motion for fees, because this is getting old.

11          Mr. Johnson, is there anything that I have said that

12  is confusing to you this morning, sir?

13          MR. JOHNSON:  No, ma'am.

14          THE COURT:  Fine.  Then we have an answer on that.

15          Let's please turn to discovery, and this time I'm

16  beginning with Mr. Giller.

17          Mr. Giller, I'm trying to figure out how one goes from

18  I think three and a half million documents to under 2,000

19  pages, but that's a question I'll be having and sharing with

20  the parties.

21          May I understand this, please, sir?  Did the parties

22  agree on search terms?

23          MR. GILLER:  No, your Honor.

24          THE COURT:  Okay.  So tell me your recollection of

25  what happened, and then I'll hear from Mr. Kleinman.  But I am

P18DJohC1

```
1    focusing on the document production issue in the first

2    instance, sir.

3              You issued requests for the production of documents,

4    sir?

5              MR. GILLER:  Correct, which we believe to be targeted

6    to the one claim left on plaintiff's side for breach of

7    contract and to our counterclaim, as the Court may recall, for

8    breach of contract for statements ridiculing defendants, which

9    we know to exist.

10             So we tried to target it to those two issues in the

11   case, or the main issues in the case.  I think we served those

12   in accordance with the Court's order back in July, and we

13   received numerous requests for more time and more time.  And we

14   were accommodating despite our inclination not to be.

15             THE COURT:  Please remind me, when did counsel change

16   for Mr. Kleinman?  You can tell me when it started.

17             MR. GILLER:  Counsel changed before we served the

18   requests.

19             THE COURT:  Thank you.

20             MR. GILLER:  And we gave multiple extensions until we

21   finally got written responses.  And we weren't getting

22   documents, and eventually -- that was only --

23             THE COURT:  Your colleague can speak.  She's allowed

24   to speak if she wants.

25             MR. GILLER:  No.  No.  She knows that.
```

P18DJohC1

```
 1                  THE COURT:  Go ahead.

 2                  MS. BENNER:  Thank you, your Honor.

 3                  It was around November 13 that we finally received

 4      responses, or the 23rd, around then.

 5                  THE COURT:  Were there document requests served by

 6      Mr. Johnson on your clients?

 7                  MR. GILLER:  There were, your Honor.

 8                  THE COURT:  Have they been responded to?

 9                  MR. GILLER:  They have, your Honor.

10                  THE COURT:  Have there been any meets or confers about

11      the adequacy --

12                  MR. GILLER:  I --

13                  THE COURT:  Let me finish, sir.

14                  MR. GILLER:  I'm sorry.

15                  THE COURT:  Any questions about the adequacy of

16      responses?

17                  MR. GILLER:  We received a letter the day before

18      Christmas, and we were able to respond yesterday.

19                  THE COURT:  I see.  So that may be something that's

20      coming in the future.

21                  MR. GILLER:  I suspect it will be, your Honor.  Yes.

22                  THE COURT:  So I imagine the answer to this is yes,

23      but have you had other litigation where the parties sort of got

24      together in advance and agreed on search terms and custodians

25      for the production of documents?
```

P18DJohC1

1          MR. GILLER:  Many times.  It's not every case for

2     sure.  Sometimes people produce the documents they're supposed

3     to produce, and other times they don't.  Here, frankly, I --

4     let me say, we didn't have that conversation here.  Counsel

5     responded to the request, and then ultimately produced what

6     I've described.

7          I assume you've seen the letter we wrote to Judge

8     Netburn.

9          THE COURT:  Yes.  Why is it going to Judge Netburn?

10    The case is not referred to her.  She's designated magistrate,

11    but I have not referred the case for general pretrial.

12         I told her last night that the issue is perplexed as

13    to why this letter was sent to her, but that I would handle it.

14    So it's all me.  None of this case is referred to her at this

15    time.

16         MR. GILLER:  I misunderstood.

17         THE COURT:  That's all right.  Other judges do

18    reflexively refer pretrial supervision to the magistrate.

19         So you can bring your complaints to me, but I did read

20    it, and that's exactly why we're having this conversation.  So

21    go ahead.

22         MR. GILLER:  Yes.  We wrote the letter to explain

23    where we were.  So sticking to the documents, we received 1,800

24    pages.  Your Honor, I can only describe it as someone went

25    through emails, cut and pasted emails, cut out headers, cut out

P18DJohC1

|  | pertinent information about senders, recipients, or dates, and |
|---|---|
| 1 | pertinent information about senders, recipients, or dates, and |
| 2 | pieced them together.  It is impossible to wade through.  I |
| 3 | mean, we've -- |

1  pertinent information about senders, recipients, or dates, and

2  pieced them together.  It is impossible to wade through.  I

3  mean, we've --

4          THE COURT:  Do you have them here?

5          MR. GILLER:  No, I don't.  I'm sorry.  I don't have

6  them with us.

7          THE COURT:  No.  That's okay.  You didn't know I'd ask

8  for them.

9          But is it the text, without any indication to whom --

10          MR. GILLER:  It's one lengthy, run on document.  You

11  can see it's sliced together from different emails.  Somebody

12  clearly went through and copied emails into a document and

13  copied another email below it and then just created this

14  document that way.  Certainly not documents kept in the

15  ordinary course of business in any fashion, and which is why

16  part of our request is I want the original of these emails now.

17  I don't want to figure out if somebody, Mr. Johnson, did these,

18  and at this point, in light of what we've seen, I think we're

19  entitled to start --

20          THE COURT:  I might not disagree with you, although

21  I'll be talking to Mr. Kleinman about that.  I was concerned,

22  though, about asking for search terms he's used, because I was

23  concerned it might implicate work products issues.  I would

24  have thought there could be a meet and confer on search terms.

25          MR. GILLER:  There hasn't been.

P18DJohC1

1              THE COURT:  Yes.

2              MR. GILLER:  Maybe there should have been.  I don't

3    know.  But this is what we got back.

4              THE COURT:  Okay.

5              MR. GILLER:  When it's represented as 3 million pages

6    the attorney received from his client and then you get back

7    1,800, it raises questions.  Well, what was done?  Why did you

8    get 3 million and why did only 1,800 purport to be relevant?

9              And, by the way, none of them actually seem to be

10   relevant.  They're not about the issues in the case.

11             THE COURT:  If you could pause, I actually understood

12   3.5 million files, which to me is not necessarily pages.  It

13   could be more.  It could be fewer.  But, yes, was that correct,

14   that it was files?

15             MR. GILLER:  Yes.

16             THE COURT:  Okay.  So 3.5 million files got reviewed

17   and yielded 1,687 pages, but you're suggesting perhaps that a

18   page could have multiple emails on it, because it sounds like

19   it's one long run-on email.

20             MR. GILLER:  Right.

21             THE COURT:  Okay.

22             MR. GILLER:  Right.  So they're not -- the emails we

23   did receive, they're not the complete emails.

24             THE COURT:  Is it only emails?  You didn't receive --

25             MR. GILLER:  Only emails.  We didn't get text

P18DJohC1

1    messages.  We didn't get social media.

2                THE COURT:  Slow down, please, for the court reporter

3    and judge.

