**Gordon Rees Scully Mansukhani, LLP**
Ronald A. Giller, Esq.
Mallory J. Benner, Esq.
1 Battery Park Plaza, 28th Floor
New York, NY 10004
Tel: (973) 549-2500
Fax: (973) 377-1911
Email: rgiller@grsm.com
Email: mbenner@grsm.com
*Attorneys for Defendants Clearview AI, Inc., Hoan Ton-That and Richard Schwartz*

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES JOHNSON,<br><br>                    Plaintiff,<br><br>vs.<br><br>CLEARVIEW AI, INC., HOAN TON-THAT and RICHARD SCHWARTZ,<br><br>                    Defendants. | Case No.: 1:23-cv-2441 |

### AFFIDAVIT OF RICHARD SCHWARTZ IN OPPOSITION OF
### PLAINTIFF'S MOTION TO DISMISS

I, Richard Schwartz, of full age, hereby declare under penalty of perjury:

1. I am a co-Chief Executive Officer at Clearview AI, Inc. ("Clearview"). I submit this Affidavit in opposition to Plaintiff Charles Johnson's (hereinafter "Plaintiff") motion to dismiss Defendants' counterclaim.

2. I am over the age of 18 and understand the obligations of an oath. I am competent to testify as to the facts stated in this Affidavit. The statements below are based upon my personal knowledge, as well as my review of Clearview's business records.

3. In light of Plaintiff's statements, Clearview has suffered harm to reputation, business and client relationships. While the exact amount of damages are unknown at this time as discovery remains ongoing, the following are examples of the harm Clearview has suffered as a result of Plaintiff's breaches of the Wind-Down Agreement.

4. The confidentiality provisions in the Wind-Down Agreement were specifically negotiated to prevent reputational harm to Clearview arising from its former association with Plaintiff, whose reputation in the industry is widely recognized as negative.

5. It is undisputed that Plaintiff breached these provisions of the Wind-Down Agreement by disclosing his involvement with Clearview to the media, directly undermining the protective purpose of the Agreement and consequently, creating reputational fallout for Clearview by reattaching it to an individual known for unprofessional and unethical conduct. Not only did Plaintiff disclose his involvement with Clearview, but he disclosed the actual terms of the Wind-Down Agreement, providing the New York Times with a copy. The resultant article, entitled "Your Face Is Not Your Own," appeared in the New York Times Magazine on March 18, 2021, and described Plaintiff as a person with "extreme views and associations," and a "peddler of disinformation," tainting Clearview by association. This is precisely the type of reputational harm that Clearview sought to prevent by executing the Agreement, and significantly, Plaintiff's breaches of the Agreement directly enabled the publication of this harmful and widely misleading article. Another compendium article published in the New York Times the same day was entitled "What We Learned About Clearview AI's Hidden 'Co-Founder'", reinforcing the focus on Plaintiff's relationship with Clearview and the consequent negative impact on Clearview's reputation.

6. For example, it was also reported in the aforementioned New York Times article

that a potential investor refused to invest in the company, stating that Clearview's ties with Plaintiff "scared him off." *See* **Exhibit A**. This is just one example of the harm suffered as a result of Plaintiff's breaches of the Agreement; however, it is Clearview's belief that many prospective investors faced the same deterrent (which the company anticipates will be revealed in discovery), reducing the number of offers that the company would receive, resulting in less favorable terms, lower overall valuations, and less available capital that the company could deploy to fuel its growth.

7. Plaintiff also criticized Clearview in his Substack posts, claiming in one instance that Clearview was a failing, mismanaged company. Again, although difficult to quantify, this reduced Clearview's ability to secure favorable investment terms. Clearview believes investors were deterred from investing, as a result of these statements made by someone who represented himself as a "co-founder" of the company, ultimately contributing to lower fundraising outcomes.

8. Plaintiff also criticized Clearview to, at least, the New York Times and France24 – which are major media outlets - resulting in negative publicity about Clearview. Clearview's customers are government agencies that are inherently reputationally sensitive and his breaches certainly deterred some customers. Although difficult to quantify, this undisputedly reduced Clearview's ability to secure contracts and investments.

9. Plaintiff also disparaged Clearview to actual or prospective clients and investors, in private communications – significantly, a majority of which we are still waiting to receive from Plaintiff in discovery – which also caused damage to Clearview.

