# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES JOHNSON,<br><br>Plaintiff,<br><br>vs.<br><br>CLEARVIEW AI, INC., HOAN TON-THAT and RICHARD SCHWARTZ,<br><br>Defendants. | Case No.: 1:23-cv-2441 |

---

**DAMAGES INQUEST AGAINST PLAINTIFF CHARLES JOHNSON: PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

**GORDON REES SCULLY MANSUKHANI, LLP**
Ronald A. Giller, Esq.
Mallory J. Benner, Esq.
1 Battery Park Plaza, 28th Floor
New York, NY 10004
Tel: (973) 549-2500
Fax: (973) 377-1911
Email: rgiller@grsm.com
Email: mbenner@grsm.com
*Attorneys for Defendants Clearview AI, Inc., Hoan Ton-That and Richard Schwartz*

1

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.    INTRODUCTION AND PROCEDURAL HISTORY**

1.     Pursuant to the Court's Order dated July 8, 2025 *(Dkt.* 97),
Defendants/Counterclaim Plaintiffs Clearview AI, Inc., Hoan Ton-That and Richard Schwartz
(collectively "Clearview" or "Defendants") submit the following Proposed Findings of Fact and
Conclusions of Law concerning all damages, and any other monetary relief permitted under the
entry of default judgment, against Plaintiff/Counterclaim Defendant Charles Johnson ("Johnson"
or "Plaintiff"). Clearview is requesting damages, fees, costs, and sanctions against Johnson
regarding the allegations set forth in the First Amended Counterclaim and Plaintiff's continuous
bad faith conduct and violation of Court orders throughout this litigation.

2.     Because a party who defaults thereby admits all "well-pleaded" factual allegations
contained in the pleading, the following allegations from the operative First Amended
Counterclaim (*Dkt.* No. 50) are deemed admitted by Johnson for default judgment purposes. *See
City of New York v. Michalis Pawn Shop, LLC,* 645 F.3d 114, 137 (2d Cir. 2011) ("It is an
ancient common law axion that a defendant who defaults thereby admits all well-pleaded
allegations contained in the complaint.") (quotation marks and citation omitted).

3.     This matter arises out of a contract entered into by the parties, titled the Wind-
Down Agreement ("Agreement"), which dissolved and wound up the affairs of SmartCheckr,
LLC, a facial recognition company owned by Johnson, Ton-That, and Schwartz. *See generally*
Plaintiff's Complaint (*Dkt.* 1); Defendants' First Amended Counterclaim (*Dkt.* 50).

4.     On March 22, 2023, Plaintiff brought this action alleging, among other things,
that Defendants had breached their obligations under the Wind-Down Agreement. *See* Plaintiff's
Complaint (*Dkt.* 1).

2

5.    On August 4, 2023, Plaintiff filed an Amended Complaint. *See* Plaintiff's Amended Complaint (*Dkt.* 25).

6.    On June 21, 2025, Defendants filed their answer to the Amended Complaint, which included counterclaims against Plaintiff. *See* Defendants' Answer and Counterclaims (*Dkt.* 44).

7.    On July 5, 2025, Defendants filed a First Amended Answer and Counterclaim, which included a counterclaim for Breach of Contract against Plaintiff under the Wind-Down Agreement (the "Counterclaim"). *See* Defendants' First Amended Answer and Counterclaim (*Dkt.* 50).

8.    More specifically, the Counterclaim asserted that Plaintiff breached ¶4(b) and (c) of the Wind-Down Agreement by: (1) making statements that impugned or attacked, or were otherwise critical of, the reputation, business or character of Clearview and its respective directors, officers, representatives, agents and employees during the Restricted Period, through emails to third parties and public statements published on his website and social media platform; and (2) publicly disclosing the existence of the Agreement, his indirect ownership of the shares of the company, and his prior provision of services to the company to the New York Times in March 2021. *Id.* at ¶¶6-7.

9.    Johnson filed an Answer to the First Amended Counterclaim on July 26, 2024. *See* Plaintiff's Answer to the First Amended Counterclaim (*Dkt.* 53).

10.    On January 8, 2025, Plaintiff's Amended Complaint was dismissed in its entirety with prejudice, leaving the Counterclaim brought by Defendants (*Dkt.* 50) as the sole remaining claim in this action. *See* Judge Failla's January 13, 2025 Court Order (*Dkt.* 68).

## II.    COURT ENTERS DEFAULT AGAINST THE PLAINTIFF AND IMPOSES SANCTIONS AS A RESULT OF PLAINTIFF'S NON-COMPLIANCE WITH COURT ORDERS

11.    Throughout this litigation, Plaintiff openly and repeatedly flouted this Court's orders, including orders regarding discovery. *See* Judge Failla's July 2, 2025 Court Order (*Dkt.* 95).

12.    Plaintiff also littered the record with false statements, half-truths and misrepresentations, and engaged in racist tirades against his adversaries and counsel. *Id.*

13.    For the sake of brevity, Defendants refer the Court to Judge Failla's July 2, 2025 Court Order (*Dkt.* 95) for a summary of the history of Plaintiff's egregious misconduct, and non-compliance with discovery obligations and Court orders through July 2, 2025.

14.    For these reasons - and those set forth more fully in the Court's July 2, 2025 Order - the Court struck Plaintiff's Answer in its entirety (*Dkt.* 53), and directed the Clerk of Court to enter default against Plaintiff in connection with Defendants' Breach of Contract Counterclaim – the only remaining claim in this action. *Id.*

15.    The Court also sanctioned Plaintiff in the amount of $10,000 for his "continued flouting of Court orders." *Id.*

16.    Significantly, this was not the first time that Plaintiff had been sanctioned in this case, as the Court had previously imposed a sanction in the amount of $7,000 against Plaintiff on April 2, 2025 for violating the Court's January 16, 2025 Order. *See* April 2, 2025 Minute Entry (*Dkt.* 83); Judge Failla's April 3, 2025 Order (*Dkt.* 84).

17.    Pursuant to Fed. R. Civ. Pro. 37, the Court also ordered the "Plaintiff to pay the 'reasonable expenses, including attorney's fees, caused by' his failure to comply with the Court's discovery orders." *See* Judge Failla's July 2, 2025 Court Order (*Dkt.* 95).

