UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___ 4/9/2026 __

----------------------------------------------------------------X

CHARLES JOHNSON,

                **Counter-Claim Defendant,**

                -against-

CLEARVIEW AI, INC., et al.,

                **Counter-Claim Plaintiffs.**

----------------------------------------------------------------X

23-CV-2441 (KPF)(SN)

**REPORT &
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE KATHERINE POLK FAILLA:**

Plaintiff/Counterclaim Defendant Charles Johnson ("Plaintiff") filed a breach of contract case against Defendants/Counterclaim Plaintiffs Clearview AI, Inc., Hoan Ton-That, and Richard Schwartz (collectively "Clearview" or "Defendants"). His claim concerned the parties' Wind-Down Agreement, pursuant to which the assets and shares of a facial recognition technology company co-founded by Plaintiff, Ton-That, and Schwartz would be transferred to Clearview AI. Defendants answered the complaint and asserted a counterclaim for breach of contract. Years into the litigation, Plaintiff voluntarily dismissed with prejudice his claim against Defendants, leaving only the counterclaim.

What followed was a series of conferences to address Plaintiff's refusal to participate in discovery, his alleged destruction of discoverable materials, and Plaintiff's publications of improper statements concerning the litigation, the Wind-Down Agreement, and the Defendants. Plaintiff's extreme misconduct ultimately resulted in the Court striking his answer to the counterclaim, entering a default and referring this matter to me for an inquest on damages.

Plaintiff has been steadfast in his refusal to participate in this action (that he initiated), stating openly to the Court that he did not intend to comply with any Court-ordered discovery or sanctions obligations. Thus, Defendants seek damages based on their best estimate of the harm they have incurred. Defendants request that the Court order Plaintiff to pay $17,077,500 in damages for their breach of contract claim, $78,945.63 for attorney's fees, and $10,000 for unpaid sanction payments previously ordered by the Court. See ECF No. 114 at 31.

Because Defendants have established entitlement to some of the damages and fees they seek, I recommend awarding Defendants $1,427,500 in damages, $59,361.75 in attorney's fees, $209.94 in costs, and incorporating the previously imposed $10,000 sanctions obligation into the final judgment.

## BACKGROUND

### I.  Factual Background

Clearview is a startup company founded in 2018 that provides a facial-recognition search engine. See Counterclaim, ECF No. 50 ¶¶ 10–11. Clearview AI collects images that are publicly available online and applies a facial-recognition algorithm that enables it to assist clients in identifying individuals by comparing facial images. Id. ¶ 11.

Plaintiff previously co-owned a facial-recognition company called SmartCheckr, LLC. Id. ¶ 21. In November 2018, Plaintiff and Defendants entered into a Wind-Down Agreement (the "Agreement") that dissolved and wound up the affairs of SmartCheckr. The Agreement further provided that Plaintiff would receive sales commissions equal to 10% of the gross revenue received by Clearview for sales of the company's software or services originating from leads provided by Plaintiff. Id. ¶ 18.

As part of the Agreement, Ton-That, Schwartz, and Plaintiff agreed to abide by certain restrictive covenants. Id. ¶ 22. Specifically, they agreed to the following restrictive covenant:

> [A]t no time during the Restricted Period shall the Individuals or affiliates of the Individuals (including, in the case of Johnson, the Transferee) make, cause or assist any other person to make any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents, or employees.

See ECF No. 25-1 at 3. Plaintiff also agreed to not publicly disclose the existence of the Agreement, his indirect ownership of Shares, or prior services to Clearview AI. The Agreement defines the "Restricted Period" as the period during which the signatories are stockholders of Clearview and for two years thereafter. As relevant here, the Restricted Period extended from November 28, 2018, to May 21, 2023. Counterclaim, ¶ 30.

During the Restricted Period, Plaintiff allegedly harassed Defendants and published false statements critical of the reputation and character of Clearview and its executives. Id. ¶ 31. According to the Counterclaim, Plaintiff made statements to the New York Times regarding the Agreement and posted disparaging remarks about Defendants on public websites, including X.com and various blogs. Id. ¶¶ 39-41.

