UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES JOHNSON,

Plaintiff,

-v.-

CLEARVIEW AI, INC.; HOAN TON-THAT; and RICHARD SCHWARTZ,

Defendants.

23 Civ. 2441 (KPF)

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION**

KATHERINE POLK FAILLA, District Judge:

Pending before the Court is the April 9, 2026 Report and Recommendation issued in this case by United States Magistrate Judge Sarah Netburn (the "Report" (Dkt. #117)). On July 2, 2025, the Court referred this case to Judge Netburn to conduct a damages inquest and thereby quantify Plaintiff's liability to Defendants on their counterclaim against him (the "Counterclaim"). The Report recommended an aggregate judgment of $1,497,071.69 in favor of Defendants, comprising: (i) $1,427,500 in damages ($862,500 for a reputation remediation program, and $565,000 for lost shareholder investments); (ii) $59,361.75 in attorneys' fees; (iii) $209.94 in costs; and (iv) the incorporation of the Court's previously-imposed $10,000 sanctions obligation into the final judgment. (Report 2). The Report also instructed the parties to file any written objections by April 23, 2026, and cautioned that untimely objections would result in a finding of waiver. (*Id.* at 20).

Twelve days after the deadline elapsed, Plaintiff filed his objections. (Dkt. #118). Defendants then timely filed their brief in opposition to Plaintiff's

objections. (Dkt. #119). After careful consideration of Judge Netburn's well-reasoned Report, Plaintiff's objections, and Defendants' brief in opposition, the Court agrees with the Report's recommendation, for largely the same reasons detailed in the Report. For the reasons set forth below, the Court will enter judgment in the amount of $1,497,071.69 in favor of Defendants.

## BACKGROUND[1]

### A. Factual Background

In 2017, Plaintiff co-founded a facial-recognition company, SmartCheckr, LLC ("SmartCheckr"), with Defendants Hoan Ton-That and Richard Schwartz (together, the "Individual Defendants"). (Dkt. #25 ¶ 19). The Individual Defendants eventually sought to wind down SmartCheckr and transfer its assets to a new company, Defendant Clearview AI (collectively, "Defendants"). (*Id.* ¶ 29). The dissolution was formalized in an agreement (the "Wind-Down Agreement"), pursuant to which Plaintiff was given a ten-percent ownership stake in Clearview AI and the right to receive certain commissions on Clearview AI's sales. (*Id.* ¶¶ 31-33).

Under the Wind-Down Agreement, Plaintiff agreed to the following restrictive covenant:

> [A]t no time during the Restricted Period shall the Individuals or affiliates of the Individuals (including, in the case of Johnson, the Transferee) make, or cause or

[1] This section draws its facts from the detailed recitation in the Report and the well-pleaded allegations in the First Amended Complaint (the "FAC") in this action. (Dkt. #25 (FAC), 117 (Report)). For ease of reference, the Court refers to the parties' briefing as follows: Plaintiff's objections to the Report will be referred to as "Pl. Obj." (Dkt. #118), and Defendants' brief in opposition to Plaintiff's objections will be referred to as "Def. Br." (Dkt. #119).

> assist any other person to make any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents or employees.

(Dkt. #25-1 at 2 (the "Non-Disparagement Clause")). On August 4, 2023, Plaintiff filed the FAC, the operative complaint in this matter, principally alleging that Defendants had breached their financial obligations under the Wind-Down Agreement. (Dkt. #25). On June 21, 2024, Defendants filed their answer, in which they asserted a counterclaim against Plaintiff for violating the Non-Disparagement Clause. (Dkt. #44). Plaintiff filed his answer to the Counterclaim on July 26, 2024. (Dkt. #53).

Since then, the litigation has been repeatedly stymied by Plaintiff's misconduct. This Court, as well as Judge Netburn, has admonished Plaintiff on multiple occasions for violating orders, failing to comply with his discovery obligations, and making "false, racist, and inflammatory postings about Defendants, defense counsel, and this case on social media." (Dkt. #95 at 3; *see also* Dkt. #21, 22, 34, 36, 37, 39, 45, 60, 61 (submissions regarding Plaintiff's inappropriate social media posts about the parties and their counsel, and Court orders to Plaintiff to cease and desist from that conduct)).

On April 3, 2025, the Court entered an order sanctioning Plaintiff $7,000 for two offending social media posts. (Dkt. #84). The Court warned that future violations could result in the possibility of additional sanctions, including the Court striking his answer to the Counterclaim and entering default judgment against him. (*Id.*). Despite that admonition, three months later, the Court was

compelled yet again to sanction Plaintiff. (Dkt. #95). This time, the Court imposed a $10,000 fine, struck Plaintiff's answer to the Counterclaim, and directed the Clerk of Court to enter default judgment against him. (*Id.* at 3-6).

The Court then referred the matter to Judge Netburn for a damages inquest. (Dkt. #96). Despite Judge Netburn's herculean efforts, Plaintiff was undeterred from committing further violations of court orders. During an in-person conference with Judge Netburn, Plaintiff stated that he had no intention of complying with the Court's order and admitted that he had deleted various discoverable documents. (Dkt. #111). According to Plaintiff's former counsel, Plaintiff's response to the Court's sanctions and discovery orders was "Oh okay. Not doing that. I gave it all away. I do not have it. Will not produce and don't have it." (Dkt. #104).

On September 8, 2025, Judge Netburn issued a final order directing Plaintiff to comply with his discovery obligations, and warned that if Plaintiff failed to do so, she would permit Defendants to seek an adverse inference. (Dkt. #111). Plaintiff filed no response, and Defendants then submitted their Proposed Findings of Fact and Conclusions of Law. ("Proposed Findings" (Dkt. #114)). Plaintiff filed no opposition.

**B. Report and Recommendation**

On April 9, 2026, Judge Netburn issued the Report. In their Proposed Findings, Defendants had sought five categories of damages: (i) $15,565,000 in damages for lost investor opportunities; (ii) $862,500 for the cost of restoring Clearview's reputation; (iii) $565,000 for the loss of shareholder investments;

(iv) $78,945.63 for attorneys' fees and costs; and (v) $10,000 for the unpaid sanctions payment previously ordered by the Court. (Proposed Findings 31).

Judge Netburn rejected the first category of damages, which was the lion's share of Defendants' request. Judge Netburn found that Defendants failed to establish damages for lost business opportunities with the requisite "reasonable certainty," as Defendants provided no evidence that prospective investments progressed beyond preliminary discussions. (Report 8-10 (citing, *inter alia*, *Schonfeld* v. *Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000))). But as to the other requested damages and fees, Judge Netburn found that Defendants satisfactorily proved those damages with reasonable certainty, albeit with a reduction in the requested attorneys' fees. (*Id.* at 10). Based on Plaintiff's extensive history of misconduct in this litigation, Judge Netburn found that it was appropriate to draw a limited adverse inference against Plaintiff. (*Id.* at 12). Finally, Judge Netburn declined to impose new sanctions on Plaintiff, finding that the fee award was sufficient to compensate Defendants for the costs caused by Plaintiff's noncompliance. (*Id.* at 19). Nonetheless, she recommended that the Court incorporate Plaintiff's unpaid $10,000 sanctions obligation into the final judgment. (*Id.*).

**1. Plaintiff's Objections**

On May 5, 2026, Plaintiff filed his objections to the Report. (Pl. Obj.).[2] He lodged four principal objections.

[2] Despite filing his objections on May 5, 2026, Plaintiff dated his objections — four times — as having been completed on "April 23, 2026," which was the filing deadline.

*First*, Plaintiff argued that the Court should reject the Report's recommended $862,500 reputation repair and $565,000 shareholder investment loss awards. (Pl. Obj. 3). Plaintiff argued that the former award is not warranted because it is a "forward-looking[] expenditure that has not yet been incurred," and it is not an "identified lost business opportunity." (*Id.*). As to the latter, Plaintiff argued that the shareholder award fails because it "d[id] not identify the shareholders at issue, the content of [Plaintiff's] communications with them, or whether any shareholder would have invested a specific amount." (*Id.* at 3-4).