4                MR. GILLER:  Sorry.

5                THE COURT:  Just emails, no attachments, no documents,

6    and --

7                MR. GILLER:  No.

8                THE COURT:  Weren't there documents in this case?  One

9    would have thought -- okay.  You've addressed a concern that

10   social media platforms and other things may not have been

11   searched.

12               MR. GILLER:  We didn't receive any.  We know from what

13   we've seen, they exist and are directly relevant to the claims

14   in the case, criticizing the defendants, so we know they're out

15   there.  Even the ones that are part of the case in terms of

16   being attachments to prior pleadings and letters wasn't

17   produced, nothing, nor anything else, nor text messages that we

18   have an understanding have been sent out to investors and other

19   people.  So it does not appear any of that was done.

20               We also have no idea at this point, in light of

21   suspension of his account with X, are those documents gone?  Is

22   it possible to get them?  There may be a spoliation issue now

23   on top of everything else.

24               THE COURT:  There was at least an effort at a meet and

25   confer on or about the 23rd of December.  Did it happen, or was

P18DJohC1

 1    there more --

 2              MR. GILLER:  It happened.

 3              THE COURT:  More at the scheduling stages?

 4              MS. BENNER:  Your Honor, I spoke to Mr. Kleinman at

 5    the time.  He said he was still working with his client, didn't

 6    have a response for us.  At the time, it had been almost a

 7    month since we served our deficiency in reference to the direct

 8    request for admission, and I think over two weeks since we

 9    served our deficiency letter in response to the document

10    production and interrogatories.

11              So at that point we said we'd be going to the Court,

12    because, as your Honor had already ordered, they had already

13    got the discovery extension, and this case couldn't be delayed

14    any longer.

15              THE COURT:  All right.  May I ask a different

16    question, please, about the requests for admissions?

17              I think you all know, Mr. Kleinman knows, I come from

18    the criminal side of the house, so request for admissions are

19    not a thing for us.  Before that, I was in securities

20    regulation, also not a thing for us.  It's interesting to me,

21    if you want to get Mr. Johnson to acknowledge that he made a

22    particular statement, that he sent a particular correspondence,

23    that he sent a particular text, I found a little bit more

24    tricky this idea that he'd have to admit that the

25    correspondence impugned, attacked, or was otherwise critical of

P18DJohC1

1   Clearview.

2       So I guess that's the one area in your submission

3   where I -- and perhaps the interrogatories as well, I get it.

4   It's sort of akin to a contention interrogatory, but I'm

5   surprised to see -- I'm surprised that I could force him not

6   only to admit that he made a statement, but that the statement

7   was somehow critical of Clearview.  I would have thought that

8   that's what the jury gets to decide, or I get to decide in some

9   later dispositive hearing.

10      So can you help with that?

11      MR. GILLER:  He can take whatever position he wants in

12  response, but what he can't do, though, is say he doesn't

13  understand an interrogatory, and the request for admission,

14  which is what he did with a lot of the requests for

15  interrogatories, which is part of the problem.  We quoted the

16  language from the agreement he signed and is suing on and just

17  said, that's the language you agreed to.  Did you do those

18  things that you said you weren't to do?

19      So I think it's a proper request for admission.

20  Interrogatories is a different question with Southern District

21  local rules.

22      THE COURT:  Exactly.  Yes.

23      MR. GILLER:  We understand that.  We understand some

24  of the questions are stepped over, and we're not pursuing those

25  at this stage.  I understand at the later litigation, in the

P18DJohC1

next step, I can ask for those again.  But that's, frankly,

also why we did requests for admission, because in civil cases,

we are allowed to do that, ask him to do something.

        If he wants to say he didn't do something, I'll put

the statement in front of him and he can say it's his

statement, and I can make an argument to your Honor that that

attack or ridicule is in violation of the agreement.  That is

where it will go.  But I'm entitled to ask the question.

        THE COURT:  I hear you in part.  I just wondered, if

plaintiff objects, saying -- impugns a text or is otherwise

critical, it still defines -- I guess what you're saying is,

well, that may be, but that's, in fact, the language from the

contract.  You didn't make up these terms.  These are terms in

the contract, correct?

        MR. GILLER:  It was a direct quote out of the

contract.

        THE COURT:  Because it does seem at times you're

asking him to admit liability on the counterclaim, and that may

be where it is, but I appreciate it, so -- I have the concerns

I have about the interrogatories.  I've expressed to you the

concerns I have about the document requests.

        With respect to what is on your pages four and five

regarding specific deficiencies, I'm not disagreeing.  I think

those materials, if they exist, should be produced, but I'll

turn to Mr. Kleinman on that.

P18DJohC1

1          What else, before I turn to Mr. Kleinman, should I

2    know?

3          MR. GILLER:  If I could cut to the chase, there are

4    two big issues.

5          THE COURT:  Sure.

6          MR. GILLER:  Could we please -- for the record, my

7    name is Giller.  He refers to me as Gillers throughout his

8    correspondence.  It's Giller.

9          THE COURT:  Okay.  I did it once, and I think that's

10   because --

11         MR. GILLER:  You corrected yourself.

12         THE COURT:  -- there's a professor Steven Gillers --

13         MR. GILLER:  Yes.

14         THE COURT:  -- who has appeared before me as an

15   expert.  So excuse me for confusing you with an expert on

16   ethics, but we are so advised.  As a woman who has her name

17   mispronounced regularly, yes, I appreciate it.  I'm sure it's

18   accidental.

19         MR. GILLER:  Yes.  To us, the core issue is simple

20   here.  There's a claim for breach of contract.  We're asking

21   for information, what information exists to show there was

22   somebody that Mr. Johnson actually brought to my client

23   Clearview that did business with them.  We have yet to see

24   that.

25         There's a lot of document requests.  There's a lot of

P18DJohC1

1    questions.  We're kind of covering our bases here, trying to be

2    thorough, but at its core, it's a simple thing.  If he had a

3    piece of paper that shows he actually made an introduction that

4    led to a sale, just produce it.  We're happy to take a look at

5    it and say, well, you made an introduction; you should get paid

6    on it; and we'll abide by the contract.  It's not an issue,

7    although he's now breached the contract, so I don't know if

8    they'd abide by anything at this point.

9         Regardless, you can't see anything -- we're a year and

10   a half into this litigation and I don't have a piece of paper

11   that supports that.

12            THE COURT:  Slow down.

13            MR. GILLER:  My apologies, your Honor.

14            THE COURT:  You're allowed to be passionate but we do

15   need to understand what you're saying.

16            But you're seeking documents on a counterclaim.

17            MR. GILLER:  And that's the other part, and we know

18   they exist, because we've all seen them on social media.  We

19   know they're postings that have done that.

20            What I don't have to a full extent is what other

21   postings he's done.  I know there's a blog that Mr. Johnson

22   puts out into the blog universe.  We know he has tweeted people

23   or texted people.  I don't have the full extent of the damage

24   he's done.  That's what we're trying to get to with those

25   requests.  I just want it put in context.

P18DJohC1

1          THE COURT:  So when you said to me a moment ago, you

2    wanted to cut to the chase, those are the two points you wished

3    to make?