10. By way of an example, a potential investor, Founders Fund, informed former Clearview CEO, Hoan Ton-That, that there would be a "0% chance" that they could invest given

the "insane threats" Plaintiff made to their team members. *See* **Exhibit B**. This is yet another example of a lost investment opportunity due to Plaintiff's breaches of the Agreement.

11. By way of further example, Plaintiff's former counsel contacted Clearview in January 2021 to communicate a message from Plaintiff wherein Plaintiff alleged that Clearview was mismanaged and offered to buy out a significant percentage of the outstanding shares and raise further funding, and claiming that his effort was backed by several existing shareholders (which leads Clearview to believe that Johnson made statements that violated the Wind-Down Agreement in these discussions). *See* **Exhibit C.** Clearview anticipates Plaintiff's discovery will identify these shareholders and the statements Plaintiff made, which will allow the company to determine an estimate of the financial harm caused. At a minimum, Clearview estimates that Plaintiff's statements diminished Clearview's ability to raise additional funds from these shareholders – funds which could range anywhere from $25,000 to several million dollars.

12. By way of another example, in August of 2021, Clearview received an email from Plaintiff. In that email, Plaintiff stated "I wonder why your revenue so low… huh. Didn't I tell you you'd get no contracts if you kicked me out of the company?". I believe this statement to meant that Plaintiff was attempting to threaten Clearview, by implying that his behind-the-scenes campaign of disparagement was depriving Clearview of access to prospective customers, and that Clearview should agree to his demands if it wanted to achieve commercial success. I believe that, in this email, Plaintiff effectively stated that he believed that his disparagements had in fact harmed Clearview's business by depriving it of revenues it otherwise would have earned.

13. Plaintiff's breaches of the Agreement also contributed to increased litigation expenses. For example, a lawsuit was brought against Clearview in California by a group of anti-law enforcement activists. The plaintiffs in that matter cited Johnson's alleged involvement

with Clearview – knowledge which the plaintiffs clearly obtained through Johnson's breaches of the Wind-Down Agreement - as evidence of the threat Clearview allegedly presented. The costs incurred in defending that lawsuit – which are well into the six figures – are consequential damages suffered by Clearview as a result of Johnson's breaches.

14. Clearview has been valued in excess of $200 million, and has annual recurring revenues in excess of $15 million. While the full impact of Plaintiff's breaches of the Agreement are difficult to quantify - largely because it involved opportunities foreclosed to Clearview behind closed doors, which Defendants anticipate will be revealed through Plaintiff's discovery – the harm is anticipated to be significant. Even assuming Plaintiff's breaches of confidentiality and disparagement of Clearview within the technology investment community, the law enforcement community, and major media outlets resulted in just a 1% reduction in Clearview's ability to grow revenue and shareholder value, the resulting damage to Clearview would exceed $1 million.

I hereby swear and affirm that all of the foregoing statements are true to the best of my knowledge. I am aware that if any of the foregoing statements are willfully false, I may be subject to the penalties of perjury.

_____
Richard Schwartz (May 2, 2025 16:55 EDT)

Richard Schwartz

Case 1:23-cv-02441-KPF    Document 88-6    Filed 05/02/25    Page 6 of 7

# Affidavit in Oppo MTD - Richard Schwartz - Final

Final Audit Report                                               2025-05-02

| | |
|---|---|
| Created: | 2025-05-02 |
| By: | Jack Mulcaire (jack@clearview.ai) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAopCUUAwGVu1GqfbIVRRzoRW6vIKeeeNS |

## "Affidavit in Oppo MTD - Richard Schwartz - Final" History

- Document created by Jack Mulcaire (jack@clearview.ai)
  2025-05-02 - 8:53:28 PM GMT

- Document emailed to richard@clearview.ai for signature
  2025-05-02 - 8:53:58 PM GMT

- Email viewed by richard@clearview.ai
  2025-05-02 - 8:54:19 PM GMT

- Signer richard@clearview.ai entered name at signing as Richard Schwartz
  2025-05-02 - 8:55:11 PM GMT

- Document e-signed by Richard Schwartz (richard@clearview.ai)
  Signature Date: 2025-05-02 - 8:55:13 PM GMT - Time Source: server

- Agreement completed.
  2025-05-02 - 8:55:13 PM GMT

Clearview AI | Powered by Adobe Acrobat Sign