### III.    PLAINTIFF'S CONTINUED NON-COMPLIANCE WITH COURT ORDERS AND SPOLIATION OF EVIDENCE

18.    Following the entry of the Court's July 2, 2025 Order, the Court referred this matter to United State Magistrate Judge Sarah Netburn for an inquest into damages on the Counterclaim, as well as the fees and expenses to which Defendants are entitled under Rule 37. *Id.*

19.    On July 8, 2025, Clearview was directed to file Proposed Findings of Fact and Conclusions of Law within thirty (30) days, concerning all damages. *See* Judge Netburn's July 8, 2025 Court Order (*Dkt.* 97).

20.    By way of letter dated July 25, 2025, Defendants requested a sixty (60) day extension of time to file their Proposed Findings of Fact and Conclusions of Law to allow them sufficient time to gather the discovery needed to support their damages assessment - an effort that had been directly thwarted by Plaintiff's ongoing and well-documented non-compliance with his discovery obligations. *See* Defendants' Letter Correspondence *(Dkt.* 98).

21.    More specifically, Defendants advised the Court that the extension was needed because the full extent of Plaintiff's breaches of the Wind-Down Agreement, and resulting damages, remained unknown due to Plaintiff's refusal to 1) produce critical discovery, including but not limited to relevant documents concerning his breach of the Wind-Down Agreement that he had gathered onto a hard drive (which, upon information and belief, included additional critical statements that Plaintiff made about the Defendants to investors, customers, shareholders, and the media in violation of the Wind-Down Agreement); and 2) appear for his deposition. *Id.*

22.    On July 31, 2025, the Court granted Defendants' extension request, and ordered Plaintiff to produce the hard drive containing discoverable documents by August 6, 2025, and

appear for his deposition no later than September 19, 2025. *See* Judge Netburn's  July 31, 2025

Order *(Dkt.* 99).

23.    The Court also ordered Plaintiff to pay the $10,000 sanction payment ordered by

the Court on July 2, 2025, no later than August 15, 2025 - noting that the failure to pay this

sanction would result in the imposition of coercive measures. *Id.*

24.    Plaintiff's former counsel, Bernard Kleinman, Esq., notified the Court of

Plaintiff's response to the Court's July 31 Order:

> Mr. Johnson's response has been as follows, when I inquired as to the whereabouts of the
> Apple computer and other devices upon which the subject files exist, and the Court's
> sanction payable on/before August 15, 2025, I was told the following: "Oh okay. Not
> doing that." "I gave it all away. I do not have it. Will not produce it and don't have it."
> "Mr. Johnson gave away many of the possessions including his computer."

*See* Plaintiff's Letter Correspondence *(Dkt.* 104).

25.    The Court then scheduled and held an in-person conference with the parties on

August 14, 2025, to discuss, among other things, Plaintiff's default discovery and refusal to

comply with the Court's orders. *See* Judge Netburn's August 7, 2025 Order *(Dkt.* 105).

26.    During the conference, Plaintiff advised on the record that he had no intention of

complying with the Court's orders - including the production of the hard drive, appearing for his

deposition, or paying the $10,000 sanctions payment – all of which the Court had previously

ordered him to do on *multiple* occasions. (*Dkts.* 68, 77, 80; 95; 99; 111).

27.    Plaintiff also admitted on the record that he deleted the discoverable documents

that Defendants had been vigorously attempting to obtain since the inception of this case,

creating an indisputable spoliation issue. *See* Declaration of Ronald A. Giller, Esq., ¶2, submitted

in connection with these Proposed Findings of Fact and Conclusions of Law ("Giller Dec.").

28.    Thereafter, on September 8, 2025, the Court issued another order (calling it its

"final directive"), again ordering Plaintiff to comply with his default discovery obligations

explained in the Court's July 31, 2025 Order (*Dkt.* 99) (*i.e.,* production of the discoverable documents that were on the hard drive) and appear for his deposition by September 19, 2025. *See* Judge Netburn's September 8 2025 Court Order (*Dkt. 111*)

29.     The Court also advised that Defendants may seek an adverse inference in light of Plaintiff's refusal to comply with this Court's discovery orders. *Id.*

30.     By letter dated September 30, 2025, Defendants notified the Court that Plaintiff again failed to comply with this Courts orders. *See* Defendants' Letter Correspondence (*Dkt.* 112).

31.     By way of example, when Plaintiff was contacted on September 9 to obtain his availability for his deposition, he replied "thank you, but I intend to contest the order. Have a nice day." *Id.*

32.     In light of Plaintiff's refusal to comply with this Court's discovery orders – which directly impacted Defendants ability to prepare its assessment of damages – Defendants requested another sixty (60) day extension to submit its damage inquest papers, from October 6, 2025 to December 5, 2025, to provide Defendants with additional time to compile its evidence and attempt to fill in the gaps that Plaintiff purposely omitted, to ensure Defendants were able to provide the Court with its best assessment of damages. *Id.*

33.     The Court granted Defendants' extension request, and advised that any additional request for sanctions should be included in these Proposed Findings of Fact and Conclusion of Law. *See* Judge Netburn Memo Endorsement (*Dkt.* 113).

34.     To date, Plaintiff has not paid the $10,000 sanctions payment ordered by the Court on July 2, 2025. *See* Giller Dec., ¶3.

35.     To date, Plaintiff has refused to sit for his Court ordered deposition. *Id.* at ¶4.

36.    To date, Plaintiff has failed to provide the discoverable documents that were previously ordered by the Court to be produced in this case. *Id.* at ¶5.

## IV.    PARTIES

37.    Clearview AI is a small technology startup that was founded in 2018 that provides the world's leading facial recognition search engine. Clearview collects billions of publicly available online images, along with the webpage addresses where they appear, from the open web , including social media, news media, image hosting sites, mugshot sites, and business webpages. Clearview applies a facial recognition algorithm to the images it collects. This enables Clearview to take images of unidentified individuals supplied by its clients and return search results with images of highly similar faces from the public Internet. *See* Defendants' First Amended Complaint, ("FAC") (*Dkt.* 50), ¶¶10-11.

38.    Clearview's clients are government agencies or government contractors, who use the Clearview Application for official investigative, law enforcement, and national security purposes. *Id.* at ¶12.