## II.    Procedural Background

As relevant here, discovery in this case has been excessively impeded by Plaintiff, and the Court has issued numerous orders and held numerous conferences to compel Plaintiff to comply with his discovery obligations and refrain from inappropriate extra-judicial conduct. See, e.g., ECF Nos. 22, 39, 68, & 80. On April 3, 2025, the Court entered an order sanctioning Plaintiff $7,000 for two posts on his Substack.com account in contravention of the Court's orders. ECF No. 84. The Court warned Plaintiff that future violations could result in more severe sanctions, including striking his answer and entry of a default judgment. Three months later, the

Court was compelled to follow through with its warning. The Court sanctioned Plaintiff by imposing a $10,000 fine, striking his answer to Defendants' counterclaim, and directing the Clerk of Court to enter default against him. ECF No. 95. The Court made several findings regarding Plaintiff's conduct during the litigation, including that Plaintiff had made "false, racist and inflammatory postings about Defendants, defense counsel, and this case on social media." ECF No. 95 at 3. The Court further found that Plaintiff repeatedly failed to comply with his discovery obligations, resulting in additional sanctions. Id. at 5–6. The Court then referred the matter to me for an inquest on damages.

Undeterred, Plaintiff continued his obstructionist conduct before this Court. Plaintiff refused to comply with discovery obligations, including by producing discoverable materials and appearing for a deposition, and would not satisfy the outstanding $10,000 sanction. At one point, Plaintiff's former counsel advised the Court that Plaintiff's response to the Court's order was: "Oh okay. Not doing that. I gave it all away. I do not have it. Will not produce and don't have it." See ECF No. 104. During a subsequent in-person conference, Plaintiff stated on the record that he had no intention of complying with the Court's order and admitted that he had deleted various discoverable documents. ECF No. 111.

On September 8, 2025, the Court issued a final order directing Plaintiff to comply with his discovery obligations or it would permit Defendants to seek an adverse inference. Plaintiff did not comply with the September 8 Order, and he has not opposed Defendants' Proposed Findings of Fact and Conclusions of Law.

## DISCUSSION

### I.    Legal Standard

The Court of Appeals set forth the procedural rules applicable to the entry of

a default judgment in <u>City of New York v. Mickalis Pawn Shop, LLC</u>:

> "Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation." <u>Vt. Teddy Bear Co. v. 1–800 Beargram Co.,</u> 373 F.3d 241, 246 (2d Cir. 2004). Rule 55 provides a "two-step process" for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment. <u>New York v. Green,</u> 420 F.3d 99, 104 (2d Cir. 2005). The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff. . . . The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c).

645 F.3d 114, 128 (2d Cir. 2011).

In an inquest for damages where the claimant has sufficiently pleaded a claim on which

relief can be granted, the only remaining issue is to determine the amount of damages

owed. <u>See</u> <u>Gucci Am., Inc. v. Tyrrell-Miller</u>, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008)

(citing <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara,</u> 183 F.3d 151, 155 (2d Cir. 1999)). The

plaintiff must provide adequate support for the requested relief. <u>Id.</u>; <u>see</u> <u>also</u> <u>Malletier v.</u>

<u>Carducci Leather Fashions, Inc.</u>, 648 F. Supp. 2d. 501, 503 (S.D.N.Y. 2009) ("A plaintiff

seeking to recover damages against a defaulting defendant must prove its claim through the

submission of evidence.") (cleaned up). A court may determine the amount a plaintiff is entitled

to recover without a hearing, so long as: (1) the court determines the proper rule for calculating

damages, and (2) the evidence submitted by the plaintiff establishes "with reasonable certainty"

the basis for the damages. <u>Id.</u>

"[A] defendant who defaults thereby admits all well-pleaded factual allegations contained

in the complaint." <u>Mickalis Pawn Shop, LLC,</u> 645 F.3d at 137 (internal quotation marks

omitted). In light of Plaintiff's default, the Court accepts as true Defendants' factual allegations, except those relating to damages. See, e.g., Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993); In re Indus. Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000).

## II.    Liability

Courts evaluating damages in a default context first look to the complaint to determine whether the plaintiff has established a *prima facie* case for recovery. See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012). "Without a response from Defendant, [a] Court must first determine whether, with respect to each element of his claims, Plaintiff's allegations in the Complaint are sufficiently 'well pleaded' to establish Defendant's liability." Belizaire v. RAV Investigative & Sec. Servs. Ltd., 61 F. Supp. 3d 336, 346 (S.D.N.Y. 2014) (citing Mickalis Pawn Shop, LLC, 645 F.3d at 137). "Only if the allegations are sufficient to state a claim, should the Court then proceed to determine the appropriate amount of damages to be awarded." Id.