*Second*, Plaintiff argued that the $59,361.75 attorneys' fees award should be reduced by 20% across the board, rather than the 10% reduction Judge Netburn imposed. (Pl. Obj. 4-5). He argued that some of the attorneys' fees would have always been incurred regardless of Plaintiff's malfeasance, and that one of the attorneys provided insufficient supporting information regarding her credentials and experience. (Report 4-5).

*Third*, Plaintiff challenged Judge Netburn's recommended $209.94 award for parking and travel fees, because Defendants purportedly failed to provide supporting documentation. (Pl. Obj. 5).

*Fourth*, Plaintiff argued that the $10,000 sanctions award should not be incorporated into the final judgment, because doing so would subject Plaintiff

(Dkt. #118 at i, 6, 7, 8). The Court finds that Plaintiff's misrepresentation may warrant further sanctions, for the reasons explained *infra*, in Discussion Section C.

to post-judgment interest, and thus "exceed what the Court originally imposed." (*Id.* at 5).

### 2. Defendants' Opposition Brief

Defendants' opposition brief focuses principally on the untimeliness of Plaintiff's opposition and Plaintiff's failure to raise these arguments before Judge Netburn. As Defendants argued, "Plaintiff not only failed to raise these arguments before Judge Netburn, [ ] he failed to file *any* opposition, counter statement of facts or conclusion or law, or otherwise participate in the damages inquest proceedings." (Def. Br. 5). Therefore, Defendants argued, the Court should consider Plaintiff's objections forfeited on both timeliness and failure-to-object grounds. On the merits, Defendants argued that Plaintiff pointed to no clear error in the Report and cited authorities in the Second Circuit affirming similar damage and sanctions awards issued in like cases. (*Id.* at 11-13).

## DISCUSSION

### A. Applicable Law

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "If a party fails to properly object to the [report and recommendation], the district judge reviews the [report and recommendation] only for clear error." *Nambiar* v. *Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 359 (2d Cir. 2025). A district court may also review for clear error when a party's "objections are nonspecific or merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set

forth in the original petition." *Knight* v. *City of New York*, 164 F.4th 173, 177 (2d Cir. 2026) (internal quotation marks omitted) (quoting *Nambiar*, 158 F.4th at 361); *see also Miller* v. *Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022).

By contrast, a district court reviews *de novo* "those portions of the Report … to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3); *Nambiar*, 158 F.4th at 358-61; *Miller*, 43 F.4th at 120. Even if a litigant raises objections that "repeat an argument raised before the magistrate judge," they should be considered de novo so long as the litigant "take[s] issue with a specific legal conclusion in the report and recommendation." *Knight*, 164 F.4th at 177 (quoting *Nambiar*, 158 F.4th at 361). But courts "need not conduct a de novo hearing on the matter." *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 69 (S.D.N.Y. 2019). "It is sufficient that the Court 'arrive at its own independent conclusion regarding those portions of the report to which objections are made.'" *City of Almaty* v. *Sater*, No. 19 Civ. 2645 (JGK), 2022 WL 1555542, at *2 (S.D.N.Y. May 16, 2022) (quoting *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d at 69).

## B. Analysis

### 1. Plaintiff Forfeited His Arguments by Failing to Object to the Proposed Findings

The Court agrees with Judge Netburn's thoughtful and well-reasoned analysis and adopts her recommendation in full. To begin, the Court observes and acknowledges that it need not reach the merits of Plaintiff's belated objections for two separate reasons.

*First*, Plaintiff forfeited his arguments by failing to raise those objections before Judge Netburn. "A proper objection [to a report and recommendation] generally may not raise new arguments not previously made before the magistrate judge." *Nambiar*, 158 F.4th at 359. District judges "will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." *United States* v. *Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (internal quotation marks and citation omitted); *Echevarria* v. *Brandes*, No. 19 Civ. 10268 (PAE) (SLC), 2020 WL 6742782, at *2 (S.D.N.Y. Nov. 17, 2020) (same).

Plaintiff had ample notice of his deadlines and opportunities to oppose Defendants' Proposed Findings. On October 2, 2025, Judge Netburn set the operative briefing schedule: December 5, 2025 for Defendants to submit the Proposed Findings, and 30 days thereafter for Plaintiff to submit his response. (Dkt. #113). Defendants timely filed their Proposed Findings. (Dkt. #114). Four months passed, during which time Plaintiff filed nothing on the docket. On March 6, 2026, Judge Netburn warned Plaintiff that "absent a filing … the Court assumes he will not oppose the damages sought." (Dkt. #115). Plaintiff filed no response or explanation for his delay, and Judge Netburn issued the Report a month later. Plaintiff's arguments are therefore forfeited, and the Court finds no reason to exercise its discretion to excuse that forfeiture.

### 2. Plaintiff Forfeited His Arguments by Failing to Timely Object to the Report

*Second*, Plaintiff's arguments are forfeited because he failed to timely object to the Report. "Where parties receive clear notice of the consequences, failure to timely object to a magistrate's report and recommendation operates as [forfeiture] of further judicial review of the magistrate's decision." *Smith* v. *Campbell*, 782 F.3d 93, 102 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Mario* v. *P & C Food Mkts.*, 313 F.3d 758, 766 (2d Cir. 2002)); *accord Nambiar*, 158 F.4th at 359; *Caidor* v. *Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).[3] The fourteen-day deadline for parties to submit an opposition brief to a report and recommendation is established both in statute and in the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(a). Consistent with that deadline, Judge Netburn instructed Plaintiff to submit any objections to the Report within fourteen days of service of the Report. That deadline, April 23, 2026, was detailed in the Report and the accompanying minute entry. (Report 20; April 9, 2026 Minute Entry).

Despite clear notice, Plaintiff failed to timely file his objections until May 5, 2026, two weeks past the deadline, without any prior request for extension or apparent excuse. Litigants who have missed their opposition

---

3 Although Defendants refer to Plaintiff's arguments as "waived," it is more accurate to describe the arguments as "forfeited." "'[W]aiver' [is] reserved for a litigant's intentional relinquishment of a known right," while forfeiture is "[w]here a litigant's action or inaction is deemed to incur the consequence of loss of a right[] or … a defense." *Doe* v. *Trump Corp.*, 6 F.4th 400, 410 n.6 (2d Cir. 2021). Courts have discretion to consider forfeited arguments, but "a waived argument may not be revived." *Id. See generally Nambiar* v. *Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 359 n.2 (2d Cir. 2025) (noting the distinction between the two doctrines).

deadlines by lesser margins have been found to have forfeited their objections. *See, e.g.*, *Forsberg* v. *Always Consulting, Inc.*, No. 06 Civ. 13488 (CS), 2008 WL 5449003, at *4 (S.D.N.Y. Dec. 31, 2008) (finding that party forfeited their objections by filing three days past the deadline); *Washington* v. *Lenihan*, No. 87 Civ. 4770 (SAS) 1996 WL 345950, at *1 (S.D.N.Y. June 21, 1996) (not considering plaintiff's objections that were filed six days late); *Garland* v. *Superintendent, Marcy Corr. Facility*, No. 22 Civ. 8712 (JLR), 2026 WL 927638, at *1 (S.D.N.Y. Apr. 6, 2026) (finding forfeiture where petitioner filed objections 11 days late).

Therefore, Plaintiff's objections are forfeited. Absent a timely objection, the Court will only review the Report for clear error. *See Nambiar*, 158 F.4th at 359 ("If a party fails to properly object to the R&R, the district judge reviews the R&R only for clear error."). A finding is clearly erroneous when, "although there is evidence to support [the finding], the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson* v. *City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985) (internal quotation marks omitted) (quoting *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 394-95 (1948)).

**3. Plaintiff's Objections Fail on the Merits**

Reviewing Plaintiff's objections on clear error review, the Court finds no basis for rejecting the Report's recommendations. The Court addresses Plaintiff's objections *seriatim*.