4          MR. GILLER:  Yes, your Honor.

5          THE COURT:  Are there any other points you want to

6    make before I turn to Mr. Kleinman?

7          MR. GILLER:  That's all.

8          THE COURT:  Mr. Kleinman, I'll hear from you.  Thank

9    you.

10         MR. KLEINMAN:  Yes.  First of all, I didn't send --

11   after I got the defendant's responses to my demands, I sent a

12   notice of deficiency, and as far as the timing goes on all of

13   these, both parties have been operating within the same time

14   frame, making the demands and responding and so forth.  I mean,

15   I made my initial demands way back I think on July 29 if I'm

16   not mistaken, which is not long after I came in the case, and I

17   didn't get the response until I believe November.

18         So it's not as if both -- one party here has been

19   really adamant and out the shoot right away in providing

20   discovery and the other party has been lax in doing it.  I

21   think both parties have been lax in responding in a timely

22   basis, and I apologize to the Court for that.  Okay.

23         THE COURT:  What was the quantum of pages that you

24   received?

25         MR. KLEINMAN:  Now, that's the thing, Judge.  I didn't

P18DJohC1

1    know we were going to discuss this today, and let me just tell

2    you that, you know, I filed it -- after I got their response,

3    their discovery responses, I did file a notice of deficiencies

4    with them.

5              THE COURT:  Yes.

6              MR. KLEINMAN:  And I did not get until last night

7    about 5:00 a letter from -- I'm not sure who wrote the letter,

8    but an attorney for one of the defendants responding and

9    basically rejecting all of my notices of deficiencies.  So I

10   was planning on following up, and I was going to follow up with

11   defendants' counsel.  I don't want to mispronounce his name.

12   Nothing intentional.

13             THE COURT:  All right.

14             MR. KLEINMAN:  Okay.  I'm being a good boy.  Nothing

15   intentional about mispronouncing his name.  But I was going to

16   follow it up, and I thought that maybe he knew the rules better

17   than I did.  And also sent it to the magistrate judge, because,

18   as you said, I have a number of cases in district court, and a

19   lot of the times, most of the times magistrates handle

20   discovery.

21             So I was going to send a similar letter to the

22   magistrate basically saying we need the Court's intervention,

23   because I'm getting no response to my demands whatsoever,

24   because they were all, almost all of them rejected.  So I am

25   basically at a loss, or the Court is at a loss, because you

P18DJohC1

1   don't have any issues before it.

2          THE COURT:  I can have another conference, sir.

3          MR. KLEINMAN:  I understand that.

4          Okay.  As far as, you know, the discovery, as far as

5   the number of documents, my recollection is that I provided the

6   -- when I Bates numbered the documents, I did reference

7   specific pages that responded to specific demands.

8          What I did was accumulate or try to accumulate in one

9   document multiple emails, and if there were parts redacted,

10  they were redacted, because they may have been something sent

11  to myself.  Okay.  So I would redact.  If Mr. Johnson says

12  something to me, I would obviously not include that.  Okay.

13         THE COURT:  Sir, thank you.  Thank you.

14         MR. KLEINMAN:  Yes.

15         THE COURT:  There's a difference between producing a

16  document in its native format or producing a document as it was

17  sent and redacting things that were irrelevant or privileged,

18  and excising what you believe to be a responsive part of the

19  document, or putting it into a different document.

20         Do you agree with Mr. Giller that these -- that the

21  emails, as produced, were not as they were -- do not look as

22  they did when they were sent?

23         MR. KLEINMAN:  My recollection, Judge, again, it's my

24  recollection, I may be wrong, is that they looked like an email

25  that was like -- do you know what a header to the email looks

P18DJohC1

1   like?  It was the body of the email there.

2          THE COURT:  Sure, but if there were six or eight

3   emails that followed that, and those you believe are not

4   responsive, didn't you redact those?

5          MR. KLEINMAN:  Right, because if the demand was, let's

6   say, I want to know about -- did your client ever send an email

7   about, you know, what happened at the corner of Pitkin Avenue

8   and Eighth Street, and there's one email about it, and the rest

9   is like other emails having nothing to do with that, well, I

10  would excise those emails.  I would only respond -- the emails

11  would only be those responsive to the demand.

12         I tried to be as particular as possible, and I may

13  have engaged in some hyperbole when I said three and a half

14  million, because that's a nice, round number --

15         THE COURT:  Well, what was it, sir, then?

16         MR. KLEINMAN:  Actually, I do not know.

17         THE COURT:  No.  You can't -- that's problematic.  You

18  cannot tell your adversary you are reviewing three and a half

19  million files and then produce 1,687 pages.  I suppose you

20  could, and you can tell me that you went through three and a

21  half million files.

22         What did you review, sir?  Without --

23         MR. KLEINMAN:  I reviewed from -- Mr. Johnson provided

24  me with access to his emails, and I did searches on those

25  emails for what I felt were relevant terms, which were names of

P18DJohC1

1    the defendants and other key words that I did not -- we did not

2    have a discussion, which actually in a lot of cases I do set

3    forth parameters with my adversaries of what words to use.  And

4    that might have been a helpful thing to do, but we didn't do

5    that.

6         THE COURT:  Why not?

7         MR. KLEINMAN:  I don't know.  I mean, it was his

8    demands.  That's a good question.  We didn't do that.

9         THE COURT:  The phone does work both ways.

10        MR. KLEINMAN:  Neither of us suggested that, and that

11   may relate to their deficiency in providing documents to me is

12   I didn't provide parameters and words that should be provided.

13   That's true.

14        THE COURT:  What is the number of files that your

15   client gave to you?  Say you may have been hyperbolic.  Three

16   and a half million files, although it sounds like you used that

17   number to explain you needed more time to review.  How many

18   files did your client give you?

19        MR. KLEINMAN:  The total file count, the size of the

20   account was about 400 gigabytes of data, okay, which was a huge

21   amount of data, okay?  And I was able to get -- I had access to

22   his email account.  I don't know how many files -- I don't know

23   how many emails were in his total email folder.  And I used

24   that, and I did search terms, as I said, looking for the names

25   of Mr. Schwartz, and the names of Mr. Ton-That.  I'm not sure

P18DJohC1

```
 1   how to pronounce his name.  But I used those as parameters

 2   looking for what would be responsive, and I thought I had

 3   provided something that was responsive to him.

 4           THE COURT:  Again, I'm trying very carefully not to

 5   invade the attorney-client privilege, but did the materials you

 6   received from your client include more than his email accounts?

 7           MR. KLEINMAN:  As far as number of emails, yes.

 8           THE COURT:  No.  I mean, did it also include his

 9   social media account, sir?

10           MR. KLEINMAN:  I did not -- I don't believe I had

11   access to his social media account.

12           THE COURT:  Did not the request for production of

13   documents also require the searching of the social media

14   accounts?

15           MR. KLEINMAN:  I believe it did.

16           THE COURT:  Why then did you not review your client's

17   social media accounts?

18           MR. KLEINMAN:  I provided what I thought would be

19   responsive.  I thought I did provide actually some -- my

20   recollection is I provided some postings that were done from

21   social media actually.

22           THE COURT:  That's why I'm asking the question.

23           MR. KLEINMAN:  Yeah.  I think I did provide -- I asked

24   my client, and he sent me documents that were from his social

25   media account.  I kind of vaguely remember -- I don't have it
```

P18DJohC1

1    in front of me, but I thought there was a posting of a picture

2    of somebody at a certain point.  Not on an email.  Probably

3    like part of his posting on X or a posting on Substack, but,

4    honestly, I don't have it in front of me, so I can't answer

5    you.  I don't want you to hold me to that.