39.    Clearview was founded by co-founders, Ton-That and Schwartz. *Id.* at ¶13.

40.    Johnson is not a director, officer, representative, agent, or employee of Clearview. *Id.* at ¶ 17.

41.    The extent of Johnson's relationship with Clearview is set forth in the Wind-Down Agreement, which provides, in relevant part, that Johnson is able to receive sales commissions of ten percent (10%) of the gross revenue received by Clearview AI for consummated sales of the company's software or services that originate from leads provided to the company by Johnson. *Id.* at ¶18.

## V.    RELEVANT TERMS OF THE WIND-DOWN AGREEMENT

42.    On or about November 24, 2018, Clearview AI, Ton-That, Schwartz, and Johnson entered into the Wind-Down Agreement. *Id.* at ¶20*;* Declaration of Richard Schwartz, submitted in connection with these Proposed Findings of Fact and Conclusions of Law ("Schwartz Decl.), **Exhibit A,** Wind-Down Agreement.

43.    As part of the Agreement, the Individuals – defined by the Agreement as Ton-That, Schwartz, and Johnson – agreed to abide by certain Restrictive Covenants. FAC (*Dkt. 50*), ¶22*.*

44.    Specifically, the Individuals agreed to the following Restrictive Covenant:

[A]t no time during the Restricted Period shall the Individuals or affiliates of the Individuals (including, in the case of Johnson, the Transferee) make, or cause or assist any other person to make any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents or employees.

FAC (*Dkt.* 50), ¶23*.*

45.    Johnson also agreed to abide by the following Restrictive Covenant:

Johnson agrees that without the prior written consent of the Company, at no time during the Restricted Period shall Johnson or any of his affiliates, including the Transferee, publicly disclose the existence of this Agreement, his indirect ownership of the Shares, or his prior provision of services to the Company.

FAC (*Dkt.* 50), ¶25*.*

46.    The Restricted Period, as defined under the Wind-Down Agreement, extended from on or about November 28, 2018, to on or about May 21, 2023. FAC (*Dkt.* 50), ¶30*.*

47.    By signing the Agreement, Johnson represented that he was (i) familiar with the Restrictive Covenants in the Agreement, (ii) was fully aware of their obligations; (iii) agreed that the length of time, scope and geographic coverage of the Restrictive Covenants were reasonable; and (iv) agreed that Restrictive Covenants were necessary to protect Clearview's confidential and proprietary information, good will, stable workforce, and customer relations. FAC (*Dkt.* 50), ¶26*.*

48.    Johnson also acknowledged and agreed that any breach of the Restrictive Covenants would cause material and irreparable harm to Clearview. FAC (*Dkt.* 50), ¶27.

## VI.    JOHNSON'S BREACHES OF THE WIND-DOWN AGREEMENT

49.    Throughout the Restricted Period, Johnson engaged in a campaign of harassment against Clearview and published *numerous* false statements that impugned, attacked, and/or were critical of the reputation, business and character of Clearview, and the Individual Defendants in blatant violation of the Restrictive Covenants set forth in the Wind-Down Agreement. FAC (*Dkt.* 50), ¶31.

50.    In fact, less than two years after the Agreement was executed, Johnson made it clear that he intended to violate the Agreement in an email to Ton-That and Hal Lambert, a third-party Board member and investor of Clearview, dated October 24, 2020. FAC (*Dkt.* 50), ¶32; *see also* Exhibit A, attached to the FAC (*Dkt.* 50).

51.    Specifically - while criticizing the company in breach of the Agreement - Johnson stated, "[i]n light of that terrible interview and effective immediately I no longer support the direction of the company nor its leadership...And given that I, a cofounder of the company, was thrown under the bus in a public manner to stroke Hoan's ego I consider our already breached agreement over with...You are cowards who do not deserve to run the company moving forward." FAC (*Dkt.* 50), ¶33; *see also* Exhibit A, attached to the FAC (*Dkt.* 50).

52.    Johnson's statement that he believed the agreement (referring to the Wind-Down Agreement) was "over with," clearly indicated he intended to breach the Agreement moving forward – which is exactly what he did. FAC (*Dkt.* 50), ¶34.

53.    Later that same day, Johnson sent another email to Ton-That and Lambert, breaching the Agreement by attacking Ton-That's character and falsely accusing him of lying, stating "Hoan has now lied to both the Wall Street Journal and the New York Times about my involvement with the company." FAC (*Dkt.* 50), ¶35; *see also* Exhibit B, attached to the FAC (*Dkt.* 50).

54.    A few months later, the New York Times published an article dated March 18, 2021, titled "*Your Face is Not Your Own.*" FAC (*Dkt.* 50), ¶36; *see also* Exhibit C, attached to the FAC (*Dkt.* 50).

55.    In the Times article, Johnson is quoted on the record regarding his indirect ownership stake in the Corporation – disclosure of which was a violation of Paragraph 4(c) of the Agreement. *See* FAC (*Dkt.* 50), ¶37; *see also* Exhibit C, attached to the FAC (*Dkt.* 50).

56.    Johnson also publicly disclosed the existence of the Agreement and provided the Times with a copy of the Agreement, which were violations of Paragraph 4(c) of the Agreement. FAC (*Dkt.* 50), ¶38; *see also* Exhibit C, attached to the FAC (*Dkt.* 50).

57.    Most egregiously, Johnson acknowledged to the New York Times that by providing the foregoing, he was purposefully and knowingly breaching the Agreement. FAC (*Dkt.* 50), ¶39; *see also* Exhibit C, attached to the FAC (*Dkt.* 50).

58.    Indeed, Johnson told the Times that "he [was] willing to break the agreement, both because he's upset about having been erased from Clearview's past and because he thinks the company should have gone further than it has in making the technology available." FAC (*Dkt.* 50), ¶40; *see also* Exhibit C, attached to the FAC (*Dkt.* 50).

59.    Johnson then began using his public website, "Charles Johnson's Thoughts and Adventures," as a vehicle to post additional disparaging statements against Counterclaim Plaintiffs in breach of the Agreement. FAC (*Dkt.* 50), ¶41.

60.    Johnson has over 2,000 subscribers to his public website. FAC (*Dkt.* 50), ¶42.

61.    Johnson also posted the links to articles published on his website to his social media account on [X.com](X.com) - @JohnsonThought1 - where he had over 14,000 followers.[1] FAC (*Dkt.* 50), ¶43.