"Under New York law, the essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." Innovative Biodefense, Inc. v. VSP Techs., Inc., 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) (internal quotation marks omitted).

The allegations in Defendants' Counterclaim, taken as true, establish Plaintiff's liability for breach of contract. Neither party disputes that the Wind-Down Agreement is a valid contract. Under the Agreement, Plaintiff agreed that during the Restricted Period he would not (1) make any statement to a third party that impugned, attacked, or otherwise criticized the reputation or

character of Clearview AI or its agents, or (2) disclose the existence of the Agreement to any third party. See ECF No. 25-1 at 3-4.

Plaintiff breached by repeatedly making disparaging remarks on social media, blog posts, and to the New York Times about Defendants and publicly disclosing the existence of the Agreement. See Declaration of Eric William Rose ("Rose Decl."), ECF No. 114-2 at 4-5. Under New York law, Defendants have established a *prima facie* case of breach of contract.

## III.  Damages

On an inquest for damages, the claimant bears the burden of proof and must introduce sufficient evidence to establish the amount of damages with reasonable certainty. See Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young, Inc., 109 F.3d 105, 111 (2d Cir. 1997); see also Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992) ("While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."). Establishing the appropriate amount of damages "involves two steps: (1) 'determining the proper rule for calculating damages on . . . a claim'; and (2) 'assessing plaintiff's evidence supporting the damages to be determined under this rule.'" Credit Lyonnais Sec. (USA), Inc., 183 F.3d at 155. Although Federal Rule of Civil Procedure 55 permits a court to conduct hearings to determine damages, a hearing is not mandatory. See Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012). The Defendants' submissions are a "sufficient basis from which to evaluate the fairness" of their request for damages and, therefore, a hearing is unnecessary. Fustok v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989).

A claimant in a breach of contract action is entitled to damages in the "amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995). Under New York law, a party seeking damages for breach of contract may recover consequential damages only to the extent such damages were caused by the breach, are capable of proof with reasonable certainty, and were within the contemplation of the parties at the time the contract was made. See Schonfeld v. Hilliard, 218 F.3d 165, 172 (2d Cir. 2000). Thus, where the damages sought are based on alleged lost business opportunities, the claimant must establish both the existence and amount of those damages with reasonable certainty; damages that are merely speculative, possible, or imaginary are not recoverable. Id.

Defendants seek to recover (1) $15,565,000 in damages for the loss of investor opportunities; and (2) $862,500 for the cost of restoring Clearview's reputation. Defendants further contend that Plaintiff's discovery misconduct warrants an adverse inference as to damages. The Court agrees that Plaintiff's failure to comply with discovery orders is relevant to the damages inquiry. But because any adverse inference may bear on the existence and scope of additional harmful communications without necessarily establishing the amount of any resulting damages, the Court first addresses each category of damages sought on the present record and then considers the extent to which an adverse inference alters that analysis.

The bulk of Defendants' requested damages concerns an alleged lost investment opportunity involving a venture capital firm referred to as "Venture Capital Fund X." Defendants described this Silicon Valley-based venture capital fund as managing a multi-billion dollar capital investment fund with over $10 billion in assets under management. Declaration of Richard Schwartz ("Schwartz Decl."), ECF No. 114-8, at ¶ 40. Defendants "communicated and

held meetings" with Venture Capital Fund X between 2019 and 2023 and "expected this process to lead to a round-leading investment" but "no investment ever materialized." Id. Later, Ton-That reported that a partner at Venture Capital Fund X stated: "There's 0% chance that we could invest given all the insane threats that Charles Johnson has made to the team members here." Id., ¶ 41.

Based on "market conditions" and "historical data," Defendants assert that a "typical round-leading investment in a Series C fundraising round from Venture [Capital] Fund X, or a similar venture investor, in 2022 and 2023, investing in a technology startup company comparable in maturity to Clearview, would have been approximately $20 million." Id., ¶¶ 44-45. Accordingly, Defendants allege a capital loss of $15 million, "discounting for fundraise round size uncertainty," because of Plaintiff's statements and disclosures. Id., ¶ 47.