**a. $862,500 Award for Reputation Remediation**

Plaintiff's first challenge is against the Report's recommended $862,500 award for Defendants to enroll in a reputation remediation program. That award is based on the estimate provided by Mr. Eric Rose, Defendants' retained expert, who stated in a declaration that a "twelve-month program targeting search prominence, third-party validation, and audience re-reach is necessary and proportionate to mitigate the harm caused by [Plaintiff]." (Dkt. #114-2 at 3). The Court finds no error in this assessment.

Plaintiff argued that the reputation remediation program violates New York law. He relied on three cases, cited in the Report, standing for the proposition that New York law prohibits recovery for "generalized reputational harm in breach of contract actions absent evidence of specific, quantifiable lost business opportunities." (Pl. Obj. 3 (citing *Karetsos* v. *Cheung*, 670 F. Supp. 111, 115 (S.D.N.Y. 1987); *MacArthur Constr. Corp.* v. *Coleman*, 457 N.Y.S.2d 530 (1st Dep't 1983); *Anderson Grp., LLC* v. *City of Saratoga Springs*, 805 F.3d 34, 55 (2d Cir. 2015))). Plaintiff also challenged the prospective nature of the award, as the costs have not yet been incurred. (*Id.*).

Defendants do not challenge Plaintiff's characterization of New York law. However, they argue that the award was not for "general reputation harm," but rather "a concrete and reasonably estimated cost of *addressing and remediating* the reputational harm caused [by] Plaintiff's breaches." (Def. Br. 11). Defendants argue that similar awards have "routinely been award[ed] in the Second Circuit," citing the example of *Carroll* v. *Trump*, 151 F.4th 50 (2d

Cir. 2025), where the jury awarded $11 million in compensatory damages for the cost of a reputation repair program. (*Id.*).

The Court agrees with Defendants' conclusion, but disagrees with their rationale. *Carroll* involved a jury award for defamation, not the breach of a contract involving a non-disparagement clause, as is the case here. New York law imposes different requirements on defamation claims and breach of contract claims. Under New York tort law, a plaintiff asserting liability for defamation is not required to prove "loss of something having economic or pecuniary value." *Liberman* v. *Gelstein*, 80 N.Y.2d 429, 434-35 (1992) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 575, comment b)). Under New York contract law, a plaintiff asserting reputational harm from a breach of contract is required to prove business losses. *See Anderson Grp., LLC* v. *City of Saratoga Springs*, 805 F.3d 34, 55 (2d Cir. 2015) (under "New York state law … harm to business reputation generally are not recoverable in a breach of contract action without specific proof of lost business opportunities as a result of diminished reputation").

Here, as the Counterclaim is based on a breach of contract, Defendants are required to provide specific proof of lost business opportunities, resulting from their diminished reputation. But Defendants' proof of specific lost opportunities is mixed, at best. Mr. Rose's report cited no specific instances of lost business opportunities, instead discussing academic research on harm that may result to businesses from defamatory statements. (Dkt. #114-2 at 18-23 (discussing the "memory persistence barrier" psychological phenomenon,

the author's white paper, and a study by Edelman, a research consultancy, on the importance of trust in business relationships)). The best evidence of lost business opportunities is the $565,000 award for lost shareholder investments that the Report recommended. (Report 11). But that award was an approximation based on (i) an adverse inference drawn against Plaintiff and (ii) an extrapolation from past average funding rounds. (*Id.*). It is not clear whether that finding is sufficiently "specific proof" of lost earnings to warrant an exception to the rule regarding contract damages for reputational harm. *Anderson*, 805 F.3d at 55. Moreover, it is unclear whether the traditional rule against double recovery would prohibit awarding an $865,000 remediation award to remediate the harm from $565,000 in lost investments, for which Defendants would already be compensated. *See generally Conway* v. *Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994).

Nonetheless, the $865,000 award could be justified in the alternative as a mitigation award.[4] Under black letter contract law, "special losses [*i.e.*, economic losses] that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages." 11 Corbin, Contracts (rev. ed.), § 57.16, p. 349; *see* Restatement (Second) of Contracts § 350 (1981) ("The injured party is not precluded from recovery … to the extent that he has

---

[4] Neither the Report nor Defendants relied expressly on a theory of mitigation damages. However, the Court can "accept, reject, or *modify, in whole or in part*, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C) (emphasis added); *see, e.g.*, *Austin* v. *Pappas*, No. 04 Civ. 7263 (KMK) (LMS), 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (adopting the "conclusion reached in the R & R … in part on different grounds than those relied on in the R & R").

made reasonable but unsuccessful efforts to avoid loss."). New York courts have adopted a comparable rule. *See, e.g.*, *Inchaustegui* v. *666 5th Ave. Ltd. P'ship*, 706 N.Y.S.2d 396, 399 (1st Dep't 2000) (holding that the "injured party is entitled to recoup from the breaching party the costs of … mitigation"), *aff'd*, 96 N.Y.2d 111 (2001); *Gordon & Co.* v. *Ross*, 84 F.3d 542, 546-47 (2d Cir. 1996) (applying New York law, holding that a finder of fact would be justified in awarding $1,034,347 in mitigation costs to avert a probable $1,890,796 loss (citing *Den Norske Ameriekalinje Actiesselskabet* v. *Sun Printing & Publishing Ass'n*, 226 N.Y. 1, 8 (1919)).

Crucially, mitigation damages do not require a nexus to a proven business loss, as the very purpose of mitigation is to avert the incurrence of further losses. The Third Department case of *Bibeau* v. *Ward* is instructive, 645 N.Y.S.2d 107 (3d Dep't 1996). The plaintiff in *Bibeau* entered a contract requiring the defendant to purchase, train, and board jumping horses, and eventually sell them for a profit. *Id.* at 109. Both the trial court and the Third Department agreed that the defendant breached the contract by, among other things, failing to pay for the horses' care or maintenance. *Id.* at 110. But the Third Department found that evidence of the "plaintiff losing profits … was too uncertain to warrant" the $132,460.25 compensatory award. *Id.* at 111. Although compensatory damages were unavailable, the Third Department found that the plaintiff was entitled to $15,974.42 in "mitigation expenses" that the plaintiff "assume[d] … because of [the] defendant's breach," namely the costs of boarding the horses and obtaining veterinary care. *Id.*

The logic of *Bibeau* extends with equal force here. Defendants assumed the costs of mitigation only because of Plaintiff's breach of the Non-Disparagement Clause. And the parties certainly contemplated the possibility of damages (even if they are difficult to measure) flowing from breach of the Non-Disparagement Clause at the time of contracting. (*See* Dkt. 25-1 ¶ 4(e) ("The parties agree that a breach of any of the covenants of [the Non-Disparagement Clause] would cause material and irreparable harm to the Company that would be difficult or impossible to measure[.]")). It is true that the damages award contemplated here is forward-looking, while the award in *Bibeau* was backward-looking. Nonetheless, "New York courts have significant flexibility in estimating general damages once the fact of liability is established." *Tractebel Energy Marketing, Inc.* v. *AEP Power Marketing, Inc.*, 487 F.3d 89, 112 (2d Cir. 2007). "To the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so," and the "risk that the future might reveal th[ose] assumptions to be false is appropriately borne by … the breaching party." *Id.*; *see Washington* v. *Kellwood Co.,* No. 05 Civ. 10034 (MHD), 2015 WL 6437456, at *24 (S.D.N.Y. Oct. 14, 2015) (noting that the "wrongdoer must shoulder the burden of the uncertainty regarding the amount of damages," regardless of whether the court is assessing "general damages" or "consequential damages of lost profits or lost value") (internal quotation marks omitted) (quoting *Indu Craft, Inc.* v. *Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995))).