6         THE COURT:  Are there not documents, paper documents,

7    or electronic copies of documents that also would be responsive

8    to the requests that they made?

9         MR. KLEINMAN:  I don't have any documents that would

10   be -- any papers, documents that would be responsive to their

11   demand.

12        THE COURT:  You have no paper documents?

13        MR. KLEINMAN:  Correct, other than what I --

14        THE COURT:  One moment, sir, because you answered that

15   very carefully and I want to probe that.

16        You don't have any paper, documents that would be

17   responsive to their demands.  Does that mean you have paper

18   documents and they weren't responsive?

19        MR. KLEINMAN:  Actually, the only paper documents I

20   have is what has been produced in the record so far, okay?  I

21   mean -- yeah, I don't think I have any paper documents, hard

22   copy documents.  I don't think I have anything.

23        THE COURT:  Are there not agreements at issue in this

24   case?

25        MR. KLEINMAN:  Yeah.  Well, the wind down agreement,

P18DJohC1

1    which is part of this, is part of the record already.

2              THE COURT:  I understand, but your client I presume, I

3    would think had to produce it at some point.

4              MR. KLEINMAN:  Well, it's already in the record.  It's

5    already been produced.

6              THE COURT:  I understand it's in the record, but who

7    produced it?

8              MR. KLEINMAN:  I believe it was attached to the

9    original complaint.

10             THE COURT:  All right.  Therefore, you believe it

11   doesn't have to be produced again?

12             MR. KLEINMAN:  Well, if I'm mistaken, I guess I should

13   have produced an original copy, which is a copy which is part

14   of the record, yes.

15             THE COURT:  Mr. Giller is surprised to not see any

16   emails regarding bringing clients to Clearview.  Did you in

17   your travels notice any emails of that type?

18             MR. KLEINMAN:  Some of the emails I sent referenced

19   contacts between my client and certain individuals or business

20   entities, or I believe there were emails regarding contacts

21   with the Miami-Dade PD.  There were emails regarding contacts

22   with the Texas Department of Public Safety.  I think those were

23   contracts that may have been -- that may have come to fruition

24   that my client may have an interest in.  And I sent specific

25   references and emails regarding my client's specific contact

P18DJohC1

1    with those individuals.

2           I do remember, Judge, actually doing a search for

3    Miami, and PD, and Police Department.  I mean, I used my own

4    parameters that I felt would be responsive, okay?  So those

5    emails that I found I did send, my recollection is I did send

6    to Mr. -- to defense counsel.

7           THE COURT:  Sir, to the best of your understanding,

8    were there any other potential clients that were brought to

9    Clearview AI other than the Miami Police Department and the

10   Texas Department of Public Safety?

11          MR. KLEINMAN:  There may have been more that I've

12   learned of since the discovery demand.  I don't know.  I'd have

13   to look through my notes, Judge.

14          THE COURT:  But my reason for asking, sir, is if

15   you're in charge of providing the search terms for your search,

16   then you have to know what your client believes to have been

17   all of the clients he brought to Clearview AI, so you knew

18   about those two.  If you knew about other ones, I presume you

19   would have done searches that included their names as well.

20          MR. KLEINMAN:  Yes.  That's true.

21          THE COURT:  You have --

22          MR. KLEINMAN:  I didn't have any other names to do a

23   search for.

24          THE COURT:  The concern, Mr. Kleinman, that I have is

25   if you stand on this document production and say, this is all

P18DJohC1

```
 1    we had, then it may be that ultimately your client has shot
 2    himself in the foot, because there will be a summary judgment
 3    motion that will say, see, nobody was brought to Clearview, and
 4    you won't have anything to say in opposition to that.
 5              MR. KLEINMAN:  Well, subject to, you know, if there
 6    were any -- if the individuals who my client had contact with
 7    at Miami-Dade PD or Texas Department of Public Safety were
 8    deposed or provided information saying they did eventually
 9    contract with Clearview, and they did, you know, and they
10    didn't have any further -- they didn't deal directly anymore
11    with my client.  They only dealt with the defendants.  But my
12    client was the one who introduced them.
13              I mean, that is quite possible.  My client introduced
14    them.  They stopped dealing with my client completely.  They
15    being, let's say Miami-Dade PD, and only dealt with
16    Mr. Schwartz, or Mr. Ton-That, or whoever it was at Clearview.
17    And that's a contract that, as I understand it, my client might
18    be entitled to some commission for.
19              THE COURT:  Let me talk to you, please, about
20    interrogatories, sir.
21              MR. KLEINMAN:  Sure.  Again, I don't have the
22    documents in front of me, so --
23              THE COURT:  I understand.  To me, there are
24    deficiencies that are listed in pages four and five, purported
25    deficiencies in the responses to interrogatories.  From my
```

1    perspective, I agree with the defense that each of those should

2    have been responded to.  So, I suppose you could push back at a

3    later date, but from my perspective, interrogatory number six,

4    the prior litigations should have been identified.

5    Interrogatory number seven, the telephone numbers, phone

6    numbers, accounts, they should have all been identified.

7          So I'm just telling you, to the extent that you have

8    not responded to these interrogatories, which are six, seven,

9    12, 14, 16, 17, 18, 19, 20, and 21, I think they should be

10    responded to with this proviso.  With respect to

11    interrogatories 17, 18, and 19, I think the inquiry regards

12    statements by your client that attacked Clearview, Ton-That,

13    and Schwartz.  Then 20 and 21 documents were wherein your

14    client attacked the reputation of the defendants.

15          I can understand if you are wondering what does it

16    mean "to attack," what does it mean "to attack the reputation

17    of" then fine, then just identify the statements where he's

18    talking about them, and we'll figure out whether those things

19    are -- I just think -- I don't think the answer is not to

20    produce.  I think the answer you produce the statements in

21    which he's making mention of them and saying that you don't

22    believe it's critical.  But I'll listen to you if you disagree.

23          For the other ones, for interrogatories six, seven,

24    12, 14, and 16, I think they just have to be responded to.

25          MR. KLEINMAN:  Okay.  Can I assume you'll issue an

P18DJohC1

1    order specifically directing those specific interrogatories?

2              THE COURT:  I was doing this so I didn't have to, and

3    I am asking you to get the transcript of this, but I'll see

4    what I can do.

5              MR. KLEINMAN:  Okay.  I just want to be clear what I

6    need to produce.  That's all.

7              THE COURT:  All right.

8              MR. KLEINMAN:  I don't mean to give you more work.

9              THE COURT:  No.  No.  You're not the only one.

10             MR. KLEINMAN:  That's fair enough.  That's fair

11   enough.