62.    On October 29, 2021, Johnson breached the Agreement, publishing a blog post on his public website, Charles Johnson's Thoughts and Adventures, titled "*My Email To New York Times's Ryan Mac: A New Accountability Project*", disparaging Ton-That by stating "[l]et me help you on your apology to Hoan Ton-That, Clearview's brilliant but hapless CEO, and to your readers." FAC (*Dkt.* 50), ¶44; *see also* Exhibit D, attached to the FAC (*Dkt.* 50).

63.    On October 14, 2022, Johnson published a blog post on his public website Charles Johnson's Thoughts and Adventures, titled "*Did A U.S. Senate Candidate Ask Me For A Bribe?*" where he criticized Clearview and its employees in breach of the Agreement, stating "[o]ne of the former executive directors at RAGA went off and joined Clearview.AI where she employs a number of not so competent people. That's probably why Clearview isn't doing so well. Shoulda listened, Hoan but you were too busy building a monument unto yourself." FAC (*Dkt.* 50), ¶45; *see also* Exhibit E, attached to the FAC (*Dkt.* 50).

64.    On October 24, 2022, Johnson published a blog post on his public website Charles Johnson's Thoughts and Adventures, titled "*Techify the Police: What a New Biden Crime Bill Might Look Like,*" attacking and criticizing Clearview and Ton-That in breach of the

---

[1] Since the filing of this Counterclaim, Johnson's X.com account has been suspended.

Agreement, stating "Clearview has its problems and its management needs changing or taming but facial recognition is here to stay. To be sure, Clearview needs to be cleaned up but like Musk's Starlink, it, too, can be pressed into the service of the state, especially given its Emirati cap table. Hoan would need to go or be sidelined." FAC (*Dkt.* 50), ¶46; *see also* Exhibit F, attached to the FAC (*Dkt.* 50).

65.     On April 27, 2022, Johnson emailed Ton-That and Lambert, attacking Ton-That's character accusing him of lying in breach of the Agreement, stating "[j]ust letting you know I watched Hoan lie to Drew Harrell of the Washington Post about my involvement in cofounding Clearview. https://youtu.be/ 0fxD39cvKXQ I'm disappointed to see this. Boy is discovery going to be illuminating." FAC (*Dkt.* 50), ¶47; *see also* Exhibit G, attached to the FAC (*Dkt.* 50).

66.     On March 8, 2023, Johnson published a blog post on his public website, Charles Johnson's Thoughts and Adventures, titled "Clearview USA: Or, How I Learned to Love Creepy Facial Recognition Spy Surveillance" where he again, attacks Ton-That's character accusing him of lying, stating "[n]aturally I rescued the company by securing investors through my network— only to have Hoan try to push me out of the company for talking to the press after he was lying about me to the press. I'm suing and it's going to be a whole thing even though it didn't need to be. Hoan just wanted to protect his ego and not the shareholders or the company. Many such cases!" FAC (*Dkt.* 50), ¶48; *see also* Exhibit H, attached to the FAC (*Dkt.* 50).

67.     Johnson also admits he made statements to France24 during the Restricted Period that impugned, attacked, or were otherwise critical of the reputation, business and character of Defendants.  *See* Giller Dec., **Exhibit B,** Plaintiff's Supplemental Answers to Interrogatories.

68.     He appeared in an interview in a documentary film published by France24 on June 4, 2023, wherein he made statements disparaging Clearview and Ton-That (e.g. "He's [Hoan] lying

13

unfortunately. it's sad. It's sad to see somebody lie to try to make money. Very pathetic. But very American too in a way. Maybe he's assimilating you know?"). Johnson published a photograph of himself with France24 journalist Jessica Le Masurier on his X.com profile on May 27, 2023–less than a week after the expiration of the Restricted Period. FAC (*Dkt.* 50), ¶50.

69.    However, the full nature and extent of the criticizing statements made to France24 are unknown because Plaintiff willfully obstructed Defendants' ability to obtain this information by blatantly failing to abide by this Court's discovery orders and spoliating evidence.

70.    In addition to these statements, Johnson made additional statements that impugned, attacked and/or were otherwise critical of Clearview and the Individual Defendants to other media outlets during the Restricted Period. FAC (*Dkt.* 50), ¶¶49-50; Giller Dec., **Exhibit B**, Plaintiff's Supplemental Answers to Interrogatories.

71.    In fact, Johnson *admits* that he made statements to Mother Jones, the Washington Post, and the New York Times during the Restricted Period that impugned, attacked, or were otherwise critical of the reputation, business and character of Defendants. *Id.*

72.    However, the nature and extent of the criticizing statements made to these media outlets are unknown because Plaintiff willfully obstructed Defendants' ability to obtain this information by blatantly failing to abide by this Court's discovery orders and spoliating evidence.

73.    Johnson also made statements that impugned, attacked and/or were otherwise critical of Clearview and the Individual Defendants to Clearview investors and third parties during the Restricted Period. FAC (*Dkt.* 50), ¶¶51-52; Giller Dec., **Exhibit C,** Plaintiff's Second Supplemental Answers to Interrogatories.

74.     In fact, Johnson *admits* that he made critical statements about the Defendants to thirty-one (31) individuals. *Id.*

75.     However, the nature and extent of the criticizing statements made to these individuals are unknown because Plaintiff willfully obstructed Defendants' ability to obtain this information by blatantly failing to abide by this Court's discovery orders and spoliating evidence.

76.     Johnson also made statements that impugned, attacked and/or were otherwise critical of Clearview and the Individual Defendants to Clearview shareholders. FAC (*Dkt.* 50), ¶¶51-52.

77.     In January of 2021, counsel for Johnson delivered, on his behalf, an unsolicited offer to purchase Ton-That and Schwartz's shares in the company, which cited alleged failings of Clearview and its management, and claimed that several existing investors supported these efforts. This offer was the outcome of discussions between Johnson and minority shareholders in Clearview wherein Johnson disparaged Ton-That, Schwartz and Clearview. FAC (*Dkt.* 50), ¶52.

78.     However, the nature and extent of the criticizing statements made to these shareholders are unknown because Plaintiff willfully obstructed Defendants' ability to obtain this information by blatantly failing to abide by this Court's discovery orders and spoliating evidence.