Defendants have not established damages arising from the loss of Venture Capital Fund X's investment with the degree of certainty required to award damages. Although liability is deemed admitted upon default, damages must still be established with reasonable certainty. See Credit Lyonnais Sec. (USA), Inc., 183 F.3d at 155. Moreover, under New York law, damages for lost business opportunities as a result of reputational harm are generally not recoverable in breach of contract actions. See Karetsos v. Cheung, 670 F. Supp. 111, 115 (S.D.N.Y. 1987); MacArthur Constr. Corp. v. Coleman, 91 A.D.2d 906 (1st Dep't 1983). Courts permit recovery in this context only where the claimant demonstrates specific business opportunities lost as a result of the alleged reputational injury. See Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 55 (2d Cir. 2015).

Defendants have not established that Venture Capital Fund X was reasonably certain to invest in Clearview. Defendants provide no evidence describing the stage of negotiations

9

between Clearview and Venture Capital Fund X, whether the parties had agreed upon the terms of a potential investment, or whether the investment had progressed beyond preliminary discussions. Nor have Defendants submitted evidence demonstrating that Venture Capital Fund X had committed to investing a specific amount or that the proposed investment was likely to occur. In the absence of such evidence, the Court cannot determine with reasonable certainty that Clearview would have received the alleged investment, much less that the value of the investment was $15,000,000.

Defendants next seek $862,500 for the cost of restoring Clearview's reputation. In support, Defendants submit the declaration of Eric Rose, who opines that Plaintiff's statements caused reputational harm to Clearview and that a 12-month reputation-repair program would cost approximately $862,500. See Declaration of Eric William Rose ("Rose Decl."), ECF No. 114-2, at 3. Unlike the Venture Capital Fund X theory, this damages request is not premised on a hypothetical future investment that may or may not have occurred. Rather, it is tied to the concrete costs Defendants contend they must incur to mitigate and remediate the reputational harm caused by Plaintiff's admitted breaches.

Defendants have adequately established this category of damages. Rose identifies the statements he reviewed, explains why those statements would be particularly harmful to a company such as Clearview operating in a sensitive and reputationally vulnerable industry, and sets forth the components of the proposed repair program and the basis for his cost estimate. Id. at 8-16; 28-30. The Court recognizes that New York law is generally reluctant to award damages for reputational injury in contract actions. But here, Defendants do not seek an abstract recovery for generalized injury to goodwill untethered to any measurable loss. Instead, they seek the concrete and reasonably estimated cost of addressing and remediating the reputational harm that

Plaintiff's breaches caused. Given the nature of the restrictive covenants at issue—which were plainly designed, at least in part, to prevent reputational injury to Clearview from Plaintiff's public disclosures and disparaging statements—the Court finds that the cost of repairing that injury is sufficiently tied to the breach and supported by the record to permit an award. Accordingly, the Court recommends awarding Defendants $862,500 representing the reasonably estimated cost of remedial measures necessary to repair the reputational harm caused by Plaintiff's breaches.

Defendants also seek $565,000 for the loss of shareholder investments. This request is based on evidence that, in January 2021, Plaintiff's former counsel communicated an unsolicited proposal to purchase Ton-That and Schwartz's shares in the company and represented that Plaintiff's effort was backed by several existing shareholders. Defendants contend that this communication demonstrates that Plaintiff had discussions with shareholders in which he disparaged Clearview and its leadership and that those communications impaired Clearview's ability to obtain additional investment from those shareholders.

This category of damages presents a closer question. Standing alone, the present record does not identify the shareholders at issue, establish the precise content of Plaintiff's communications with them, or demonstrate with certainty that any particular shareholder would have invested a specific amount in Clearview absent Plaintiff's conduct. However, unlike the Venture Capital Fund X theory, this claim is not based solely on a single potential investor's expression of interest. The record contains evidence that Plaintiff's buyback effort was represented to be supported by existing shareholders, which reasonably implies that Plaintiff communicated with those shareholders about Clearview and its management. See ECF No. 114-10. And critically, Plaintiff refused to produce discovery concerning those communications and

failed to appear for a deposition at which Defendants could have explored the nature and consequences of those discussions. See ECF No. 111.