To be sure, as far as the Court is aware, New York courts have not expressly endorsed the use of a projected reputation remediation program as an estimate of mitigation damages in a breach of contract action. There may well be colorable arguments cutting in the opposite direction. Nonetheless, the Court is unaware of any cases that expressly foreclose the use of mitigation damages in this manner. To the extent that there are authorities supporting a contrary view of New York law, the consequences for failing to bring those authorities to the Court's attention lie with Plaintiff. "[T]he party who has caused the loss may not insist on theoretical perfection" as to how that loss is calculated, particularly after having already squandered his prior opportunities to object. *Tractebel*, 487 F.3d at 111 (internal quotation marks omitted) (quoting *Entis* v. *Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964)); *Baroda*, 47 F.3d at 496.

**b. $565,000 for Loss in Shareholder Investments**

Next, Plaintiff challenged the Report's recommended $565,000 award for projected loss in shareholder investments. That award stems from a January 2021 email from Plaintiff's counsel to the Individual Defendants, where Plaintiff offered to purchase the Individual Defendants' shares in Clearview AI, Inc. (Dkt. #114-10). In that outreach, Plaintiff's counsel conveyed various complaints Plaintiff had regarding Clearview's corporate governance and represented that the company needed a change of direction. (*Id.*). That letter also represented that Plaintiff was "backed by several of the existing shareholders in this effort," *id.*, which Defendants argue is an indication that

Plaintiff had disparaging conversations with those shareholders, which resulted in the loss of potential additional investors. (Report 111; Def. Br. ¶¶ 100-106).

Now, Plaintiff argues that the Report should be rejected because "the record does not identify the shareholders at issue, the content of Johnson's communications with them, or whether any shareholder would have invested a specific amount." (Pl. Obj. 3). But Plaintiff complains of a self-inflicted wound. As Judge Netburn concluded, it was Plaintiff himself who foreclosed the possibility of a deeper inquiry into Defendants' lost business opportunities. Plaintiff "repeated[ly] refus[ed] to comply with discovery orders, fail[ed] to appear for a deposition, and admi[tted] that he destroyed discoverable documents." (Report 13). Accordingly, Judge Netburn drew an adverse inference against Plaintiff, and Plaintiff does not dispute that it was within her discretion to do so. (*See* Pl. Obj. 4). Rather, Plaintiff argues that the $565,000 figure is "fundamentally speculative and should not be adopted." (*Id.*).

The Court disagrees and finds no error. Where a "plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty." *Baroda*, 47 F.3d at 496. "New York courts do not require scientific rigor in the calculation of damages," and where the "only uncertainty is as to the[] amount [of damages], there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach." *In re Best Payphones, Inc.*, 432 B.R. 46, 64 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Lexington Prods., Ltd.* v. *B.D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982), *aff'd*, 450 F. App'x 8 (2d Cir.

2011) (summary order)). The breaching party "should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain." *Id.* (quoting *Lexington*, 677 F.2d at 253).

Here, Judge Netburn found that the $565,000 award was a reasonably certain estimate of Defendants' injuries, because that amount reflected the historical average of investments in Clearview's prior funding rounds. (Report 12-13). The Second Circuit, and other courts in this District, have frequently approved calculations of loss profits based on historical averages. *See, e.g., Travellers Int'l, A.G.* v. *Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994) (affirming district court's calculations of lost profits using "historical operating statistics between the parties"); *In re Best Payphones, Inc.*, 432 B.R. at 64-65 (approving damages based on usage date over "the preceding twelve-month period," because "past experience [i]s a reasonable basis from which a jury may determine lost profits with the requisite degree of certainty" (internal quotation marks and citation omitted)). Plaintiff may disagree with the exact methodology the Report employed, or may have wished for a lower damages amount, but the "mere fact that a party disagrees with the methodology utilized or a particular assumption does not render proof [of damages] speculative." *Delshah 60 Ninth, LLC* v. *Free People of PA, LLC*, No. 20 Civ. 5905 (JMF), 2024 WL 4648014, at *5 (S.D.N.Y. Nov. 1, 2024) (internal quotation marks omitted) (quoting *Travellers*, 41 F.3d at 1579), *appeal dismissed as moot*, 175 F.4th 192 (2d Cir. 2026). In sum, the Court finds no

clear error in the Report's recommendation of $565,000 for lost shareholder investments.

**c. $59,361.75 in Attorneys' Fees and $209.94 in Costs**

Next, the Court finds no error, much less clear error, in the Report's recommendation of $59,361.75 in attorneys' fees and $209.94 in costs. As to the former recommended award, Judge Netburn applied a 10% across-the-board discount to account for work that would have "been required in the ordinary course of the litigation regardless of Plaintiff's noncompliance." (Report 18). Plaintiff argues that the 10% reduction is insufficient and should instead be 20% as it "more accurately reflects the acknowledged evidentiary uncertainty." (Pl. Obj. 4). But that assessment is untethered to any legal authority and is, as Defendants point out, "based on nothing more than Plaintiff's own opinion." (Def. Br. 12).

Plaintiff also takes issue with the hourly rates of two attorneys: (i) Ms. Mallory Benner, an associate who graduated from law school in 2019, whose work Judge Netburn assessed at $325 per hour for 314.10 hours of work, and (ii) Ms. Bailey Boesch, another attorney whose work was assessed at $200 per hour for 10.70 hours of work. (Report 14-16). Plaintiff argues that Defendants submitted insufficient information regarding both attorneys' biographies and work experience to support their attorneys' fees, and that the award should be reduced to reflect that uncertainty. (Pl. Obj. 4-5). But Judge Netburn had already reduced Ms. Boesch's fee from $325 to $200 per hour to account for that uncertainty. (Report 16). And those rates are comparable to rates paid for

other junior and midlevel associates in this District. *See StoneX Group, Inc.* v. *Shipman*, No. 23 Civ. 613 (JGK) (VF), 2025 WL 1212165, at *4 (S.D.N.Y. Apr. 25, 2025) ("Decisions from the past three years reflect a range of reasonable hourly rates for midlevel and junior associates between $225 and $325." (internal quotation marks omitted) (quoting *Z.H.* v. *N.Y.C. Dep't of Educ.*, No. 23 Civ. 3081 (ER), 2024 WL 3385690, at *4 (S.D.N.Y. Jul. 12, 2024))).

As for the $209.94 in transportation costs, the Court again finds no error in the Report's recommendation. Plaintiff argues that the transportation costs should not be adopted without supporting documentation. (Pl. Obj. 5). Defendants submitted ample documentation substantiating their costs. (*See* Def. Br. 12-13 (citing documentation at Dkt. #114, 116)).

**d. Incorporation of $10,000 in Unpaid Sanctions**

Finally, the Report recommended that the Court enter Plaintiff's unpaid $10,000 sanctions obligation into the final judgment. This Court previously imposed that sanction under Rule 37 and the Court's inherent authority and, as of the date of the Report, that sanction has gone unpaid. (Dkt. #95; Report 19). Plaintiff argues that incorporation would impermissibly amplify the $10,000 sanction, because it would subject the sanction to post-judgment interest. (Pl. Obj. 5). Nevertheless, he points to no authority stating that the Court cannot incorporate that sanction into the final judgment. And, as the Report and Defendants correctly note, courts in this District have authorized this practice. *See Joint Stock Co. Channel One Russia Worldwide* v. *Infomir LLC*, No. 16 Civ. 1318 (GBD) (BCM), 2019 WL 8955234, at *17 n.14 (S.D.N.Y.

Oct. 25, 2019) ("Entering a judgment based on (or incorporating) accumulated but unpaid sanctions and fines is appropriate even where additional sanctions may become final thereafter."), *report and recommendation adopted*, 2020 WL 1467098 (S.D.N.Y. Mar. 26, 2020); *CE Int'l Res. Holdings LLC* v. *S.A. Minerals Ltd. P'ship*, No. 12 Civ. 8087 (CM), 2013 WL 324061, at *3 (S.D.N.Y. Jan. 24, 2013) (noting the court's power to "enter judgment ... from time to time for the accrued amounts of [the] fines").