12             THE COURT:  I feel the same with respect to the

13   production of documents, 21, 22, 23, 24, and 28.  As I've said,

14   I have a little bit of issue with the request for admissions,

15   but I've already had my discussion with counsel on that.  So my

16   view is those have to be responded to.

17             MR. KLEINMAN:  Okay.

18             THE COURT:  But the bigger issue is Mr. Giller has

19   said to me that he can't figure out where these emails come

20   from, because they're not produced as they were maintained in

21   the ordinary course of business, and they're not paired with

22   the document requests or interrogatories to which they are

23   responsive.  You've said no.

24             MR. KLEINMAN:  My recollection, Judge, is I've Bates

25   numbered, and if there was the same interrogatory 12, I put

P18DJohC1

1    down what Bates number pages responded to that.  That's my

2    recollection of what I did.

3           THE COURT:  Okay.

4           MR. KLEINMAN:  And I think that, again, I mean, I'm --

5    I have not had a chance to submit to your Honor, because you're

6    obviously handling the discovery issues, my own issues

7    regarding the fact that my demands were basically dismissed as

8    being, you know, the usual language, overbroad and burdensome

9    and what everybody says --

10         THE COURT:  I will take those as seriously as I'm

11    taking these.

12         MR. KLEINMAN:  I have no doubt, Judge.

13         THE COURT:  You have to let me know what they are.

14         One moment, please, sir.

15         At page three of Mr. Giller's letter, he expresses

16    concern because he just doesn't know whether your client's

17    social media platforms were searched and whether your client's

18    cell phone information, the stuff in his cell phone was

19    searched.

20         If you know, tell me.  If you don't know, I'll let you

21    go back and confirm that they were.

22         I would expect that it's not enough to look in your

23    client's email accounts, that you'd have to look in the cell

24    phone as well, and you'd have to look in the social media

25    platforms.

P18DJohC1

1          MR. KLEINMAN:  I just want to make one observation,

2    your Honor.

3          THE COURT:  Yes.

4          MR. KLEINMAN:  That my client told me, since he no

5    longer has access to X, that means he can't go back and get

6    everything he published on X.  That banning on X wasn't

7    something he sent an email and said please ban me from X.

8          THE COURT:  No.  Of course.

9          MR. KLEINMAN:  So they can --

10         THE COURT:  They'll make the spoliation argument, and

11   you'll say you had no idea it was coming until it came.

12         MR. KLEINMAN:  If they want to issue a subpoena to X

13   and get the documents that way, I guess that is a way to get

14   around it, but my client, since he has no other access to it,

15   he won't be able to produce information that was published on

16   X.

17         THE COURT:  Right now, today, if he tried to access

18   his account on X, he is just locked out?

19         MR. JOHNSON:  Yes, ma'am.

20         MR. KLEINMAN:  Yes.  That's what he told me.

21         MR. JOHNSON:  Yes, ma'am.

22         THE COURT:  That's what he told me, and hopefully he

23   won't lie to a Federal Judge.

24         MR. KLEINMAN:  I'm not sure what the solution is, but

25   as I said, if they want to issue a subpoena to X, I think that

P18DJohC1

 1   might be --

 2           MR. JOHNSON:  I can show your Honor if you wish.

 3           THE COURT:  Not at this time, sir.  Thank you.

 4           Are there other social media platforms on which your

 5   client has had an extant account or an account that was in play

 6   during the time period?

 7           I heard something about Substack.

 8           MR. KLEINMAN:  Something on Substack, and there might

 9   be some other.  I don't recall.

10           THE COURT:  Can I understand from you, sir, that you

11   will speak with your client to ensure that you have reviewed

12   those social media accounts to which he has access or can get

13   access?

14           I want to be sure -- you didn't read his Substack

15   account, did you, sir?

16           MR. KLEINMAN:  No, I did not read his Substack

17   account.

18           THE COURT:  But you're going to check.

19           MR. KLEINMAN:  I will check Substack postings --

20           THE COURT:  Would you check with him now when we're

21   all together whether he has any other social media accounts

22   that were in play during the time period of the events charged

23   in the complaint?

24           MR. JOHNSON:  Your Honor, the emails in the Substack

25   all go to the same place, and I turned them all over to

P18DJohC1

1    counsel, so there shouldn't be anything that's outstanding.

2            THE COURT:  Everything in Substack was turned over to

3    your counsel?

4            MR. JOHNSON:  The emails, the X's, all of that was

5    reproduced within the emails, and I gave them all to counsel,

6    so presumably they should have been included along with the

7    emails.

8            THE COURT:  Is it your belief, sir, then at least as

9    of the time you sent this information to your counsel, all of

10   your X postings were sent to your counsel?

11           MR. JOHNSON:  Yes, ma'am.

12           THE COURT:  And any postings made after the date you

13   sent those to your counsel would not be there?

14           MR. JOHNSON:  Presumably not, ma'am.

15           THE COURT:  Right, because you're not psychic.

16   Everything, the entirety of your Substack account, was sent to

17   your counsel, or was it that portion of the Substack that

18   related to Clearview?

19           MR. JOHNSON:  All of it.

20           So just to be clear, I was my first subscriber to my

21   own Substack, so I get my emails.

22           THE COURT:  Yes.

23           MR. JOHNSON:  Also, my other emails for my other

24   accounts, I was also a subscriber, so presumably it would be

25   triplicate.

P18DJohC1

| | |
|---|---|
| 1 | THE COURT:  Which is better than not having it at all. |
| 2 | And in terms of cell phone information, sir -- |
| 3 | MR. JOHNSON:  As far as I know, presumably -- |
| 4 | THE COURT:  Mr. Kleinman, I don't want to intrude on |
| 5 | your relationship.  I'll let you have that question. |
| 6 | MR. JOHNSON:  I have no objection to speaking to you |
| 7 | directly, your Honor. |
| 8 | MR. KLEINMAN:  No, this is not a problem. |
| 9 | THE COURT:  All right.  Go ahead, sir. |
| 10 | MR. JOHNSON:  I have no objection whatsoever. |
| 11 | THE COURT:  Just bring the microphone closer to you so |
| 12 | I can hear you. |
| 13 | MR. JOHNSON:  Yes.  So I was instructed by defense to |
| 14 | do most communications through Signal, a self-deleting app -- |
| 15 | THE COURT:  Okay. |
| 16 | MR. JOHNSON:  -- which I objected to at the time, |
| 17 | because we want to preserve records, because we're dealing with |
| 18 | federal agencies. |
| 19 | And since the time which my X account was suspended -- |
| 20 | and you will recall, just to be precise on this, your Honor, |
| 21 | that there are a number of people who are uniformed officers at |
| 22 | the IDF who work for X.  Their offices are located in Ireland. |
| 23 | Since this time, since I gave the communications with |
| 24 | counsel, which I have no interest in ever communicating with |
| 25 | counsel again, I have been contacted by federal law |

P18DJohC1

1   enforcement.  I have met with law federal law enforcement.

2              THE COURT:  You have or have not?

3              MR. JOHNSON:  I have.  I have.

4              THE COURT:  You have reached out --

5              MR. JOHNSON:  No.  They have reached out to me.

6              THE COURT:  Okay.

7              MR. JOHNSON:  Yes, ma'am.  The Department of Homeland

8   Security.

9              THE COURT:  Okay.

10             MR. JOHNSON:  If I may, your Honor?

11             THE COURT:  No.  I'm trying to disentangle everything

12  you told me in that paragraph.