79.     Significantly, Plaintiff admitted to engaging in the above-referenced conduct – that is set forth in Clearview's Counterclaim - in breach of the Wind-Down Agreement. *See* Giller Dec., **Exhibit D,** Plaintiff's Supplemental Request for Admissions.

## VII.    DAMAGES CAUSED BY JOHNSON'S BREACHES OF THE WIND-DOWN AGREEMENT

80.     In light of Plaintiff's statements, Clearview has suffered harm to reputation,

business and client relationships. While the exact amount of damage is unknown because of Plaintiff's blatant failure to comply with the Court's discovery orders and his spoliation of evidence, the following are reasonable estimates of the harm Clearview has suffered as a result of Plaintiff's breaches of the Wind-Down Agreement. *See generally* Schwartz Dec.; Declaration of Expert Eric Rose submitted in connection with these Proposed Findings of Fact and Conclusions of Law  ("Expert Dec.").

81.    The confidentiality provisions in the Wind-Down Agreement were specifically negotiated between the parties to prevent reputational harm to Clearview arising from its former association with Plaintiff, whose reputation in the industry is widely recognized as negative. *See* Schwartz Dec., ¶7.

82.    It is undisputed that Plaintiff breached these provisions of the Wind-Down Agreement by disclosing his involvement with Clearview to the media (see Section VI, *supra*), directly undermining the protective purpose of the Agreement; and consequently, creating reputational fallout and lost business opportunities for Clearview by reattaching it to an individual known for unprofessional and unethical conduct. *See generally* Schwartz Dec.

83.    Not only did Plaintiff disclose his involvement with Clearview, but he disclosed the actual terms of the Wind-Down Agreement, providing the New York Times with a copy. Section VI, *supra;* Schwartz Dec. ¶¶17-18.

84.    The resultant article, entitled "Your Face Is Not Your Own," and "What We Learned About Clearview AI and Its 'Secret Co-Founder'" appeared in the New York Times Magazine on March 18, 2021, and described Plaintiff as a person with "extreme views and associations," and a "peddler of disinformation," tainting Clearview by association. *Id.;* Exhibit C, attached to FAC (*Dkt.* 50).

16

85.     This is precisely the type of reputational harm that Clearview sought to prevent by executing the Wind-Down Agreement, and significantly, Plaintiff's breaches of the Agreement directly enabled the publication of these harmful and widely misleading articles. Schwartz Dec. ¶20.

86.     Indeed, "Your Face Is Not Your Own" directly stated that "Johnson…provided email and legal documents that, along with other sources, strongly support his claims; indeed, the company might not exist without his contributions."[2] Exhibit C, attached to FAC (*Dkt.* 50).

87.     It was also reported in the aforementioned New York Times article that a potential investor refused to invest in the company, stating that Clearview's purported ties with Plaintiff "scared him off." Exhibit C, attached to FAC (*Dkt.* 50).

88.     This unknown investor would not have known that Plaintiff had any ties with Clearview but for Johnson's breach of the Agreement. Schwartz Dec. ¶27.

89.     Clearview's Series and Series B rounds, which took place during 2019, 2020, and 2021, saw a combined average investment size of $565,000. Schwartz Dec. ¶¶31-33.

90.     Thus, if the unnamed investor had participated in Clearview's then-ongoing fundraising round, Clearview lost out on a business opportunity of approximately $565,000 – the average investment amount between 2019 and 2021 – monies that Clearview would have received but for Johnson's breaches of the Agreement. Schwartz Dec. ¶¶35-37.

91.     By way of further example, a leading Silicon Valley-based venture capital fund ("Venture Capital Fund X") informed former Clearview CEO, Hoan Ton-That, in August 2023, that there would be a "0% chance" that they could invest given the "insane threats" Plaintiff

---

[2]  It is difficult to imagine a more self-evident confirmation that Johnson's disclosure of the Wind-Down Agreement, which was itself a breach, resulted in media coverage that portrayed him as deeply associated with Clearview.

made to their team members. Schwartz Dec. ¶40.

92.    Venture Capital Fund X would not have known that Plaintiff had any ties with Clearview but for Johnson's breach of the Agreement. *Id.*

93.    Based on the historical market data on Series C investments in comparable companies to Venture Capital Fund X, and comparable venture funds, Clearview reasonably anticipated that it would have invested between $15,000,000 to $20,000,000. Schwartz Dec. ¶44-47.

94.    Thus, at a minimum, Clearview estimates it lost out on a business opportunity of approximately $15,000,000 – monies that Clearview would have received but for Johnson's breaches of the Agreement. *Id.*

95.    In addition to these two investors, Plaintiff also disparaged Clearview to other actual or prospective clients and investors - which Plaintiff admits in his discovery responses; however, Clearview is unable to calculate or reasonably estimate the damages caused by these breaches due to Plaintiff's blatant failure to comply with the Court's discovery orders and his spoliation of evidence.

96.    As a result, the Court should draw an adverse inference that *additional* investor opportunities were lost due to Plaintiff's breaches of the Wind-Down Agreement, which would have been discovered had Plaintiff complied with his discovery obligations.

97.    Therefore, at a minimum, Clearview reasonably estimates that Plaintiff's statements diminished Clearview's ability to raise additional funds from at least one other investor during the Restricted Period. Schwartz Dec. ¶¶37, 43, 47.

98.    During the Restricted Period, the average investor in Clearview invested approximately $565,000 to $20,000,000. Schwartz Dec. ¶¶36, 44, 45.

99.     Thus, at a minimum, Clearview lost out on additional monies from investors in the amount of $565,000 that Clearview would have received but for Johnson's breaches of the Agreement. Schwartz Dec. ¶¶37, 43, 47.

100.    Plaintiff also disparaged Clearview to Clearview's shareholders. Schwartz Dec. ¶¶9-14.

101.    For example, Plaintiff's former counsel contacted Clearview in January 2021 to communicate a message from Plaintiff wherein Plaintiff alleged that Clearview was mismanaged and offered to buy out a significant percentage of the outstanding shares and raise further funding, and claiming that his effort was backed by several existing shareholders (which leads Clearview to believe that Johnson made statements that violated the Wind-Down Agreement in these discussions). *Id.*

102.    However, Clearview was unable to identify these shareholders and the statements Plaintiff made, due to Plaintiff's blatant failure to comply with the Court's discovery orders and his spoliation of evidence, which prohibited Clearview from calculating the financial harm caused. Schwartz Dec. ¶12.