Under these circumstances, the Court concludes that a limited adverse inference is appropriate. Under Rule 37, a court may draw an adverse inference where a party fails to comply with discovery obligations by failing to produce evidence that it has control over, and the missing evidence is relevant to the opposing party's claims or defenses. See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-cv-1318 (GBD)(BCM), 2018 WL 4760345, at *12 (S.D.N.Y. Sept. 28, 2018) (citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)). The record indicates that Plaintiff was in communication with existing shareholders concerning Clearview and its management yet failed to produce discovery concerning those communications, despite repeated court orders requiring him to do so. Plaintiff also admitted to destroying discoverable materials. Because those withheld or destroyed communications bear directly on whether Plaintiff disparaged Clearview to shareholders and thereby impaired Clearview's fundraising efforts, it is appropriate to infer that Plaintiff made disparaging statements to certain existing shareholders and that those statements were harmful to Clearview's ability to secure additional investment. That inference does not establish the full scope of any resulting damages, but it does support a conservative estimate that Clearview lost at least one shareholder investment opportunity as a result of Plaintiff's conduct.

Defendants do not ask the Court to extrapolate across a large universe of unidentified investors or to multiply the average investment size by some unspecified number of opportunities. Instead, they seek a single investment amount—$565,000—based on the historical average of investments in Clearview's prior funding rounds. Schwartz Decl., ¶ 15. In light of

Plaintiff's discovery misconduct, the evidence that Plaintiff solicited support from existing shareholders while disparaging Clearview, and the limited nature of the estimate sought, the Court concludes that this amount represents a reasonable approximation of damages based on the best evidence available. The Court therefore recommends awarding Defendants $565,000 for the loss of shareholder investments.

Finally, the Court turns to the extent to which Plaintiff's discovery misconduct warrants a broader adverse inference as to damages. The Court agrees that Plaintiff's repeated refusal to comply with discovery orders, failure to appear for a deposition, and admission that he destroyed discoverable documents support an adverse inference that Plaintiff made additional disparaging communications to investors, shareholders, and other third parties, and that those communications were harmful to Clearview. That inference reinforces the Court's conclusion that Plaintiff's misconduct caused reputational and fundraising harm broader than the documented record reflects. At the same time, the adverse inference does not relieve Defendants of their burden to prove damages with reasonable certainty. Thus, while the Court relies on that inference in concluding that Plaintiff's communications with shareholders caused at least some loss of investment opportunity, the Court declines to extend the inference so far as to conclude that Venture Capital Fund X was reasonably certain to invest $15,000,000 in Clearview or that Rose's reputational-damages estimate should be increased by some unspecified amount. In short, the adverse inference supports the existence and broader scope of harm, but it does not justify an award of speculative damages untethered to the record.

Accordingly, the Court recommends denying Defendants' request for $15,000,000 in damages arising from the alleged Venture Capital Fund X investment opportunity but awarding $862,500 for reputational harm and $565,000 for the loss of shareholder investments.

IV.    **Attorney's Fees and Costs**

On July 2, 2025, the Court sanctioned Plaintiff by, in part, ordering him to pay "the reasonable expenses, including attorney's fees, caused by his failure to comply with the Court's discovery orders." See ECF No. 95 at 15. Courts determine the "presumptively reasonable fee" for an attorney's services by looking to "what a reasonable, paying client would be willing to pay," "who wishes to pay the least amount necessary to litigate the case effectively." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 184 (2d Cir. 2008). The "presumptively reasonable fee" is the product of a reasonable hourly rate and the reasonable number of hours required by the case. See Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).

Defendants request a total of $68,924.61 for 466.80 hours of attorney work. Attorneys Ronald A. Giller, Mallory Benner, and Bailey Boesch billed time for this case, along with law clerks Caroline Staff and Devon Williams. In addition, paralegal Carla Tankel billed time for this case. Mr. Giller requests an hourly rate of $375 for 124.10 hours of work. Ms. Benner requests an hourly rate of $325 for 314.10 hours of work. Ms. Boesch requests an hourly rate of $325 for 10.70 hours of work. Ms. Staff requests an hourly rate of $175 for 3.20 hours of work. Ms. Williams requests an hourly rate of $175 for 1.0 hours of work. Finally, Ms. Tankel requests an hourly rate of $175 for 1.10 hours of work. Defendants' time records also include entries for several other attorneys and law clerks who are not identified in defense counsel's declaration. In assessing the reasonableness of the requested fee award, the Court considers only time billed by the attorneys identified in that declaration and excludes time billed by all other individuals.