**C. Further Sanctions Against Plaintiff May Be Warranted**

Finally, the Court takes notice of another potential ground for sanctionable conduct. The electronic filing system confirms that Plaintiff filed his objections on May 5, 2026. (*See* Def. Br. 7 n.1). *See Torres* v. *Ciele Partners L.P.*, No. 16 Civ. 8477 (KPF), 2017 WL 2773702, at *5 (S.D.N.Y. June 26, 2017) ("'[A] document filed electronically is deemed filed on the date and time stated on the Notice of Electronic Filing (NEF) from the Court.'" (quoting SDNY ECF Rules § 3.2)). Yet, on four separate occasions in his objections, Plaintiff represented that he filed his objections on April 23, 2026, the exact deadline to submit objections. (Pl. Obj. i, 6, 7, 8). Indeed, Plaintiff went so far as to file a "Certificate of Service," wherein he "hereby certif[ied] that on April 23, 2026, a true and correct copy of the ... Notice of Objections and Memorandum of Law was served upon all counsel of record via the Court's ECF system." (*Id.* at 8). At the bottom of the Certificate of Service, Plaintiff again dates the filing as April 23, 2026, next to his signature line.

Based on Plaintiff's misrepresentations regarding the filing date, the Court finds sufficient *prima facie* evidence of potentially sanctionable conduct. Were this a standalone offense, the Court may have been inclined to extend the benefit of the doubt to Plaintiff, or attribute the discrepancy to a scrivener's error. But Plaintiff has long since drained his reservoir of credibility with this Court.

Therefore, Plaintiff is ORDERED to show cause in writing, on or before **December 18, 2026**, explaining why the Court should not impose further sanctions against Plaintiff for filing a backdated certification of service with this Court. Plaintiff shall also submit a declaration containing the following information: (i) the date and approximate time when he began drafting his objections to the Report; (ii) the date and approximate time when he filed his objections on ECF; and (iii) confirmation of when he served his objections to Defendants, if he did so outside of the ECF system. Plaintiff shall provide any supporting documentation in his possession (*e.g.*, timestamps or meta-data contained in Microsoft Word or Google Docs, or email confirmation from ECF). Plaintiff is warned that failure to respond may support an adverse inference against Plaintiff.

**CONCLUSION**

The Court extends its appreciation to Judge Netburn for her thoughtful and well-reasoned Report. For the foregoing reasons, the Court ADOPTS the Report in full and awards Defendants: (i) $862,500 for the cost of restoring Clearview's reputation, (ii) $565,000 for the loss of shareholder investments,

(iii) $59,361.75 for attorneys' fees and costs, and (iv) $209.94 in costs. Additionally, Plaintiff's unpaid $10,000 sanctions obligation shall be incorporated into the final judgment. The Clerk of Court is directed to enter judgment in this amount. In addition, the Court ORDERS Plaintiff to show cause in writing as detailed above.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: November 23, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/9/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

**CHARLES JOHNSON,**

**Counter-Claim Defendant,**

**-against-**

**CLEARVIEW AI, INC., et al.,**

**Counter-Claim Plaintiffs.**

---------------------------------------------------------------X

**23-CV-2441 (KPF)(SN)**

**REPORT & RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE KATHERINE POLK FAILLA:**

Plaintiff/Counterclaim Defendant Charles Johnson ("Plaintiff") filed a breach of contract case against Defendants/Counterclaim Plaintiffs Clearview AI, Inc., Hoan Ton-That, and Richard Schwartz (collectively "Clearview" or "Defendants"). His claim concerned the parties' Wind-Down Agreement, pursuant to which the assets and shares of a facial recognition technology company co-founded by Plaintiff, Ton-That, and Schwartz would be transferred to Clearview AI. Defendants answered the complaint and asserted a counterclaim for breach of contract. Years into the litigation, Plaintiff voluntarily dismissed with prejudice his claim against Defendants, leaving only the counterclaim.

What followed was a series of conferences to address Plaintiff's refusal to participate in discovery, his alleged destruction of discoverable materials, and Plaintiff's publications of improper statements concerning the litigation, the Wind-Down Agreement, and the Defendants. Plaintiff's extreme misconduct ultimately resulted in the Court striking his answer to the counterclaim, entering a default and referring this matter to me for an inquest on damages.

Plaintiff has been steadfast in his refusal to participate in this action (that he initiated), stating openly to the Court that he did not intend to comply with any Court-ordered discovery or sanctions obligations. Thus, Defendants seek damages based on their best estimate of the harm they have incurred. Defendants request that the Court order Plaintiff to pay $17,077,500 in damages for their breach of contract claim, $78,945.63 for attorney's fees, and $10,000 for unpaid sanction payments previously ordered by the Court. See ECF No. 114 at 31.

Because Defendants have established entitlement to some of the damages and fees they seek, I recommend awarding Defendants $1,427,500 in damages, $59,361.75 in attorney's fees, $209.94 in costs, and incorporating the previously imposed $10,000 sanctions obligation into the final judgment.

## BACKGROUND

### I. Factual Background

Clearview is a startup company founded in 2018 that provides a facial-recognition search engine. See Counterclaim, ECF No. 50 ¶¶ 10–11. Clearview AI collects images that are publicly available online and applies a facial-recognition algorithm that enables it to assist clients in identifying individuals by comparing facial images. Id. ¶ 11.

Plaintiff previously co-owned a facial-recognition company called SmartCheckr, LLC. Id. ¶ 21. In November 2018, Plaintiff and Defendants entered into a Wind-Down Agreement (the "Agreement") that dissolved and wound up the affairs of SmartCheckr. The Agreement further provided that Plaintiff would receive sales commissions equal to 10% of the gross revenue received by Clearview for sales of the company's software or services originating from leads provided by Plaintiff. Id. ¶ 18.

As part of the Agreement, Ton-That, Schwartz, and Plaintiff agreed to abide by certain restrictive covenants. Id. ¶ 22. Specifically, they agreed to the following restrictive covenant:

> [A]t no time during the Restricted Period shall the Individuals or affiliates of the Individuals (including, in the case of Johnson, the Transferee) make, cause or assist any other person to make any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents, or employees.

See ECF No. 25-1 at 3. Plaintiff also agreed to not publicly disclose the existence of the Agreement, his indirect ownership of Shares, or prior services to Clearview AI. The Agreement defines the "Restricted Period" as the period during which the signatories are stockholders of Clearview and for two years thereafter. As relevant here, the Restricted Period extended from November 28, 2018, to May 21, 2023. Counterclaim, ¶ 30.

During the Restricted Period, Plaintiff allegedly harassed Defendants and published false statements critical of the reputation and character of Clearview and its executives. Id. ¶ 31. According to the Counterclaim, Plaintiff made statements to the New York Times regarding the Agreement and posted disparaging remarks about Defendants on public websites, including X.com and various blogs. Id. ¶¶ 39-41.

## II. Procedural Background

As relevant here, discovery in this case has been excessively impeded by Plaintiff, and the Court has issued numerous orders and held numerous conferences to compel Plaintiff to comply with his discovery obligations and refrain from inappropriate extra-judicial conduct. See, e.g., ECF Nos. 22, 39, 68, & 80. On April 3, 2025, the Court entered an order sanctioning Plaintiff $7,000 for two posts on his Substack.com account in contravention of the Court's orders. ECF No. 84. The Court warned Plaintiff that future violations could result in more severe sanctions, including striking his answer and entry of a default judgment. Three months later, the

Court was compelled to follow through with its warning. The Court sanctioned Plaintiff by imposing a $10,000 fine, striking his answer to Defendants' counterclaim, and directing the Clerk of Court to enter default against him. ECF No. 95. The Court made several findings regarding Plaintiff's conduct during the litigation, including that Plaintiff had made "false, racist and inflammatory postings about Defendants, defense counsel, and this case on social media." ECF No. 95 at 3. The Court further found that Plaintiff repeatedly failed to comply with his discovery obligations, resulting in additional sanctions. Id. at 5–6. The Court then referred the matter to me for an inquest on damages.