13             MR. JOHNSON:  Yes, ma'am.

14             THE COURT:  So you're saying to me, first, I should

15  expect fewer communications than I would otherwise expect

16  because a lot of communications were through Signal, and there

17  are no memorialization of those communications?

18             MR. JOHNSON:  Yes, ma'am.

19             THE COURT:  Separately you're telling me you were

20  approached by DHS?

21             MR. JOHNSON:  Yes, ma'am.

22             THE COURT:  About this case?

23             MR. JOHNSON:  About this case, and specifically about

24  the defense.

25             THE COURT:  Okay.

P18DJohC1

1       MR. JOHNSON:  Counsel, as well as defendants.  Yeah.

2  And I'm happy to --

3       THE COURT:  You did not initiate these contacts, sir?

4       MR. JOHNSON:  No, ma'am.

5       THE COURT:  They reached out to you?

6       MR. JOHNSON:  Correct.

7       THE COURT:  You've spoken with them?

8       MR. JOHNSON:  I have, and I've met with them on

9  several occasions.

10       THE COURT:  Okay.

11       MR. JOHNSON:  And if I may, your Honor, if it would

12  please the Court, if it -- you know, I have no interest in

13  pursuing this matter further.  I'm embarrassed by the whole

14  situation.

15       THE COURT:  Which "this" is that, sir?

16       MR. JOHNSON:  "This" would be this case and my

17  particular claims, and I talked with counsel about this

18  earlier.  So I met with federal law enforcement, and I met with

19  them basically over the last few weeks now.

20       And I did not -- I'm, frankly, far from being an

21  investor, I feel as if I was a victim of an elaborate harm, and

22  I am embarrassed for my participation in it.  And I only

23  pursued the matter --

24       THE COURT:  Take a moment, please, sir.

25       MR. JOHNSON:  -- because my ex-wife and daughter are

P18DJohC1

1    shareholders, and I wanted to do right by them.

2           THE COURT:  Okay.  Did they ask you to pursue it, sir,

3    or did you want to do it on their behalf?

4           MR. JOHNSON:  Both.

5           THE COURT:  Okay.  Therefore, what?

6           MR. JOHNSON:  Therefore, I spoke to the press.  So my

7    wind down agreement was amended after I signed it.  So many of

8    the claims that are being made here were modified after I even

9    signed the contract, which I didn't even know you can do, but

10   apparently you can.

11          So I spoke to Kashmir Hill, because I was concerned,

12   having spoken to other friends of mine in federal law

13   enforcement, that the company was a front.

14          THE COURT:  Who did you --

15          MR. JOHNSON:  I spoke with Carl Wagner, who was

16   counter-intelligence for CNN.  I also spoke with Johnathan

17   Buma, who was my handler for many years with the FBI.

18          THE COURT:  Who was that, the second gentleman?

19          MR. JOHNSON:  Johnathan Buma.

20          THE COURT:  B-u-m-a?

21          MR. JOHNSON:  Yes, ma'am.  Johnathan, with a

22   J-o-h-n-a-t-h-a-n.

23          THE COURT:  Thank you.

24          MR. JOHNSON:  He's since no longer with the FBI.

25          And I also spoke with members of what I understand to

P18DJohC1

1  be helpful foreign intelligence, namely the French and the

2  British.

3            THE COURT:  Okay.

4            MR. JOHNSON:  And to be precise about it, a better --

5  counsel know -- to his Jewishness, my counsel is Jewish.  My

6  girlfriend is Jewish.  It's whatever.

7            For me, what I was informed of was there's a concern

8  that Clearview and the source code for Clearview has material

9  that's both Chinese and Israeli in origin.

10           And what happened, if I may, your Honor, is that many

11  of the attacks on my reputation began when Hal Lambert, who is

12  one of the board members of Clearview, approached me about

13  selling Clearview to an organization calling itself Friends of

14  the IDF, which I presumed to mean the IDF.  I think that's a

15  fair assumption, your Honor.

16           THE COURT:  All right.

17           MR. JOHNSON:  And so this defamation began, I was

18  swatted, had all sort of attacks against me.  I was helpful to

19  law enforcement in dealing with white nationalists, where I was

20  a confidential informant.  My code name was Genius.  I didn't

21  pick it.  Sorry.

22           And then, basically, the pretext of me being an

23  anti-Semite was used to steal my shares.

24           My mother lived in Israel.  My grandfather worked for

25  the CIA in Israel.  I have no beef with the Israeli people.

P18DJohC1

1    It's a lovely country.  I am against the killing of

2    Palestinians, as I hope we all are.

3           And then, just to be clear about this, I wanted to

4    warn the public and the press.  I'm obliged by my faith to

5    offer people an opportunity to settle, to do the right thing.

6    But having spoken to federal law enforcement, I don't believe

7    there's anything to really recover here, and I don't want to

8    waste the Court's time, certainly not a civil court.  And I've

9    made myself available to law enforcement in this country and in

10   other countries.

11          This is not -- you know, on social media, while I felt

12   I had to defend myself against my own defamation, I pulled down

13   all my social media accounts.  I agreed with my CO, or my --

14   whatever at the Department of Homeland Security, not to talk

15   about this case anymore.  And it's not because I don't think

16   the case has merit.  I wouldn't have spent millions of dollars,

17   both with Alston & Bird and Mr. Kleinman, who, by the way, has

18   done a much better job representing me than Alston & Bird,

19   which I understand is very close with the British Government,

20   which I learned when I was last in Britain this November.

21          So, you know, I apologize for anything I did to harm

22   the Court.  It was not my intention.  And I'm embarrassed by

23   the whole situation, to be honest with you.

24          THE COURT:  So what do you want me to do?

25          MR. JOHNSON:  I would like you to speak with the

P18DJohC1

1    several DHS officers, whose names I will give you.  I prefer to

2    do it privately.

3              THE COURT:  Oh, no.  I don't know how --

4              MR. JOHNSON:  You may not be able to do that, but --

5              THE COURT:  Right.

6              MR. JOHNSON:  If you like, I would want you to dismiss

7    my part of the case, or my -- or I would like you to dismiss

8    the case entirely, even though I'm bringing suit.

9              THE COURT:  I need to pause for a moment.

10             Mr. Kleinman, do you know the expression "bury the

11   lead?" I did not know this was coming.  I would have asked this

12   at the beginning.  I don't --

13             MR. KLEINMAN:  I'm not --

14             THE COURT:  I'm surprised by all of this.  Let's do

15   this, Mr. Kleinman.  Take a few minutes.

16             MR. JOHNSON:  No, we've spoken earlier.

17             THE COURT:  You've known this the whole time, Mr.

18   Kleinman?

19             MR. KLEINMAN:  Well, I've had some discussions with my

20   client about this, but I've not had -- I had a brief discussion

21   with him about the efficacy of filing a Rule 41(a)(2) motion.

22   Okay.  However, I explained to him that there are outstanding

23   counterclaims obviously.