103.    As a result, the Court should draw an adverse inference that Plaintiff's statements diminished Clearview's ability to raise additional funds from these shareholders due to Plaintiff's breaches of the Wind-Down Agreement.

104.    At a minimum, Clearview reasonably estimates that Plaintiff's statements diminished Clearview's ability to raise additional funds from at least one of these shareholders. Schwartz Dec. ¶15-16.

105.    Investments in Clearview's previous Series A round, and then-ongoing Series B funding round, averaged $565,000. *Id.*

106.    Thus, even if only one of these shareholders was deterred from participating in Clearview's Series B round, Clearview lost out on additional monies from shareholders in the amount of $565,000, that Clearview would have received but for Johnson's breaches of the Agreement. *Id.*

107.    Plaintiff also criticized Clearview to the New York Times, France24, the Washington Post, and Mother Jones – all of which are major media outlets - resulting in negative publicity about Clearview. Section VI, *supra.*

108.    Clearview's customers are government agencies that are inherently reputationally sensitive and his breaches certainly deterred some customers. Schwartz Dec. ¶48.

109.    However, Clearview was unable to identify any customers lost, due to Plaintiff's blatant failure to comply with the Court's discovery orders and his spoliation of evidence, which prohibited Clearview from calculating the financial harm caused. *Id.*

110.    Defendants retained expert Eric Rose, an expert in image repair, reputation management, and crisis communications, to assess the economic impact of Plaintiff's statements and breaches of the Wind-Down Agreement, to calculate the costs required to restore Clearview's reputation to the position it would have been in but for Plaintiff's breaches of the Wind-Down Agreement. *See* Expert Decl.

111.    Rose conducted a thorough analysis – as set forth in detail in Rose's written declaration and report, submitted simultaneously with these Proposed Findings of Fact and Conclusions of Law – including research analysis to analyze the facts of this case to determine reputational damages; analysis of industry; analysis of online review to assess the scope and spread of information; visibility check to assess whether the breaches and harmful statements are still accessible; and other relevant metrics. *Id.*

112.     Rose then opined on the extent of damage caused by Johnson's breaches and the reasonable steps required to mitigate and restore Clearview's reputation, and the costs of those steps, which provides a reliable, evidence based estimate of damages directly caused by Plaintiff's breaches of the Wind-Down Agreement. *Id.*

113.     Based on Rose's expert analysis, he opined that the reasonable cost to restore Clearview's reputation is approximately $862,500, which constitutes a direct and foreseeable consequence of Plaintiff's breaches of the Wind-Down Agreement. *Id.*

114.     Significantly, Rose's analysis and calculations are only based on the statements by Plaintiff that Defendants have been able to identify and verify. *Id.*

115.     Due to Plaintiff's blatant failure to comply with the Court's discovery orders and his spoliation of evidence, Rose did not have access to the full breadth of statements that Plaintiff made that were in violation of the Wind-Down Agreement. *Id.*

116.     Because Plaintiff willfully withheld relevant evidence and engaged in spoliation, the Court should draw an adverse inference that the cost to repair Clearview's reputational harm is greater than the amount reflected in Rose's report.

117.     Accordingly, Rose's calculation of damages should be viewed as conservative and minimum measure of damages, subject to an upward adjustment based on the adverse inference warranted by Plaintiff's discovery violations and spoliation of evidence. *Id.*

## CONCLUSIONS OF LAW

## I.   DEFENDANTS ARE ENTITLED TO AN ADVERSE INFERENCE FOR DAMAGES

118.     Rule 37 of the Federal Rules of Civil Procedure permits the Court to impose a variety of sanctions for discovery-related abuses, and "affords the court 'broad discretion in fashioning an appropriate sanction.'" *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 195 (E.D.N.Y.

2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir.

2002)).

119.    Courts have routinely drawn adverse inferences in damages inquests where a

party's willful non-production of discovery impedes an accurate assessment of damages. *See,

e.g.,* Telebrands Corp. v. BHSD Trading LLC, No. 1:23-CV-00225 (MAD/CFH), 2025 WL

107070, at *4 (N.D.N.Y. Jan. 15, 2025); *Joint Stock Co. Channel One Russia Worldwide v.

Infomir LLC,* No. 16-CV-01318 (GBD) (BCM), 2018 WL4760345, at *13 (S.D.N.Y. Sept. 28,

2018) (drawing an adverse inference against defaulting defendants for purposes of a pending

damages inquest with respect to documents and information they failed to produce); *Sensonics,

Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996) ("[I]f actual damages can not be

ascertained with precision because the evidence available from the infringer is

inadequate, damages may be estimated on the best available evidence, taking cognizance of the

reason for the inadequacy of proof and resolving doubt against the infringer ....  When

the calculation of damages is impeded by incomplete records of the

infringer, adverse inferences are appropriately drawn").

120.    Here, there is no doubt that Clearview has satisfied its burden of demonstrating

entitlement to an adverse inference.

121.    Plaintiff had – and likely still has – control over and possession of the

communications and documents related to his breaches of the Wind-Down Agreement (*i.e.,* the

documents he admitted he gathered on the hard drive that were relevant to this case).

122.    Plaintiff was obligated and ordered (multiple times) to produce this discovery, and

appear for his deposition, but undisputedly failed to do so.

123.    Plaintiff's failure to comply with this Court's discovery orders, and then his *destruction* of evidence, was purposeful and done in bad faith.

124.    In fact, Plaintiff repeatedly advised the Court and counsel that he had no intention of complying with this Court's orders.

125.    This evidence was essential to determine the full scope and extent of the damages caused by Plaintiff's breaches that was needed for Defendants' calculation of damages in this case.

126.    Clearview is clearly prejudiced because precise damages cannot be calculated without the missing discovery.

127.    Therefore, Clearview respectfully submits that the Court should draw an adverse inference that the discovery withheld by Plaintiff would have shown that Clearview's damages were greater than the documentary record presently reflects, and requests that the Court credit Clearview's declarations and reasonable estimates of damages and any resolve uncertainties in the damages computation against Plaintiff.