14

### A. Reasonable Rates

In determining reasonable fees for a particular case, courts rely on reasonable hourly rates prevailing in the same district for similar services provided by attorneys with comparable skill and experience. See Arbor Hill, 522 F.3d at 184; Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., Inc., No. 13-cv-02548 (KMW)(JLC), 2014 WL 1303434, at *8 (S.D.N.Y. Apr. 1, 2014) ("It is the fee movant's burden to establish the prevailing market rate.").

Mr. Giller is a partner at defense counsel's firm and has practiced law for more than 25 years. His biography on the firm's website reflects substantial experience in commercial litigation and related matters. In light of that experience, as well as the default posture of this case and Plaintiff's repeated discovery noncompliance, the Court finds that an hourly rate of $375 for Mr. Giller's work is reasonable.

Defendants provide no information regarding the experience of Ms. Benner, Ms. Boesch, Ms. Staff, or Ms. Williams, including their years of practice, dates of admission, or experience in this area of law. "Where the fee applicant 'has not even provided the most basic information necessary to assess the reasonableness of rates: the years of experience of the particular attorneys and the type of experience they had,' courts generally reduce fee requests." Zero Carbon Holdings, LLC v. Aspiration Partners, Inc., No. 23-cv-5262 (LJL), 2024 WL 3409278, at *7 (S.D.N.Y. July 15, 2024) (citing Wells Fargo Tr. Co., N.A. v. Fast Colombia S.A.S., No. 23-cv-603 (PGG)(RWL), 2023 WL 8591953, at *7 (S.D.N.Y. Oct. 16, 2023)). According to defense counsel's firm website, Ms. Benner graduated from law school in 2019 and is admitted in New York and New Jersey, but it is unclear when she was admitted in those jurisdictions, how long she has been practicing, or the extent of her experience in this area of litigation. Given the default posture of this case and Ms. Benner's extensive work on this matter, the Court will award

15

her the requested hourly rate of $325. As for Ms. Boesch, the firm website does not even indicate when she graduated from law school, let alone provide information about her admissions or relevant litigation experience. Accordingly, the Court finds that a more modest hourly rate of $200 is reasonable in light of the absence of supporting information. See Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc., No. 17-cv-6851 (SHS), 2020 WL 5731953, at *2 (S.D.N.Y. Sept. 24, 2020) (finding an hourly rate of $160 reasonable for associates in a breach of contract case).

As for the law clerks, Ms. Staff and Ms. Williams, Defendants also fail to clarify whether these individuals are law school graduates not yet admitted to the bar or law students who have not yet graduated. See Zero Carbon Holdings, 2024 WL 3409278, at *8 (noting that the term "law clerk" is generally understood to refer to a law school graduate not yet admitted to the bar but has also been used to describe a law student who has not yet graduated). Moreover, the Court could not locate bio pages for these two individuals on defense counsel's firm website. Because law students are typically billed at a lower rate than law school graduates who have not yet been admitted to the bar, and because Defendants provide no evidence establishing whether Ms. Staff and Ms. Williams have graduated from law school, the Court will apply a rate consistent with that of a law student. Accordingly, the Court finds that an hourly rate of $115 is reasonable for the work performed by Ms. Staff and Ms. Williams. See Casmento v. Volmar Constr., Inc., No. 20-cv-944 (LJL), 2022 WL 17666390, at *4 (S.D.N.Y. Dec. 14, 2022).

With respect to the paralegal, Ms. Tankel, the Court likewise reduces her hourly rate to $120, which is consistent with rates awarded to paralegals in this District. See Hong v. Mommy's Jamaican Market Corp., No. 20-cv-9612 (LJL), 2024 WL 1242507, at *6 (S.D.N.Y. Mar. 21, 2024).

### B. Reasonable Hours

When evaluating whether claimed hours are reasonable, "the district court should exclude excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." Quarantino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1997). An attorney who requests "court-ordered compensation . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).