Undeterred, Plaintiff continued his obstructionist conduct before this Court. Plaintiff refused to comply with discovery obligations, including by producing discoverable materials and appearing for a deposition, and would not satisfy the outstanding $10,000 sanction. At one point, Plaintiff's former counsel advised the Court that Plaintiff's response to the Court's order was: "Oh okay. Not doing that. I gave it all away. I do not have it. Will not produce and don't have it." See ECF No. 104. During a subsequent in-person conference, Plaintiff stated on the record that he had no intention of complying with the Court's order and admitted that he had deleted various discoverable documents. ECF No. 111.

On September 8, 2025, the Court issued a final order directing Plaintiff to comply with his discovery obligations or it would permit Defendants to seek an adverse inference. Plaintiff did not comply with the September 8 Order, and he has not opposed Defendants' Proposed Findings of Fact and Conclusions of Law.

## DISCUSSION

### I. Legal Standard

The Court of Appeals set forth the procedural rules applicable to the entry of a default judgment in City of New York v. Mickalis Pawn Shop, LLC:

> "Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation." Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004). Rule 55 provides a "two-step process" for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment. New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005). The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff. . . . The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c).

645 F.3d 114, 128 (2d Cir. 2011).

In an inquest for damages where the claimant has sufficiently pleaded a claim on which relief can be granted, the only remaining issue is to determine the amount of damages owed. See Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (citing Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)). The plaintiff must provide adequate support for the requested relief. Id.; see also Malletier v. Carducci Leather Fashions, Inc., 648 F. Supp. 2d. 501, 503 (S.D.N.Y. 2009) ("A plaintiff seeking to recover damages against a defaulting defendant must prove its claim through the submission of evidence.") (cleaned up). A court may determine the amount a plaintiff is entitled to recover without a hearing, so long as: (1) the court determines the proper rule for calculating damages, and (2) the evidence submitted by the plaintiff establishes "with reasonable certainty" the basis for the damages. Id.

"[A] defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint." Mickalis Pawn Shop, LLC, 645 F.3d at 137 (internal quotation marks

omitted). In light of Plaintiff's default, the Court accepts as true Defendants' factual allegations, except those relating to damages. See, e.g., Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993); In re Indus. Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000).

## II. Liability

Courts evaluating damages in a default context first look to the complaint to determine whether the plaintiff has established a *prima facie* case for recovery. See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012). "Without a response from Defendant, [a] Court must first determine whether, with respect to each element of his claims, Plaintiff's allegations in the Complaint are sufficiently 'well pleaded' to establish Defendant's liability." Belizaire v. RAV Investigative & Sec. Servs. Ltd., 61 F. Supp. 3d 336, 346 (S.D.N.Y. 2014) (citing Mickalis Pawn Shop, LLC, 645 F.3d at 137). "Only if the allegations are sufficient to state a claim, should the Court then proceed to determine the appropriate amount of damages to be awarded." Id.

"Under New York law, the essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." Innovative Biodefense, Inc. v. VSP Techs., Inc., 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) (internal quotation marks omitted).

The allegations in Defendants' Counterclaim, taken as true, establish Plaintiff's liability for breach of contract. Neither party disputes that the Wind-Down Agreement is a valid contract. Under the Agreement, Plaintiff agreed that during the Restricted Period he would not (1) make any statement to a third party that impugned, attacked, or otherwise criticized the reputation or

character of Clearview AI or its agents, or (2) disclose the existence of the Agreement to any third party. See ECF No. 25-1 at 3-4.

Plaintiff breached by repeatedly making disparaging remarks on social media, blog posts, and to the New York Times about Defendants and publicly disclosing the existence of the Agreement. See Declaration of Eric William Rose ("Rose Decl."), ECF No. 114-2 at 4-5. Under New York law, Defendants have established a *prima facie* case of breach of contract.

**III. Damages**

On an inquest for damages, the claimant bears the burden of proof and must introduce sufficient evidence to establish the amount of damages with reasonable certainty. See Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young, Inc., 109 F.3d 105, 111 (2d Cir. 1997); see also Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992) ("While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."). Establishing the appropriate amount of damages "involves two steps: (1) 'determining the proper rule for calculating damages on . . . a claim'; and (2) 'assessing plaintiff's evidence supporting the damages to be determined under this rule.'" Credit Lyonnais Sec. (USA), Inc., 183 F.3d at 155. Although Federal Rule of Civil Procedure 55 permits a court to conduct hearings to determine damages, a hearing is not mandatory. See Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012). The Defendants' submissions are a "sufficient basis from which to evaluate the fairness" of their request for damages and, therefore, a hearing is unnecessary. Fustok v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989).

A claimant in a breach of contract action is entitled to damages in the "amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995). Under New York law, a party seeking damages for breach of contract may recover consequential damages only to the extent such damages were caused by the breach, are capable of proof with reasonable certainty, and were within the contemplation of the parties at the time the contract was made. See Schonfeld v. Hilliard, 218 F.3d 165, 172 (2d Cir. 2000). Thus, where the damages sought are based on alleged lost business opportunities, the claimant must establish both the existence and amount of those damages with reasonable certainty; damages that are merely speculative, possible, or imaginary are not recoverable. Id.

Defendants seek to recover (1) $15,565,000 in damages for the loss of investor opportunities; and (2) $862,500 for the cost of restoring Clearview's reputation. Defendants further contend that Plaintiff's discovery misconduct warrants an adverse inference as to damages. The Court agrees that Plaintiff's failure to comply with discovery orders is relevant to the damages inquiry. But because any adverse inference may bear on the existence and scope of additional harmful communications without necessarily establishing the amount of any resulting damages, the Court first addresses each category of damages sought on the present record and then considers the extent to which an adverse inference alters that analysis.

The bulk of Defendants' requested damages concerns an alleged lost investment opportunity involving a venture capital firm referred to as "Venture Capital Fund X." Defendants described this Silicon Valley-based venture capital fund as managing a multi-billion dollar capital investment fund with over $10 billion in assets under management. Declaration of Richard Schwartz ("Schwartz Decl."), ECF No. 114-8, at ¶ 40. Defendants "communicated and

held meetings" with Venture Capital Fund X between 2019 and 2023 and "expected this process to lead to a round-leading investment" but "no investment ever materialized." Id. Later, Ton-That reported that a partner at Venture Capital Fund X stated: "There's 0% chance that we could invest given all the insane threats that Charles Johnson has made to the team members here." Id., ¶ 41.

Based on "market conditions" and "historical data," Defendants assert that a "typical round-leading investment in a Series C fundraising round from Venture [Capital] Fund X, or a similar venture investor, in 2022 and 2023, investing in a technology startup company comparable in maturity to Clearview, would have been approximately $20 million." Id., ¶¶ 44-45. Accordingly, Defendants allege a capital loss of $15 million, "discounting for fundraise round size uncertainty," because of Plaintiff's statements and disclosures. Id., ¶ 47.

Defendants have not established damages arising from the loss of Venture Capital Fund X's investment with the degree of certainty required to award damages. Although liability is deemed admitted upon default, damages must still be established with reasonable certainty. See Credit Lyonnais Sec. (USA), Inc., 183 F.3d at 155. Moreover, under New York law, damages for lost business opportunities as a result of reputational harm are generally not recoverable in breach of contract actions. See Karetsos v. Cheung, 670 F. Supp. 111, 115 (S.D.N.Y. 1987); MacArthur Constr. Corp. v. Coleman, 91 A.D.2d 906 (1st Dep't 1983). Courts permit recovery in this context only where the claimant demonstrates specific business opportunities lost as a result of the alleged reputational injury. See Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 55 (2d Cir. 2015).

Defendants have not established that Venture Capital Fund X was reasonably certain to invest in Clearview. Defendants provide no evidence describing the stage of negotiations

between Clearview and Venture Capital Fund X, whether the parties had agreed upon the terms of a potential investment, or whether the investment had progressed beyond preliminary discussions. Nor have Defendants submitted evidence demonstrating that Venture Capital Fund X had committed to investing a specific amount or that the proposed investment was likely to occur. In the absence of such evidence, the Court cannot determine with reasonable certainty that Clearview would have received the alleged investment, much less that the value of the investment was $15,000,000.