24             THE COURT:  Yes.

25             MR. KLEINMAN:  I don't want to get into the area of --

P18DJohC1

```
1    I mean, this is not an area, with all due respect, that --
2              THE COURT:  That's a statement that you should -- let
3    me say this, don't ever say "with all due respect."  It's a
4    trigger for me.  It suggests you have no respect.
5              MR. KLEINMAN:  I'm glad you told me.
6              THE COURT:  That's why I told you.
7              My question is, do you want this case to proceed or
8    not?
9              MR. KLEINMAN:  My client has expressed a desire to
10   withdraw his claim.  And I will do that under Rule 41(a)(2)
11   obviously, because --
12             THE COURT:  But you're concerned about the
13   counterclaims.
14             MR. KLEINMAN:  My concern is there are counterclaims,
15   and if he withdraws his claim but is still involved in the
16   litigation and the cost and the expense of doing that --
17             THE COURT:  I understand.
18             MR. KLEINMAN:  I have not dealt with defense counsel
19   and given them any indication about this, because I had a brief
20   discussion with my client outside the courtroom now.
21             THE COURT:  All right.
22             MR. KLEINMAN:  So I'm kind of like not all the way
23   there.  Okay.
24             THE COURT:  Okay.
25             MR. KLEINMAN:  Before I get all the way there, I want
```

P18DJohC1

1    to make sure I have all the facts.

2              THE COURT:  Of course, Mr. Kleinman.

3              MR. KLEINMAN:  And let me say one other thing before I

4    get all the way there.  I want to make sure my client

5    understands the ramifications of whatever was done.  And I am

6    someone who has learned long ago to make sure I get those

7    acknowledgements in writing.

8              MR. JOHNSON:  I'm happy to make them in court right

9    now if that would please your Honor.

10             THE COURT:  I'm sorry, Mr. --

11             MR. JOHNSON:  I'm happy to make it right now if it

12   would please your Honor.  I understand the counterclaims

13   against me.  I understand.  When we began this process, I told

14   Mr. Kleinman, we're only going to do the right thing as far as

15   the country goes, and if I'm instructed by federal law

16   enforcement to pursue certain actions, I'm going to do that.

17   And so, though it does not feel good to be in this situation,

18   your Honor --

19             THE COURT:  Do you want to finish your thought?

20             MR. JOHNSON:  I would.

21             THE COURT:  Go ahead.

22             MR. JOHNSON:  I have met with federal law enforcement

23   and seen contracts and talked with the highest level of

24   authority at Homeland Security about this technology.  I'm not

25   saying it -- I have other investments, other things I have

P18DJohC1

1    backed.  And I am embarrassed by the situation.

2            THE COURT:  Sir, why are you embarrassed, if I may

3    ask?

4            MR. JOHNSON:  Because I have been made a fool.

5            THE COURT:  I'm not saying that.  By whom?

6            MR. JOHNSON:  My ex-wife is --

7            THE COURT:  Okay.  They're family.

8            MR. JOHNSON:  My wife and my daughter are

9    shareholders.  I deliberately set up the trust for them, so I

10   could speak publicly, knowing full well I could lose my shares,

11   because I thought it was the right thing to do.

12           THE COURT:  Okay.  Now, sir, a little while ago you

13   asked me about talking to Homeland Security.

14           MR. JOHNSON:  Yes, ma'am.

15           THE COURT:  The issue for me -- it's not that I have a

16   philosophical position.  It's not that I haven't spoken to DHS

17   folks, because I was a prosecutor before this.

18           MR. JOHNSON:  Yes.

19           THE COURT:  However, I don't know what I know.  I'm

20   the judge presiding over the case.  I have no firsthand

21   knowledge about anything.  So appreciate the thought, but I

22   don't think there's anything I can contribute.  So can we put a

23   pin in it a moment?

24           MR. JOHNSON:  Yes, ma'am.

25           THE COURT:  Mr. Giller, I'm just wondering if I could

P18DJohC1

1    talk to you, sir.  This is all new to me, and it raises a

2    really interesting question.

3              Perhaps I'll go off the record.

4              (Discussion off the record)

5              THE COURT:  We're going back on the record.

6              MR. KLEINMAN:  I just want to make an observation.  I

7    know this is new to defense counsel --

8              THE COURT:  And to Court.

9              MR. KLEINMAN:  -- and to your Honor.  And, as I said,

10   I wanted to have this discussion.  I just had this -- this was

11   given, communicated to me very, very recently.  And I had a

12   very brief opportunity before court to discuss this with my

13   client.  I did not have the opportunity to discuss this with

14   defense counsel.

15             And one of the reasons I want to say that I did not

16   file a request with the magistrate or your Honor to deal with

17   my problems with discovery was I wanted to make -- I wanted to

18   make sure that I wasn't wasting my time, billable time on an

19   issue when the case might be resolved.

20             THE COURT:  Of course.

21             MR. KLEINMAN:  Do you understand what I'm saying?  I

22   don't want to spend a lot of time killing a lot of trees when I

23   could only kill a few bushes and then the case is done with.

24   Got it?

25             THE COURT:  I appreciate the metaphor, sir.  I still

P18DJohC1

1     think you should have told me before an hour and a half into

2     this subject.

3              Do I understand, sir, on this record, that it's your

4     client's wish to dismiss the case with prejudice?

5              MR. KLEINMAN:  He's expressed an interest -- correct,

6     with prejudice.  Also, I have not discussed it, but I think

7     certainly, as far as any type of settlement, a

8     non-disparagement agreement and so forth, so we remove the

9     issues that --

10             THE COURT:  We would like a non-disparagement

11    agreement that --

12             MR. KLEINMAN:  We can include defense counsel.  They

13    can be part of it.  That's fine.

14             THE COURT:  Does your client wish this case to be

15    dismissed even if the counterclaims remain, or is it contingent

16    on the contemporaneous dismissal of the counterclaims?

17             MR. KLEINMAN:  That is not -- where I got as far as

18    the discussion --

19             THE COURT:  Okay.

20             MR. KLEINMAN:  -- and that's why I wanted to first

21    talk to Mr. Giller beforehand, and once I had all the

22    information, then explained to my client, well, if you kill

23    your claim, you've still got these defamation claims -- whether

24    they'll be successful or not, I don't know, but, you know,

25    that's for a jury to decide, whether there was defamation and

P18DJohC1

1   so forth.  And I don't know what the truth is, because I never

2   know what the truth is, so -- but I wasn't at that point is a

3   short answer.

4          THE COURT:  I do understand that.

5          Mr. Giller, does it make sense for you to talk to Mr.

6   Kleinman, for you to talk to your client?

7          I've got on the record what I've got on the record,

8   and I wonder if perhaps this transcript may one day be

9   requested to be sealed.

10          What do you want, sir?

11          I wish to do this.  I've given my answer on the first

12   part of our reason for our meeting, which was the sanctions.  I

13   was in the middle of discussing discovery.  I have in my head

14   drafted in part an order regarding discovery.

15          I know there's a possibility that there may be a

16   deficiency letter coming from defense and I'll have to do this

17   from the other side.  I'd like for myself to stop working on

18   discovery issues if there's a chance this case is going to be

19   dismissed.  So can I have that?  Can we stop this conference?