## II.    DEFENDANTS ARE ENTITLED TO DAMAGES BASED ON PLAINTIFF'S BREACHES OF THE WIND-DOWN AGREEMENT

128.    "Under New York state law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *MBIA Ins. Corp. v. Royal Bank of Can*., 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000)); *Oneflight International v. Stallion Aviation, LLC* No. 24-CV-8381 (JGK) (HJR), 2025 WL 3239733 (S.D.N.Y. Nov. 20, 2025).

129.    Plaintiff entered into a valid and enforceable agreement with Defendants (*i.e.*, Wind-Down Agreement).

130.    Defendants have performed all obligations in accordance with the Agreement.

131.    The Agreement includes clear and unambiguous Restrictive Covenants, which constitute a binding contractual obligations. *See* Schwartz Dec., Exhibit A, ¶4.

132.    Plaintiff materially breached these terms by 1) making statements that were prohibited by the Agreement; and 2) disclosing the Agreement's terms.

133.    Due to Plaintiff's default, all well pleaded allegations of breach are deemed admitted. *City of New York,* 645 F.3d at 137; *Premier Fla. Auto Sales & Leasing, LLC v. Mercedes-Benz of Massapequa, LLC*, No. 10 CV 4428 DRH WDW, 2013 WL 2177785, at *2 (E.D.N.Y. May 20, 2013).

134.    As a direct and proximate result of Plaintiff's breach, Defendants are entitled to damages.

135.    Under New York law, a breaching party is liable for all direct and proximate damages that result from a breach of contract. *Tractebel Energy Mktg, Inc. v. AEP Power Mktg, Inc.*, 487 F.3d 89, 110 (2d Cir. 2007).

136.    "[A] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007); *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).

137.    To recover consequential damages for "breach of contract under New York law, a plaintiff must make three showings: [i] the damages were caused by the breach; [ii] the damages are provable with reasonable certainty; and [iii] the damages were within the contemplation of the parties at the time of contract." *Atlas v. Sedrish,* 133 F. App'x 759, 760 (2d Cir. 2005);

*Fitzpatrick v. Animal Care Hosp. PLLC*, 104 A.D.3d 1078 (3rd Dept. 2013); *Crystal Clear Development, LLC v. Devon Architects of New York*, P.C., 97 A.D.3d 716 (2nd Dept. 2012).

138.    "The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made." *Ashland Mgt. v. Janien*, 82 N.Y.2d 395, 403 (1993); *Inspectronic Corp. v. Gottlieb Skanska, Inc.,* 135 A.D.3d 707, 708 (2016).

139.    Clearview is entitled to recover damages for:

    a.    The cost of restoring Clearview's reputation in the amount of $862,500, as set forth in Expert Rose's declaration and report;

    b.    The loss of investor opportunities in the amount of $15,565,000; and

    c.    The loss of shareholder investments in the amount of $565,000.

140.    These damages were proximately caused by Plaintiff's breaches of the Wind-Down Agreement, are reasonably certain in scope in light of the evidence available, and falls within the category of losses Clearview would have reasonably contemplated at the time of contracting the Restricted Covenant terms.

141.    In addition, the Second Circuit recently held in *Caroll v. Trump,* 151 F.4th 50 (2d Cir. 2025) that the costs required to repair an individual's reputation (*i.e.,* a repair campaign) are a separate category of compensatory damages that may be recoverable in a civil action. *Carroll v. Trump*, 151 F.4th 50 (2d Cir. 2025) (affirming award of $11 million in compensatory damages for the costs of a reputational repair program).

142.    The Court explained that "there is a difference between the costs required to *repair* an individual's reputation and the costs arising from the damaged reputation itself" and

that these restoration costs are "distinct from other damages that flow[] from [] reputational harm." *Id.* at 81.

143.    Although *Carroll v. Trump* centered on a defamation claim, the principle that damages for a reputational repair program constitute a distinct category of compensatory damages that can be awarded, can be similarly applied in other contexts, such as the breach of contract case here.

144.    Clearview is therefore entitled to an award of damages in the total amount of $17,077,500, representing the sum of reputation-restoration damages, lost investor opportunity damages, and lost shareholder opportunity damages.

## III.    PURSUANT TO THE COURT'S JULY 2, 2025 ORDER, DEFENDANTS ARE ENTITLED TO AN AWARD OF REASONABLE ATTORNEYS' FEES AND COSTS UNDER RULE 37

145.    Pursuant to the Court's Order dated July 2, 2025, Plaintiff is ordered to pay the "reasonable expenses, including attorney's fees, caused by" his failure to comply with the Court's discovery orders. *See* Judge Failla's July 2, 2025 Court Order (*Dkt.* 95) (citing Fed. R. Civ. P. 37(b)(2)(C)).

146.    A certification of attorneys' fees is submitted herewith, evidencing $68,846.43 in attorney's fees and $78.18 in total costs, for a total of **$68,924.61**, that were directly attributable to Plaintiff's non-compliance and failure to comply with the Court's discovery orders from the inception of this case through the date of the Court's July Order. *See* Giller Dec. at ¶¶7-8.

147.    Plaintiff's continuous, egregious misconduct and undisputable failure to comply with the Court rules and this Court's *multiple* orders concerning discovery required the Defendants to spend an extraordinary amount of time addressing these issues with the Court, including attendance at three conferences, two of which required the parties to appear in person.

148.    As such, the amount of attorneys' fees and costs expended here was reasonable in conformity with the facts of this case, Plaintiff's misconduct conduct, the experience of the undersigned, along with other contributing attorneys and staff.

149.    Therefore, the total amount of fees requested should be granted in its entirety.

150.    Clearview also respectfully requests that the Court order Plaintiff to pay this sanction by a date certain; and should Plaintiff fail to comply with this Court's order, impose a further coercive sanction in the amount of a daily fine of $100 per day for each day Plaintiff fails to pay the sanctions amount, until full payment is made to Clearview.

## IV.    DEFENDANTS REQUEST ADDITIONAL SANCTIONS UNDER RULE 37 FOR PLAINTIFF'S CONTINUED NON-COMPLIANCE WITH THE COURT'S ORDERS CONCERNING DISCOVERY

151.    "A district court has wide discretion to impose sanctions for abusing the discovery process." *Bilodeau v. Usinage Berthold, Inc.,* No. 24-2922, 2025 WL 1778857, at *3 (2d Cir. June 27, 2025) (summary order) (internal quotation marks omitted).