In support of their application, Defendants' attorney has submitted a billing invoice with contemporaneous time records under seal. See ECF Nos. 114-4, 116. Defendants seek fees for work performed from July 2024 through October 2025. The Court's prior order, however, limited any fee award to those attorney's fees "caused by" Plaintiff's failure to comply with the Court's discovery orders. See ECF No. 95 at 15. The Court did not issue its first discovery-compliance order until January 16, 2025, when it directed Plaintiff to gather all potentially discoverable material for review by his then-counsel. See ECF No. 68. Thereafter, the Court repeatedly directed Plaintiff to comply with that order and ultimately sanctioned him, in part, for his continued noncompliance with his discovery obligations. See ECF Nos. 80, 84. Accordingly, consistent with the Court's prior order, Defendants are entitled to recover fees for work performed only on or after January 16, 2025, when Plaintiff began to violate the Court's discovery orders.[1] The Court will review 197 hours of time billed from January 17, 2025, through October 21, 2025. This breaks down to 136 hours for Ms. Benner, 56.7 hours for Mr. Giller, 3.2 hours for Ms. Staff, 1.0 hours for Ms. Williams, and 0.1 hours for Ms. Tankel.

---

[1] The consequence of this is that the Court will not award any fees for work performed by Ms. Boesch, whose work on this case occurred only in September 2024.

The Court has reviewed the contemporaneous time records submitted in support of the application and finds that, subject to the temporal limitation discussed above, the descriptions of the work performed are sufficiently detailed to allow the Court to assess the reasonableness of the hours expended. The Court further concludes that the time billed is not facially excessive, redundant, or otherwise unnecessary, particularly given Plaintiff's repeated failure to comply with discovery orders and the resulting need for motion practice and repeated court intervention.

Not all of the fees, however, incurred during the relevant period were caused by Plaintiff's discovery violations. Some of counsel's time entries reflect work that would have been required in the ordinary course of the litigation regardless of Plaintiff's noncompliance, and the billing records do not always permit those tasks to be segregated with precision. Accordingly, the Court exercises its discretion to apply a 10% across-the-board reduction to the lodestar amount to account for work not fairly attributable to Plaintiff's discovery misconduct.

Accordingly, I recommend that the Court award Defendants attorney's fees in the amount of $59,361.75

### C. Costs

Defendants also seek $209.94 in costs, consisting of $78.18 for parking fees incurred in attending court conferences in this action and an additional $131.76 for travel and additional parking fees. "It is well-settled in this Circuit that 'attorney's fees awards' include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." Tlacoapa v. Carregal, 386 F. Supp. 2d 362, 374 (S.D.N.Y. 2005) (citation omitted). The Court finds Defendants' requests for reimbursement of travel-related expenses incurred in attending court hearings to be reasonable. Accordingly, I recommend awarding Defendants $209.94 in costs.

### V.    Additional Sanctions

Defendants also request an additional award of fees and costs as a further sanction for Plaintiff's continued noncompliance with the Court's discovery orders. See ECF No. 114 at 27-30. The Court declines to recommend any additional fee award. Rule 37 authorizes recovery of reasonable expenses caused by a party's discovery misconduct, and the Court has already determined the fee award appropriate to compensate Defendants for the costs caused by Plaintiff's noncompliance. In light of that award, together with the other consequences of Plaintiff's misconduct—including default and the damages awarded on the counterclaim—an additional fee award would be duplicative and is not warranted.

The Court will, however, recommend that Plaintiff's unpaid $10,000 sanctions obligation be incorporated into the final judgment. The record reflects that the Court previously imposed that sanction, and that Plaintiff has failed to satisfy it. Under these circumstances, incorporating the unpaid sanction into the judgment is an appropriate means of enforcing the Court's prior order and ensuring that Plaintiff does not evade a monetary sanction already imposed. See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-cv-1318 (GBD)(BCM), 2019 WL 8955234, at *17 (Oct. 25, 2019), report and recommendation adopted, 2020 WL 1467098 (S.D.N.Y. Mar. 26, 2020).

### CONCLUSION

For the reasons set forth above, I recommend that the Court award Defendants the following relief:

(1) Damages on the counterclaim in the total amount of $1,427,500;

(2) Attorneys' fees in the amount of $59,361.75

(3) Costs in the amount of $209.94; and

(4) Incorporation of Plaintiff's previously imposed and unpaid $10,000 sanctions obligation into the final judgment.

SARAH NETBURN
United States Magistrate Judge

DATED:      April 9, 2026
            New York, New York

\*            \*            \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable Katherine Polk Failla if required by her Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Failla. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).

20