Defendants next seek $862,500 for the cost of restoring Clearview's reputation. In support, Defendants submit the declaration of Eric Rose, who opines that Plaintiff's statements caused reputational harm to Clearview and that a 12-month reputation-repair program would cost approximately $862,500. See Declaration of Eric William Rose ("Rose Decl."), ECF No. 114-2, at 3. Unlike the Venture Capital Fund X theory, this damages request is not premised on a hypothetical future investment that may or may not have occurred. Rather, it is tied to the concrete costs Defendants contend they must incur to mitigate and remediate the reputational harm caused by Plaintiff's admitted breaches.

Defendants have adequately established this category of damages. Rose identifies the statements he reviewed, explains why those statements would be particularly harmful to a company such as Clearview operating in a sensitive and reputationally vulnerable industry, and sets forth the components of the proposed repair program and the basis for his cost estimate. Id. at 8-16; 28-30. The Court recognizes that New York law is generally reluctant to award damages for reputational injury in contract actions. But here, Defendants do not seek an abstract recovery for generalized injury to goodwill untethered to any measurable loss. Instead, they seek the concrete and reasonably estimated cost of addressing and remediating the reputational harm that

Plaintiff's breaches caused. Given the nature of the restrictive covenants at issue—which were plainly designed, at least in part, to prevent reputational injury to Clearview from Plaintiff's public disclosures and disparaging statements—the Court finds that the cost of repairing that injury is sufficiently tied to the breach and supported by the record to permit an award. Accordingly, the Court recommends awarding Defendants $862,500 representing the reasonably estimated cost of remedial measures necessary to repair the reputational harm caused by Plaintiff's breaches.

Defendants also seek $565,000 for the loss of shareholder investments. This request is based on evidence that, in January 2021, Plaintiff's former counsel communicated an unsolicited proposal to purchase Ton-That and Schwartz's shares in the company and represented that Plaintiff's effort was backed by several existing shareholders. Defendants contend that this communication demonstrates that Plaintiff had discussions with shareholders in which he disparaged Clearview and its leadership and that those communications impaired Clearview's ability to obtain additional investment from those shareholders.

This category of damages presents a closer question. Standing alone, the present record does not identify the shareholders at issue, establish the precise content of Plaintiff's communications with them, or demonstrate with certainty that any particular shareholder would have invested a specific amount in Clearview absent Plaintiff's conduct. However, unlike the Venture Capital Fund X theory, this claim is not based solely on a single potential investor's expression of interest. The record contains evidence that Plaintiff's buyback effort was represented to be supported by existing shareholders, which reasonably implies that Plaintiff communicated with those shareholders about Clearview and its management. See ECF No. 114-10. And critically, Plaintiff refused to produce discovery concerning those communications and

failed to appear for a deposition at which Defendants could have explored the nature and consequences of those discussions. See ECF No. 111.

Under these circumstances, the Court concludes that a limited adverse inference is appropriate. Under Rule 37, a court may draw an adverse inference where a party fails to comply with discovery obligations by failing to produce evidence that it has control over, and the missing evidence is relevant to the opposing party's claims or defenses. See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-cv-1318 (GBD)(BCM), 2018 WL 4760345, at *12 (S.D.N.Y. Sept. 28, 2018) (citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)). The record indicates that Plaintiff was in communication with existing shareholders concerning Clearview and its management yet failed to produce discovery concerning those communications, despite repeated court orders requiring him to do so. Plaintiff also admitted to destroying discoverable materials. Because those withheld or destroyed communications bear directly on whether Plaintiff disparaged Clearview to shareholders and thereby impaired Clearview's fundraising efforts, it is appropriate to infer that Plaintiff made disparaging statements to certain existing shareholders and that those statements were harmful to Clearview's ability to secure additional investment. That inference does not establish the full scope of any resulting damages, but it does support a conservative estimate that Clearview lost at least one shareholder investment opportunity as a result of Plaintiff's conduct.

Defendants do not ask the Court to extrapolate across a large universe of unidentified investors or to multiply the average investment size by some unspecified number of opportunities. Instead, they seek a single investment amount—$565,000—based on the historical average of investments in Clearview's prior funding rounds. Schwartz Decl., ¶ 15. In light of

Plaintiff's discovery misconduct, the evidence that Plaintiff solicited support from existing shareholders while disparaging Clearview, and the limited nature of the estimate sought, the Court concludes that this amount represents a reasonable approximation of damages based on the best evidence available. The Court therefore recommends awarding Defendants $565,000 for the loss of shareholder investments.

Finally, the Court turns to the extent to which Plaintiff's discovery misconduct warrants a broader adverse inference as to damages. The Court agrees that Plaintiff's repeated refusal to comply with discovery orders, failure to appear for a deposition, and admission that he destroyed discoverable documents support an adverse inference that Plaintiff made additional disparaging communications to investors, shareholders, and other third parties, and that those communications were harmful to Clearview. That inference reinforces the Court's conclusion that Plaintiff's misconduct caused reputational and fundraising harm broader than the documented record reflects. At the same time, the adverse inference does not relieve Defendants of their burden to prove damages with reasonable certainty. Thus, while the Court relies on that inference in concluding that Plaintiff's communications with shareholders caused at least some loss of investment opportunity, the Court declines to extend the inference so far as to conclude that Venture Capital Fund X was reasonably certain to invest $15,000,000 in Clearview or that Rose's reputational-damages estimate should be increased by some unspecified amount. In short, the adverse inference supports the existence and broader scope of harm, but it does not justify an award of speculative damages untethered to the record.

Accordingly, the Court recommends denying Defendants' request for $15,000,000 in damages arising from the alleged Venture Capital Fund X investment opportunity but awarding $862,500 for reputational harm and $565,000 for the loss of shareholder investments.

**IV. Attorney's Fees and Costs**

On July 2, 2025, the Court sanctioned Plaintiff by, in part, ordering him to pay "the reasonable expenses, including attorney's fees, caused by his failure to comply with the Court's discovery orders." See ECF No. 95 at 15. Courts determine the "presumptively reasonable fee" for an attorney's services by looking to "what a reasonable, paying client would be willing to pay," "who wishes to pay the least amount necessary to litigate the case effectively." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 184 (2d Cir. 2008). The "presumptively reasonable fee" is the product of a reasonable hourly rate and the reasonable number of hours required by the case. See Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).

Defendants request a total of $68,924.61 for 466.80 hours of attorney work. Attorneys Ronald A. Giller, Mallory Benner, and Bailey Boesch billed time for this case, along with law clerks Caroline Staff and Devon Williams. In addition, paralegal Carla Tankel billed time for this case. Mr. Giller requests an hourly rate of $375 for 124.10 hours of work. Ms. Benner requests an hourly rate of $325 for 314.10 hours of work. Ms. Boesch requests an hourly rate of $325 for 10.70 hours of work. Ms. Staff requests an hourly rate of $175 for 3.20 hours of work. Ms. Williams requests an hourly rate of $175 for 1.0 hours of work. Finally, Ms. Tankel requests an hourly rate of $175 for 1.10 hours of work. Defendants' time records also include entries for several other attorneys and law clerks who are not identified in defense counsel's declaration. In assessing the reasonableness of the requested fee award, the Court considers only time billed by the attorneys identified in that declaration and excludes time billed by all other individuals.

**A. Reasonable Rates**

In determining reasonable fees for a particular case, courts rely on reasonable hourly rates prevailing in the same district for similar services provided by attorneys with comparable skill and experience. See Arbor Hill, 522 F.3d at 184; Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., Inc., No. 13-cv-02548 (KMW)(JLC), 2014 WL 1303434, at *8 (S.D.N.Y. Apr. 1, 2014) ("It is the fee movant's burden to establish the prevailing market rate.").