20          MR. GILLER:  Your Honor, of course, at the Court's

21   request, we're willing to stop.  I have some concerns, I'll

22   just put on the record, that there were false statements made,

23   there were incorrect statements made about discovery, about

24   even another claim that's been filed.  There's no defamation

25   claim that either side has filed in --

P18DJohC1

```
1          THE COURT:  I think there's an imprecision in the
2    claims, but I don't know --
3          MR. GILLER:  My point is there is a number of things
4    said in respect to the issues we're discussing that are not
5    accurate.
6          THE COURT:  Okay.
7          MR. GILLER:  I have a fear we'll walk out of here with
8    no agreement and I'm going to have to revisit all these issues
9    again and spend several more hours with the Court on this.
10          THE COURT:  Well, we're here now.  I apparently have
11    nowhere to go.  Do you want to talk to your client now?
12          Do you want me to give you my jury room so that
13    counsel can speak about this?
14          Because the issue, from my perspective, is I'm trying
15    to strike while the proverbial iron is hot.  I've been told,
16    there's an offer on the table to dismiss this case.  But I
17    understand your concerns, and Mr. Kleinman has some concerns as
18    well, because this hasn't really come to me in its fully formed
19    form.
20          I'm willing to stay here.  I can stay at the bench,
21    although that seems to be a bit of a waste.  I can stay in the
22    robing room.  You can talk to your client.  You can talk to Mr.
23    Kleinman.
24          If there's something you want to put on the record,
25    equivalent to a terms sheet, as to the conditions under which
```

P18DJohC1

1    this case gets dismissed, I will listen to you.  So to your

2    point about not wanting to lose -- to have this change and

3    morph into something else as soon as we leave, fine, then do

4    you have your phone here?

5              MR. GILLER:  I checked it in downstairs, your Honor.

6              THE COURT:  Okay.  My law clerk can help you get it,

7    or we can give you access to a phone.

8              MR. GILLER:  I'm happy to reach out to my client.  I

9    don't know if I can reach him now.  I'm happy to try.  I can't

10   make any representations about what they're willing to do

11   without talking to them.

12             MR. JOHNSON:  Your Honor, may I --

13             THE COURT:  No.  No.

14             Sir, I'm asking you what you want to do right now.

15   You had said to me you're concerned that this will, again, my

16   words, not yours, transmute or modify into something else, and

17   I understand that.  So I'm trying to see what we can do to

18   mitigate against that happening.  That's what we're able to do

19   now.  But if you think it's better to part, sleep on it, talk

20   to Mr. Kleinman, that's fine, too.  Just tell me what you want,

21   sir.

22             MR. GILLER:  I need to speak to my client.  My contact

23   at my client, I don't know that -- he has to speak to the

24   owners of the company.  I don't know if he can reach them

25   immediately.

P18DJohC1

1        I can get my client on the phone.  I suspect he might

2   have more difficulty reaching his -- if they're in different

3   parts of the country or whatnot.

4        MR. JOHNSON:  Your Honor, he should have controlling

5   shares of the company, so he could make the decision

6   unilaterally if he wanted to.

7        THE COURT:  This is who, sir?

8        MR. JOHNSON:  This is Ton-That.

9        THE COURT:  Ton-That.

10        Well, Mr. Giller, do you want to speak with

11   Mr. Kleinman?  I can give you a room to speak.

12        MR. GILLER:  It's not that I have an objection to

13   talking to counsel, but I can't do anything about the offer

14   that's on the table, which is to dismiss everything if we

15   dismiss, without speaking to my client, without --

16        THE COURT:  That's fine.  Do you want to end today?

17   Do you want to come back this afternoon?  I can do whatever

18   makes the most sense for the parties.

19        MR. GILLER:  Your Honor, I'm okay ending today in

20   light of the proposal.  It's on the record.

21        I'm going to have to trust a little bit that it wasn't

22   just made as some kind of subterfuge here.  I'll speak to my

23   client, and I'm sure he'll respond back if not today by

24   tomorrow.

25        And I'd just like the Court, if we could reconvene it,

P18DJohC1

1   if we could calendar it for reconvening fairly soon, in the

2   event it does not get dismissed immediately?

3            THE COURT:  All right.  Let me understand what this

4   means, sir.

5            Let's go off the record again.

6            (Discussion off the record)

7            (Continued on next page)

P18AJon2

| | |
|---|---|
| 1 | THE COURT:  During the time that we've been off the |
| 2 | record, we've been discussing a path forward for this case |
| 3 | depending on which fork in the road is taken.  We've also |
| 4 | talked about the possibility of having a date to resume the |
| 5 | discovery disputes that we've been having, and I've offered to |
| 6 | the parties Monday at 3:00 p.m. as a possible time to get |
| 7 | together and review discovery issues. |
| 8 | Right before we got back on the record, I was advised |
| 9 | by plaintiff that he has advised the Department of Homeland |
| 10 | Security that he will make no further public statements about |
| 11 | this case. |
| 12 | Mr. Johnson, have I said that correctly? |
| 13 | MR. JOHNSON:  Yes, ma'am. |
| 14 | THE COURT:  Thank you.  And, Mr. Kleinman? |
| 15 | MR. KLEINMAN:  I want to be clear on the record that I |
| 16 | was not withholding any information regarding possible |
| 17 | settlement, nor to sandbag my adversary.  This was just |
| 18 | something that was just dating, and I wanted to make sure my |
| 19 | client was fully aware of all the ramifications of any |
| 20 | decisions he made.  I had no intention -- it's not the way I |
| 21 | practice law, and I wanted to make sure I had all the facts in |
| 22 | writing before I made any type of representation to either the |
| 23 | Court or my adversary. |
| 24 | THE COURT:  And it may be the case, sir, that your |
| 25 | client, having jumped the gun, may not have been the advice you |

P18AJon2

```
1    would have given him.  And I understand that.
2              MR. KLEINMAN:  Correct.
3              THE COURT:  I will not take it as sandbagging.
4    Mr. Giller will not take it as sandbagging.
5              Mr. Giller, is there something else you want to add to
6    the record?
7              MR. GILLER:  No, your Honor, that's fine.
8              MR. JOHNSON:  To be precise, your Honor.
9              THE COURT:  Mr. Johnson, yes.
10             MR. JOHNSON:  We came at 3:00 in the morning today.
11             THE COURT:  Yes, sir.
12             MR. JOHNSON:  Precisely because I just met with
13   Homeland Security later, and it's a new development.  I gave
14   them my word to them that I intend to not speak publicly about
15   the case, to ask for dismissal of this case in my particular
16   thing.  So if there's any punishments or whatever, if they
17   intend to continue pursuing it, I have thought about the
18   matter, I've spoke within the requisite people, I talked to a
19   priest about it, for what it's worth, and I'm entirely
20   confident if you were to dismiss my claims, even if they were
21   to pursue them, I would continue to have that position because
22   of what I said to the Department of Homeland Security.
23             THE COURT:  Okay.  That's on the record.
24             Thank you all very much.  I'll hear from you as
25   quickly as I can.  Thank you again. (Adjourned)
```