152.    Federal Rule of Civil Procedure 37 provides that when "a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A).

153.    Rule 37 also specifically provides that "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

154.    Several considerations inform a court's analysis of a motion for sanctions under Rule 37, including: "[i] the willfulness of the [noncompliance] or the reason for noncompliance; [ii] the efficacy of lesser sanctions; [iii] the duration of the period of noncompliance[;] and [iv]

whether the noncompliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortg. Corp.,* 555 F.3d 298, 302-03 (2d Cir. 2009) (internal quotation marks and alteration omitted) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002).

155.    Further, the court has "inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct." *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995); *see also Chambers v. NASCO, Inc*., 501 U.S. 32, 45-46 (1991) ("[A] court may assess attorney's fees when a party has `acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975))); *see generally Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.,* 991 F.3d 361, 367 (2d Cir. 2021).

156.    Each of the *Agiwal* factors supports the imposition of severe sanctions in this case.

157.    First, there is no dispute that Plaintiff has willfully, and in bad faith, failed to comply with this Court's discovery orders that were issued following the Court's July 2, 2025 Court Order.

158.    Despite multiple opportunities to rectify those deficiencies, Plaintiff has continued to deprive Defendants of discoverable information and documentation needed to accurately assess the amount of damages caused by Plaintiff's breaches in this case.

159.    Not only has Plaintiff failed to comply with this Court's discovery orders, but he *admitted* to destroying the very discovery (*i.e.,* hard drive that contained relevant documents), that Defendants had been attempting to obtain for months, and which had been previously ordered to be produced by the Court on multiple occasions.

160.    Second, lesser sanctions have been employed to no avail. Plaintiff has already been monetarily sanctioned *two times* by this Court for his non-compliance with Court's orders (which remain unpaid), had his Answer stricken, and default be entered against him - and yet, still continued to flout this Court's orders.

161.    Third, Plaintiff has an extremely lengthy history of noncompliance with this Court's orders regarding his discovery obligations – essentially spanning the entirety of this lawsuit – that has been willful and undertaken in bad faith.

162.    Fourth, Plaintiff has been ***repeatedly*** warned of the consequences of his noncompliance, and such warnings have had absolutely no deterrent effect on the Plaintiff. In fact, this Court has held four separate conferences to address Plaintiff's non-compliance directly. (*Dkts.* #64, 77, 83, 105).

163.    This case has presented exactly the kind of "extreme situation[ ]" to warrant the implementation of harsh sanctions to be imposed here. *Agiwal,* 555 F.3d at 302

164.    Consequently, in accordance with Rule 37 and the Court's inherent authority, Defendants respectfully submit that the Court should order Plaintiff to pay "the reasonable expenses, including attorney's fees, caused by" Plaintiff in the amount of $10,021.02 for his continued failure to comply with the Court's discovery orders from July 2, 2025, to the present. *See* Fed. R. Civ. P. 37(b)(2)(C).

165.    A certification of attorneys' fees is submitted herewith, evidencing $9,889.26 in attorney's fees and $131.76 in total costs, for a total of **$10,021.02**, that were directly attributable to Plaintiff's non-compliance and failure to comply with the Court's discovery orders from July 2, 2025 through the present. *See* Giller Dec. at ¶¶9-10.

166.    As indicated by Plaintiff's continuous, egregious misconduct and undisputable failure to comply with the Court rules and this Courts *multiple* orders concerning discovery, the amount of attorneys' fees and costs expended here was reasonable in conformity with the facts of this case, Plaintiff's misconduct conduct, the experience of the undersigned, along with other contributing attorneys and staff.

167.    Therefore, the total amount of fees requested should be granted in its entirety.

168.    Should the Court grant Clearview's request for additional fees, Clearview respectfully requests that the Court order Plaintiff to pay this sanction by a date certain; and should Plaintiff fail to comply with this Court's order, impose a further coercive sanction in the amount of a daily fine of $100 per day for each day Plaintiff fails to pay the sanctions amount, until full payment is made to Clearview.

## V.    DEFENDANTS REQUEST THE INCORPORATION OF PLAINTIFF'S UNPAID $10,000 SANCTIONS PAYMENT INTO THE FINAL JUDGMENT

169.    Courts have inherent authority to enforce compliance with their lawful orders, including by incorporating unpaid sanctions into a default judgment. *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16CV1318GBDBCM, 2019 WL 8955234, at *12 (S.D.N.Y. Oct. 25, 2019), *report and recommendation adopted sub nom. Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, No. 16CIV1318GBDBCM, 2020 WL 1467098 (S.D.N.Y. Mar. 26, 2020).

170.    Because Plaintiff failed to comply with this Court's prior sanctions order, Defendants respectfully submit that the Court should include the $10,000 unpaid sanctions amount in the final damages award.

171.    Clearview also respectfully requests that the Court order Plaintiff to pay this sanction by a date certain; and should Plaintiff fail to comply with this Court's order, impose a

further coercive sanction in the amount of a daily fine of $100 per day for each day Plaintiff fails to pay the sanctions amount, until full payment is made to Clearview.

## CONCLUSION

**WHEREFORE,** Defendants respectfully request that this Court accept these Proposed Findings of Fact and Conclusions of Law in connection with the damages inquest relating to defaulted Plaintiff Johnson for damages, fees, and costs, and award the following relief against Plaintiff Johnson:

(1)     For a monetary award in the amount of $17,077,500, which amount includes $862,500 for the costs of restoring Clearview's reputation as set forth in Expert Rose's declaration and report; $15,565,000 in lost investor opportunities; and $565,000 in lost shareholder investment opportunities;

(2)     For an award of $78,945.63 for attorneys' fees and costs due to Plaintiff's non-compliance with discovery orders;

(3)     For an award of $10,000 for the unpaid sanctions payment previously ordered by the Court on July 2, 2025; and

(4)     For such other relief this Court deems just and appropriate.

Dated: New York, New York
December 5, 2025

Respectfully submitted,
GORDON REES SCULLY MANSUKHANI, LLP
*Attorneys for Defendants Clearview AI, Inc.,*
*Hoan Ton-That and Richard Schwartz*

By:   **/s/ Ronald A. Giller**
Ronald A. Giller

1 Battery Park Plaza, 28th Floor
New York, NY 10004
Phone: (973) 549-2500
E-mail: rgiller@grsm.com