Mr. Giller is a partner at defense counsel's firm and has practiced law for more than 25 years. His biography on the firm's website reflects substantial experience in commercial litigation and related matters. In light of that experience, as well as the default posture of this case and Plaintiff's repeated discovery noncompliance, the Court finds that an hourly rate of $375 for Mr. Giller's work is reasonable.

Defendants provide no information regarding the experience of Ms. Benner, Ms. Boesch, Ms. Staff, or Ms. Williams, including their years of practice, dates of admission, or experience in this area of law. "Where the fee applicant 'has not even provided the most basic information necessary to assess the reasonableness of rates: the years of experience of the particular attorneys and the type of experience they had,' courts generally reduce fee requests." Zero Carbon Holdings, LLC v. Aspiration Partners, Inc., No. 23-cv-5262 (LJL), 2024 WL 3409278, at *7 (S.D.N.Y. July 15, 2024) (citing Wells Fargo Tr. Co., N.A. v. Fast Colombia S.A.S., No. 23-cv-603 (PGG)(RWL), 2023 WL 8591953, at *7 (S.D.N.Y. Oct. 16, 2023)). According to defense counsel's firm website, Ms. Benner graduated from law school in 2019 and is admitted in New York and New Jersey, but it is unclear when she was admitted in those jurisdictions, how long she has been practicing, or the extent of her experience in this area of litigation. Given the default posture of this case and Ms. Benner's extensive work on this matter, the Court will award

her the requested hourly rate of $325. As for Ms. Boesch, the firm website does not even indicate when she graduated from law school, let alone provide information about her admissions or relevant litigation experience. Accordingly, the Court finds that a more modest hourly rate of $200 is reasonable in light of the absence of supporting information. See Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc., No. 17-cv-6851 (SHS), 2020 WL 5731953, at *2 (S.D.N.Y. Sept. 24, 2020) (finding an hourly rate of $160 reasonable for associates in a breach of contract case).

As for the law clerks, Ms. Staff and Ms. Williams, Defendants also fail to clarify whether these individuals are law school graduates not yet admitted to the bar or law students who have not yet graduated. See Zero Carbon Holdings, 2024 WL 3409278, at *8 (noting that the term "law clerk" is generally understood to refer to a law school graduate not yet admitted to the bar but has also been used to describe a law student who has not yet graduated). Moreover, the Court could not locate bio pages for these two individuals on defense counsel's firm website. Because law students are typically billed at a lower rate than law school graduates who have not yet been admitted to the bar, and because Defendants provide no evidence establishing whether Ms. Staff and Ms. Williams have graduated from law school, the Court will apply a rate consistent with that of a law student. Accordingly, the Court finds that an hourly rate of $115 is reasonable for the work performed by Ms. Staff and Ms. Williams. See Casmento v. Volmar Constr., Inc., No. 20-cv-944 (LJL), 2022 WL 17666390, at *4 (S.D.N.Y. Dec. 14, 2022).

With respect to the paralegal, Ms. Tankel, the Court likewise reduces her hourly rate to $120, which is consistent with rates awarded to paralegals in this District. See Hong v. Mommy's Jamaican Market Corp., No. 20-cv-9612 (LJL), 2024 WL 1242507, at *6 (S.D.N.Y. Mar. 21, 2024).

**B. Reasonable Hours**

When evaluating whether claimed hours are reasonable, "the district court should exclude excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." Quarantino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1997). An attorney who requests "court-ordered compensation . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).

In support of their application, Defendants' attorney has submitted a billing invoice with contemporaneous time records under seal. See ECF Nos. 114-4, 116. Defendants seek fees for work performed from July 2024 through October 2025. The Court's prior order, however, limited any fee award to those attorney's fees "caused by" Plaintiff's failure to comply with the Court's discovery orders. See ECF No. 95 at 15. The Court did not issue its first discovery-compliance order until January 16, 2025, when it directed Plaintiff to gather all potentially discoverable material for review by his then-counsel. See ECF No. 68. Thereafter, the Court repeatedly directed Plaintiff to comply with that order and ultimately sanctioned him, in part, for his continued noncompliance with his discovery obligations. See ECF Nos. 80, 84. Accordingly, consistent with the Court's prior order, Defendants are entitled to recover fees for work performed only on or after January 16, 2025, when Plaintiff began to violate the Court's discovery orders.[1] The Court will review 197 hours of time billed from January 17, 2025, through October 21, 2025. This breaks down to 136 hours for Ms. Benner, 56.7 hours for Mr. Giller, 3.2 hours for Ms. Staff, 1.0 hours for Ms. Williams, and 0.1 hours for Ms. Tankel.

---

[1] The consequence of this is that the Court will not award any fees for work performed by Ms. Boesch, whose work on this case occurred only in September 2024.

The Court has reviewed the contemporaneous time records submitted in support of the application and finds that, subject to the temporal limitation discussed above, the descriptions of the work performed are sufficiently detailed to allow the Court to assess the reasonableness of the hours expended. The Court further concludes that the time billed is not facially excessive, redundant, or otherwise unnecessary, particularly given Plaintiff's repeated failure to comply with discovery orders and the resulting need for motion practice and repeated court intervention.

Not all of the fees, however, incurred during the relevant period were caused by Plaintiff's discovery violations. Some of counsel's time entries reflect work that would have been required in the ordinary course of the litigation regardless of Plaintiff's noncompliance, and the billing records do not always permit those tasks to be segregated with precision. Accordingly, the Court exercises its discretion to apply a 10% across-the-board reduction to the lodestar amount to account for work not fairly attributable to Plaintiff's discovery misconduct.

Accordingly, I recommend that the Court award Defendants attorney's fees in the amount of $59,361.75

**C. Costs**

Defendants also seek $209.94 in costs, consisting of $78.18 for parking fees incurred in attending court conferences in this action and an additional $131.76 for travel and additional parking fees. "It is well-settled in this Circuit that 'attorney's fees awards' include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." Tlacoapa v. Carregal, 386 F. Supp. 2d 362, 374 (S.D.N.Y. 2005) (citation omitted). The Court finds Defendants' requests for reimbursement of travel-related expenses incurred in attending court hearings to be reasonable. Accordingly, I recommend awarding Defendants $209.94 in costs.

**V. Additional Sanctions**

Defendants also request an additional award of fees and costs as a further sanction for Plaintiff's continued noncompliance with the Court's discovery orders. See ECF No. 114 at 27-30. The Court declines to recommend any additional fee award. Rule 37 authorizes recovery of reasonable expenses caused by a party's discovery misconduct, and the Court has already determined the fee award appropriate to compensate Defendants for the costs caused by Plaintiff's noncompliance. In light of that award, together with the other consequences of Plaintiff's misconduct—including default and the damages awarded on the counterclaim—an additional fee award would be duplicative and is not warranted.

The Court will, however, recommend that Plaintiff's unpaid $10,000 sanctions obligation be incorporated into the final judgment. The record reflects that the Court previously imposed that sanction, and that Plaintiff has failed to satisfy it. Under these circumstances, incorporating the unpaid sanction into the judgment is an appropriate means of enforcing the Court's prior order and ensuring that Plaintiff does not evade a monetary sanction already imposed. See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-cv-1318 (GBD)(BCM), 2019 WL 8955234, at *17 (Oct. 25, 2019), report and recommendation adopted, 2020 WL 1467098 (S.D.N.Y. Mar. 26, 2020).

**CONCLUSION**

For the reasons set forth above, I recommend that the Court award Defendants the following relief:

(1) Damages on the counterclaim in the total amount of $1,427,500;

(2) Attorneys' fees in the amount of $59,361.75

(3) Costs in the amount of $209.94; and

(4) Incorporation of Plaintiff's previously imposed and unpaid $10,000 sanctions obligation into the final judgment.

SARAH NETBURN
United States Magistrate Judge

DATED: April 9, 2026
New York, New York

* * *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable Katherine Polk Failla if required by her Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Failla. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).